1

2

3

4

5

6

7

8

9

10

11

12 **UNITED STATES DISTRICT COURT**

13 **SOUTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15 CHRISTINE MYERS, Acting as guardian ad litem for L. Myers, a | CASE NO. 02cv1349-BEN |
| 16 minor, | **DECISION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 17              Plaintiff, | |
| 18        vs. | |
| 19 UNITED STATES OF AMERICA, | |
| 20              Defendant. | |

21 **INTRODUCTION**

22    Plaintiff CHRISTINE MYERS filed a First Amended Complaint against a

23 private contractor for the United States, IT/OHM, and the United States under the

24 Federal Tort Claims Act ("FTCA").  *See* 28 U.S.C. § 1346(b).[1]  Plaintiff reached a

25 _____

26    [1]Title 28 U.S.C. § 1346(b) states:

27    (b). . . the district courts shall have exclusive jurisdiction of civil actions
    on claims against the United States, for money damages . . . for injury or
28    loss of property, or personal injury or death caused by the negligent or
    wrongful act or omission of any employee of the Government while

1  settlement with the private contractor and it is no longer a party to this action. *See*

2  Order Filed Aug.12, 2005.

### The Claim

4       The United States Navy decided to clean up contaminated areas on a military

5  base known as Camp Pendleton.[2]  In carrying out work on the project (in what

6  became known as the Box Canyon landfill project, or Site 7, or "OU-3"), Plaintiff

7  claims that her minor daughter, L Myers, was negligently exposed to toxic levels of

8  the dangerous elemental metal *thallium*.  She claims that dirt was being brought to

9  the landfill adjacent to the Wire Mountain Housing Project on the base where the

10  Myers family lived.  She claims further that heavy metals migrated in wind-blown

11  dust to the yard where her daughter played and that her daughter was exposed to the

12  heavy metals, particularly thallium.  As a result of her exposure to thallium, Plaintiff

13  asserts that L suffers from neurological damage, gastrointestinal disorders, alopecia

14  (loss of hair), pain, psychological injuries, and severe emotional distress and now

15  seeks damages.  (First Amended Complaint ¶¶ 12 and 13.)

### The Evidence

17       The first phase of a bifurcated bench trial was held before this Court from

18  February 28, 2006 to March 10, 2006.  After this Court issued its findings of fact

19  and conclusions of law finding in favor of the Defendant, an appeal was filed.  The

20  Ninth Circuit Court of Appeals reversed.  *Myers v. United States*, 652 F.3d 1021

21  (9th Cir. 2011).  On remand, the second phase of the trial took place over 11 days

---

24      acting within the scope of his office or employment, under circumstances
where the United States, if a private person, would be liable to the
25  claimant in accordance with the law of the place where the act or omission
occurred.

26      [2] Camp Pendleton is a United States Marine Corps Base in San Diego County,
California. In 1989, the United States Environmental Protection Agency placed Camp
27  Pendleton on its National Priority List. Sites are listed on EPA's National Priority List
based on the relative risk or danger to the public health. *See* 42 U.S.C. § 9605(a)(8).
28  Placing Camp Pendleton on the National Priority List triggered intra-agency and intra-
governmental plans for clean up. *See* 42 U.S.C. § 9620(e).

1   from February 20, 2013 to March 8, 2013.[3]

2          During the first phase of the trial in 2006, 51 exhibits were admitted. After

3   the trial concluded, 311 exhibits were entered into evidence by stipulation,

4   including the 51 previously mentioned. Several of the exhibits were hundreds of

5   pages. Few were one or two pages. The overwhelming number of exhibits were of

6   technical or scientific content. Many were nearly illegible because of print quality,

7   size of print, or because they were handwritten.

8          Four months after the second phase of the trial in 2013, the parties jointly

9   moved 123 exhibits into evidence. One exhibit was 3,837 pages in length and filled

10  three banker's boxes (exhibit NR). Plaintiff's exhibits were presented in 23 3½"

11  three-ring binders. Defendant's exhibits were held in six 3½" three-ring binders, in

12  addition to the three boxes of exhibit NR. The Court was required to cull through

13  and remove from those binders the exhibits that were never admitted. The joint

14  exhibits from the first phase of trial together with Plaintiff's admitted exhibits from

15

16          [3] Plaintiff recently stated that the Myers family is "befuddled and perplexed"
    about how much time has passed without a final decision, explaining that plans for L's
17  future cannot be made without knowing what resources she will have. *See* Plaintiff's
    Request for Status Conference (filed Sept. 12, 2014), Dkt.#567 at 3.
18          After settling with IT/OHM for $1,500,000, a Special Needs Trust was set up for
    L and funded with $181,898.21. *See* Plaintiff's Biennial Account and Report of the
19  Trust (filed Sept. 11, 2013), Dkt.#563.
            In 2007, a $36,054 disbursement was made for a 2007 Hyundai Veracruz
20  automobile for L's benefit (L would have been approximately 11 years old).
            Yet, some medical care that has been recommended has *not* been obtained for
21  L. For example, L has not received recommended annual neuropsychological exams
    or monthly psychotherapy sessions because, as Plaintiff testified, "Tricare won't pay
22  for it." Trial Phase 2, Dkt.#543 at 122:4-18 (Testimony of Christine Myers). "Tricare"
    is shorthand for the health benefits program covering members of the U.S. military and
23  their families. As of Sept. 30, 2012, there remained in L's Special Needs Trust
    $115,672.08.
24          Meanwhile, Plaintiff has claimed that she cannot afford to provide L with needed
    educational assistance. *See* Appellant's Brief, *Myers v. U.S.A.*, Case No. 09-56092, at
25  67-68 (filed Nov. 12, 2009) ("Part of Plaintiff's claim for damages is based on the need
    for funds to provide L[ ] with educational assistance that her parents cannot afford.
26  Every additional day that passes is another missed opportunity to help with L[ ]'s
    education.").
27          The Court notes that Plaintiff is an emergency room nurse. L's father is a Master
    Sergeant in the United States Marine Corps. And although the facts are not critical to
28  this Court's decision, that L has not received the care recommended, does call into
    question whether Plaintiff really believes that such care is needed.

1  the second phase, required about two gigabytes of memory. *See* Statement of Scott

2  Allen, Esq., Status Conference (held Sept. 25, 2014).

3  Many of the exhibits from both phases of the trial were several hundred pages

4  in length. *E.g.*, Exh JA: 261 pgs. (medical records); Exh JH: 145 pgs. (ATSDR

5  Public Health Assessment); Exh KE/730: 117 pgs. (INCHEM: Environmental

6  Health Criteria 102 Thallium); Exh LT: 186 pgs. (Personality Assessment Inventory

7  - Adolescent); Exh MR/719: 163 pgs. (EPA Toxicological Review of Thallium and

8  Compounds); Exh NU: 134 pgs. (Dr. Renfroe medical records); Exh 189: 403 pgs.;

9  Exh 229: 229 pgs. (L[ ] Myers ESE Central File); Exh 452: 129 pgs. (Addendum);

10  Exh 611: 115 pgs. (WISC III); Exh 704: 114 pgs. (Toxicological Profile for

11  Thallium); Exh 775: 299 pgs. (Revised Final Toxicity of Thallium Sulfate); Exh

12  785: 599 pgs. (lab raw data); Exh 820: 314 pgs. (notes); Exh 835: 121 pgs. (school

13  records); Exh 836: 164 pgs. (school records); Exh 848: 221 pgs. (Deposition of

14  William A. Dunn); Exh 78: 290 pgs. (construction notes); Exh 85: 320 pgs. (NMS

15  Instrument Data); Exh 109: 572 pgs. (construction data); Exh 482: 381 pgs.

16  (military records); Exh 645: 162 pgs. (Metal Analysis Calibration); Exh 646: 217

17  pgs. (raw data); Exh A: 146 pgs. (Draft Final Remedial Design and Remedial

18  Action Work Plan); Exh AU: 192 pgs. (ROD); Exh AX: 138 pgs. (Remedial

19  Investigation and Feasibility Study); and Exh X: 290 pgs.

20  And as in the first trial phase, many from the second trial phase were near

21  illegible because of print quality, size of print, or again because they were

22  handwritten. *E.g.*, Exh JW: 42 pgs. (small typeface); Exh NC: 92 pgs. (poor print

23  quality medical records); Exh NQ: 31 pgs. (poor quality print and handwritten

24  pages); Exh 90: 92 pgs. (poor print quality medical records); Exh 219: 7 pgs. (Sgt.

25  Myers handwritten notes); Exh 654: 19 pgs. (Neuropsychology of Thallium

26  Poisoning)(small print); Exh 708: 15 pgs. (Brockhaus Study) (small, poor print

27  quality); Exh 710: 27 pgs. (Cavanagh Study) (small, poor print quality); Exh 736:

28  54 pgs. (Environmental Levels of Thallium) (small, poor print quality); Exh 753: 40

pgs. (Thallium Poisoning) (small, poor print quality); Exh 774: 55 pgs. (Toxicity of Thallium Sulfate) (small, poor print quality); and Exh 796: 52 pgs. (Protocols for Determination of Limits of Detection and Limits of Quantitation) (small print). Many of the exhibits included physician notes with handwriting that was difficult to read. And many were highly technical such as the 1996 World Health Organization Report on Thallium, the EPA 2009 Report on Thallium, the ATSDR,[4] the PPRTV,[5] the Sprague-Dawley Rat Study, and the Munsch Study, to list a few. This Court has reviewed every admitted exhibit, as well as the 1,740 page transcript from the first phase of trial and the 2,365 page transcript from the second phase of trial.

### *The Plaintiff's Burden*

In order for the Plaintiff to prevail, she must prove by a preponderance of the evidence: (1) that the Navy owed a duty; (2) that the Navy breached its duty; and (3) that the breach of the duty was the proximate and actual cause of her daughter's injuries. The first two elements, duty and breach of duty, have already been proven, according to the Court of Appeals. In order for her to prove proximate and actual causation, she must further demonstrate that her daughter was exposed to toxic quantities of thallium from the landfill operations. Once exposure to thallium is proven, Plaintiff "must . . . establish that the substance at issue was capable of causing the injury alleged (general causation), and that the substance caused, or was a substantial factor in causing, the specific plaintiff's injury (specific causation)." *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir. 2011).

Plaintiff must prove that: (1) the dirt being brought to the Box Canyon landfill contained a sufficient quantity of thallium to cause injury; (2) that the soil migrated to her back yard; (3) that her daughter ingested a sufficient quantity of thallium to cause the injuries that she claims; and (4) that she was, in fact, injured.

Competent expert testimony is required. "[C]ausation must be proven within

---

[4]"ATSDR" means Agency of Toxic Substances and Disease Registry.

[5]"PPRTV" means Provisional Peer-Reviewed Toxic Value.

1   a reasonable medical probability based upon competent expert testimony." *Avila*,

2   633 F.3d at 836 (quoting *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402

3   (1985)); *see also Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 503-04 (9th Cir.

4   1994) (expert testimony required to show that plaintiff suffered ailments as a result).

5                         *Scientific Evidence Gatekeeping*

6          The Court is aware of its obligation to act as a gatekeeper to keep out junk

7   science where it does not meet the reliability standard of *Daubert v. Merrell Dow*

8   *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. *See*

9   *Estate of Barabin v. Astenjohnson*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc)

10  (duty falls squarely upon the district court to act as gatekeeper).  It is also aware of

11  its broad latitude and flexibility in fashioning its inquiry into the relevance and

12  reliability of scientific evidence. *Id.*

13         This entire case is based on scientific evidence.  Almost every witness had an

14  expert opinion to offer.  There were toxicologists, analytical chemists, industrial

15  hygienists, environmental scientists, neuropsychologists, educators, family practice

16  physicians, and physicians with specialities and sub-specialities.  These witnesses

17  were permitted to testify because, "[t]he relevancy bar is low," and Rule 702 is to be

18  applied with a liberal thrust favoring admission. *Messick v. Novartis Pharm. Corp.*,

19  747 F.3d 1193, 1196 (9th Cir. 2014).  This is all the more true in bench trial.

20         Even so, while the Court may have found opinions and evidence admissible,

21  in some cases, the evidence has been given very little weight or no weight at all.

22  This is the fact finder's role. *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)

23  (though opinion of doctor is admitted, jury may reject the opinion); *see also, e.g.,*

24  *United States v. Vallejo*, 237 F.3d 1008, 1021 (9th Cir. 2001) (admissibility of

25  expert opinion different than weight to be accorded).  "Challenges that go to the

26  weight of the evidence are within the province of a fact finder . . . ." *City of*

27  *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  So, while

28  questionable expert testimony was admitted, it has now been weighed in light of all

1    of the evidence. *Id.* (quoting *Daubert*, 509 U.S. at 564) ("Shaky but admissible
2    evidence is to be attacked by cross examination, contrary evidence, and attention to
3    the burden of proof, not exclusion.").

### *Weighing Two Views*

5    This case is about two contrasting views on what happened to Plaintiff's
6    daughter while living with her parents at Camp Pendleton. One view is that L's hair
7    fell out because she was poisoned by thallium from dust blown off the nearby
8    landfill. That thallium was the culprit is proven, in this view, by a lab test that
9    showed "ten times" more than a normal adult in her body. And in this view, her
10   physical and intellectual functioning has been degraded ever since.

11   The contrasting view is one of genetics and coincidence. In this view, her
12   hair fell out because of a well-known genetic condition that runs in families and her
13   physical and intellectual functioning is simply within the wide range of "normal."
14   That her alopecia is genetic is proven, in this view, by the fact her sister also has
15   alopecia, and all of the soil, environmental, and biological testing proves that there
16   existed such a small amount of thallium anywhere that it would be harmless. That
17   there was thallium in the nearby landfill, in this view, is merely coincidence. And
18   in this view, that her intellectual functioning is nothing more than genetics at work,
19   is proven by the fact that her I.Q. is very much like her mother's when she was a
20   child.

21   To decide whether Plaintiff has proven her view of what happened to L,
22   scientific evidence is necessary. Physicians evaluated physical symptoms.
23   Neuropsychologists evaluated intellectual functioning. Environmental scientists
24   explained environmental and biological testing. Industrial hygienists explained
25   what hazards the landfill work posed to humans. Analytical chemists opined about
26   how to measure thallium in urine. And finally, toxicologists attempted to explain
27   whether and to what extent thallium may have injured L.

28   In this case, the science of toxicology is all the more important because the

accused "toxin" is thallium.  It is an element that is toxic at higher doses but relatively harmless at a very low dose.  Therefore, the toxicologist is necessary to describe the relationship between dose and response so that the fact finder may determine causation.  B. Black & P. Lee, *Expert Evidence* (West 1997), Ch. 4(I), A Practitioner's Guide to Toxicology, at 122 n.11 ("Aspirin is a relatively safe drug at recommended doses, but it is fatal at a dose of about 0.2-0.5 g/kg.  Metals such as iron, copper, and magnesium are dietary essentials, but are toxic at high levels.  To say that a compound is 'toxic' or 'nontoxic' is meaningless until qualified by a dose factor.") (citations omitted).  In evaluating the toxicology opinions in this case, the Court understands that a toxicologist should be able to demonstrate an understanding of the discipline of toxicology and disease processes.  Federal Judicial Center, *Reference Manual on Scientific Evidence* 3d., at 676.  The following caution from the *Reference Manual* applies directly to the toxicological opinions of Plaintiff's expert, Dr. Barry Gustin, M.D.,

> A physician without particular training or expertise in toxicology is unlikely to have sufficient background to evaluate the strengths and weaknesses of toxicological research. . . most physicians have little training in chemical toxicology and lack an understanding of exposure assessment and dose-response relationships.

*Id.*  As noted later in this opinion, Dr. Gustin is an emergency room physician of many years, but without particular expertise in toxicology.

Also, in assessing the expert witness' opinions, a court looks to see whether the opinions given are newly made or whether they grew naturally out of research conducted outside of the litigation.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (after remand) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998)

(expert's development of opinion expressly for purposes of testifying is a significant consideration in evaluating opinion). This came into play while evaluating the analytical chemistry opinions of Plaintiff's expert, Ron Briggs, PhD., who had done little prior research and had little actual experience, as discussed *infra*.

Bias may be evident, according to legal authorities, where the expert forms an opinion without peer-reviewed scientific support or before examining sufficient data. *Expert Evidence*, Ch. 4(IV)(B) at 147 ("A toxicologist who is willing to provide an opinion before performing the necessary validating tests could properly be viewed by a trial court 'as lacking the objectivity that is the hallmark of the scientific method.'"). This was a consideration, for example, with the opinions expressed by the environmental scientist testifying for Plaintiff, Jon Chorover, PhD. As is noted below, he arrived at his main expert opinions during a single full day spent on university meetings and teaching.

Finally, the Court is mindful that, "[f]or scientific evidence to be admissible, the proponent must show the assertion is 'derived by a scientific method,'" and "[o]pinion based on 'unsubstantiated and undocumented information is the antithesis of scientifically reliable expert opinion.'" *City of Pomona*, 750 F.3d at 1044 (quoting *Cabrera* , 134 F.3d at 1423). This was an issue present throughout the trial. "The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *Id.* Methods and procedures must be followed and undisciplined speculation is not science. *Daubert*, 509 U.S. at 589-90. ("The subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.").

### Deciding Causation is Fact Specific

Deciding proximate and actual causation has required this Court to consider

02cv1349-BEN

and evaluate all of the above – including testimony and exhibits from the first trial. "Forseeability in evaluating negligence and causation requires a 'more focused, fact-specific' inquiry that takes into account a particular plaintiff's injuries and the particular defendant's conduct." *Myers*, 652 F.3d at 1034-35 (*quoting Laabs v. S. Cal. Edison Co.*, 175 Cal. App. 4th 1260, 1273 (2009)). Questions bearing on negligence and proximate causation are fact-specific. *Id.*

This Court has looked at every page of the hundreds of exhibits and considered the testimony of every witness. As to the exhibits, although this Court acknowledges a considerable amount of duplication, this Court assumed that these exhibits were not being submitted simply for the purpose of decimating a small forest. Therefore, even if there were duplicates, the Court examined each exhibit in order to verify that there was nothing new or different for this Court to glean. Many of these exhibits, it is worth noting, were admitted without context and sometimes were an agglomeration of multiple, unrelated exhibits. Because of the voluminous evidence, this Court cannot and will not note or discuss many aspects of the evidence. The fact that some evidence is not noted or not mentioned should not be construed as an oversight. Furthermore, much of the evidence presented was exaggerated, contradicted, or simply not believable.

### *Other Preliminary Notes*

As a preliminary matter, the Court notes that it is familiar with the admonition against allowing sympathy to enter into its decision. See Ninth Circuit Model Jury Instruction 1.1. The Court is also familiar with Ninth Circuit Model Jury Instruction 1.7, which cautions that argument and questions by lawyers are not evidence. And finally, the Court is familiar with how a trier of fact should go about evaluating the testimony of a witness. Ninth Circuit Jury Instruction 1.11. Although these instructions are designed to guide a jury, they are no less applicable to a trial without a jury.

The Court also notes that it may have previously decided issues at motions to

dismiss, summary judgment, or on *Daubert* motions.  Motions are generally decided based on different standards and the burden may lie with a different party than at trial.  For example, motions to dismiss, where facts are to be construed in a light most favorable to the non-moving party and the post-*Iqbal* and *Twombly standard* require only plausibility.  Furthermore, such motions are almost always decided based on declarations which do not allow the trier of fact to observe demeanor, hear inflection, or allow for cross-examination, which as Professor Wigmore once noted is "the greatest legal engine ever invented for the discovery of truth."  5 J. Wigmore, *Evidence* § 1367, p. 32 (J. Chadbourn rev. 1974).

The parties filed proposed findings of fact and conclusions of law.  Except to the extent that they may conflict with this Court's expressed findings below, the Court adopts and incorporates by reference the Defendant's findings of fact and conclusions of law.  Pursuant to Federal Rule of Civil Procedure 52(a)(2), this Court now makes the following additional findings of fact and conclusions of law.  Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

### *Everyday Thallium*

Without a doubt, thallium is a dangerous substance.  But thallium is a naturally occurring substance distributed widely throughout the earth's crust.  Thallium is unlike artificially created dangerous chemicals or substances, like gasoline or anthrax powder, that have no proper place to be loose in the environment without human negligence.  According to the U.S. Environmental Protection Agency, the natural concentration of thallium in the soil around Camp Pendleton is 1.4 milligrams (mg) per kilogram (kg).  Though unaware, humans daily ingest thallium.  It is estimated that the average adult generally consumes over 5.0 micrograms (*ug*)/kg per day, mostly from foodstuffs.  How much thallium the average person has in his or her body at any one time varies by location and even by year.

02cv1349-BEN

Thallium is generally found to have two naturally occurring isotopes, 203 and 205. Other isotopes also exist, but these have a very short half-life of days, with the exception of isotope 204. Isotope 204 has a half-life of 3.78 years. Isotopes other than 203 and 205 are not naturally occurring.

### Common Uses

Thallium has been used as a depilatory causing a rapid loss of hair. It has been used to cure syphilis and tuberculosis. It has been used as a rodenticide. These uses have generally been discontinued in the United States. It is also used in the manufacturing of costume jewelry, glass and optics, thermometers, green fireworks and photovoltaic cells. It is also used in the medical field. It is estimated that 70% of thallium used in the U.S. is in electronics.[6]

### Normal Thallium Levels in Humans

Everyone, however, has thallium in their system. Laboratories will generally not report a urine level less than 5.0 ug/L.[7] Likewise, occupational exposure resulting in an urine level of less than 50.0 ug/L is not deemed reportable.

According to the World Health Organization, urine concentrations of less than 5.0 ug/L are not believed to have any adverse health effects. Urine concentrations of more than 5.0 ug/L, up to 500 ug/L, may or may not have an effect on health. Concentrations of more than 500 ug/L generally have some toxic effect.

### Why a Landfill Near Homes and a School?

With these general comments in mind, it is not unreasonable to ask: Why would they move dirt containing toxic substances like thallium to a landfill adjacent

---

[6] The Court notes that L's father, at the time that L began to lose her hair, was a Marine Corps helicopter electronics instructor at Camp Pendleton.

[7] Thallium in urine is often measured in micrograms per liter, which may be abbreviated as mcg/L or ug/L. Particulates in dust are often measured in milligrams or micrograms per cubic meter of air, which may be abbreviated as mg/m³ or mcg/m³ or ug/m³.
    Quantities cited in this opinion may refer to units measured in milligrams or units measured in micrograms, since the witnesses and trial exhibits vary in usage and forms of abbreviation.

to an elementary school and family housing area?  The answer is found in the
testimony of several witnesses, including Cheryl Lauth and Dr. Daniel Stralka of the
EPA, Fred Mlakar, a Certified Industrial Hygienist (CIH) employed by IT/OHM,
and Walter J. Shields, PhD, an expert in environmental investigation and
remediation (whose opinions are relevant and reliable), the Federal Facility
Agreement Under CERCLA Section 120 (FFA), and the Record of Decision (ROD).
These will be addressed in greater detail below.

### *Not a Knee-Jerk Decision*

The evidence clearly demonstrates the decision to relocate the dirt to the Box
Canyon landfill was not some careless, knee jerk decision, made with disregard for
the well-being of families and children in the adjacent housing complex and
elementary school.  It was made seriously and deliberately by many individuals who
are professionals in the health and environmental disciplines, and only after much
investigation of the risks involved and the possible alternatives.  That those of us in
the legal profession may find it curious, does not mean the decision was incautious.
Surely, individuals outside of the legal profession have shaken their heads in
bewilderment when we issued a proclamation, ordered or enjoined some action to
be taken, or exercised our discretion in the myriad of ways that we are required to
do by our office, profession, or training.

### *A Joint Decision*

The decision to use the Box Canyon landfill was not made by the Navy.  In
1989, the EPA placed Camp Pendleton on its National Priority List.  The Navy
collaborated with other government agencies in the planning and oversight of the
soil remediation work to be carried out at Box Canyon.  In 1990, the Department of
the Navy formulated a plan with input and approval from the EPA, the California
Department of Toxic Substances Control (DTSC), and the California Regional
Water Quality Control Board  (RWQCB).  Remediation investigations were
conducted of the possible hazards.  The data was gathered and analyzed.  Risk

1    assessments were made by the regulatory agencies and a comprehensive analysis
2    undertaken. Cheryl Lauth, an EPA project manager with many years of experience,
3    looked at the results of the investigations. So did the California regulatory
4    agencies. A decision was made to move contaminated material to the Box Canyon
5    landfill (also known as Site 7).

6         First, and foremost, the Court notes that the EPA is not an agency known to
7    act irresponsibly or to take its obligation to protect human health and the
8    environment lightly. In fact, this Court would suspect that many might argue the
9    contrary – that it is over-zealous in its enforcement and tends to over-regulate.
10   Even Plaintiff's CIH, Mr. Roman Worobel, admitted that in his experience the EPA
11   takes its obligations seriously. The DTSC and the RWQCB also take their
12   responsibility to protect the public from toxic substances seriously.

13                    ***The Federal Facility Agreement (FFA)***

14        The result was the FFA. Exh AL. The purpose of the FFA was to ensure that
15   the soil contamination was thoroughly investigated and remediated with the goal of
16   protecting the public health and the natural environment. The FFA also established
17   a framework for sorting out the roles and responsibilities of the national, state, and
18   local government entities.

19        Under the FFA, the EPA, the DTSC and the RWQCB held wide-ranging
20   oversight authority. As a result of the FFA, sites on Camp Pendleton were
21   identified as worthy of either remediation or investigation. One site, Box Canyon,
22   had been the site of quarry operations from 1946 to 1970. From 1974 to 1984, Box
23   Canyon became a landfill for the disposal of solid waste. Box Canyon, or Site 7, is
24   not a small parcel of land. It is a 28-acre parcel that slopes steeply towards the
25   ocean.

26        Per the FFA and the ROD, it was decided that the highest priority sites at
27   Camp Pendleton should be excavated, treated, and then placed in the Box Canyon
28   landfill for consolidation and covering. The four FFA entities agreed that the Box

Canyon plan would not create unacceptable risks to humans, even though it was not far from a military housing complex and an elementary school. Initial work began in 1996 as material was moved to Box Canyon. That work was completed in 1997.

### The Record of Decision (ROD)

In 1998, the four FFA agencies decided to remediate five additional Camp Pendleton environmental sites. The decision was memorialized in a Record of Decision, Operable Unit 3 Final ("ROD").[8] Exhs 59 & BD. Twenty-eight sites were prioritized and assigned to groups based on the potential health hazards. Sites ranked in "Group A" had the highest risk to human health and "Group D" sites the lowest. Site 7, itself, was a "Group B" site. The soil to be brought to site 7 came from sites in lower hazard groups, "Group C" and "Group D." *Id.* at ¶1.1. These are the sites at the center of this case.

### The Five Clean-Up Sites

According to the ROD, Cal/EPA, RWQCB, and DTSC approved the plan to clean up only sites 1A, 1D, 1E, 1F, and 2A by moving soil from these sites to the Box Canyon landfill.[9] *Id.* at ¶ 2.4.4.3.1. *All five of these sites were lower level risk sites.* Sites 1A and 1F were assigned to the least hazardous "Group D." *Id.* at ¶1.1. Sites 1D, 1E, and 2A were assigned to hazard "Group C." *Id.*

The plan called for using the soil from sites 1A, 1D, 1E, 1F, and 2A, along with stockpiles of other clean fill brought from completely uncontaminated sites, to cap the dirt previously relocated to site 7 in 1996/1997. At the end of the remediation project, an impenetrable material would be installed over the top layer of clean fill. Afterwards, site 7 would be monitored every five years to insure that there was no migration of any contaminants off of the site.

---

[8] The ROD looked at a total of 28 sites on the Camp Pendleton military base that potentially needed remediation. These were designated as sites 1A through 1I, 2A through 2G, 7, 10, etc.

[9] It was deemed that no action was necessary for the protection of human or ecological health for all of the other investigated sites. *Id.* at ¶1.6.

Cheryl Lauth performed a risk assessment of the various possible contaminants. Those contaminants for sites 1A, 1B, 1E, 1F, and 2A were mostly heavy metals. They included arsenic, copper, manganese, barium, thallium and lead. These were found in various frequencies and concentrations throughout the various sites. Although thallium was found at two of the sites, the remediation program was not undertaken because of a concern for thallium. A determination was made with regards to thallium that the concentrations of 5.4 mg/kg for the surface soil presented a low residential risk. At those concentrations, a person would live for 30 years gardening, playing, and doing all of the activities human residents are likely to do without experiencing any adverse health effects.

But Ms. Lauth was not the only person to perform a risk assessment. Dr. Stralka, a PhD with many years of experience in the Superfund program, whose specialty was risk assessment, also weighed in on the decision. The Court heard from Ms. Lauth and Dr. Stralka and found them both to be credible. In addition to the EPA, as previously stated, the RWQCB and the DTSC were also actively involved in the risk assessment. A list of contaminants of concern and contaminants of possible concern was compiled, the risk assessed, the opportunity for public comment was given, and various alternatives for remediation were considered. Then public hearings were held and notice given to nearby residents. Eventually, the ROD was approved. After the ROD was approved a Remedial Work Action Plan was signed and the plan effectuated. As the Court of Appeals noted, paragraph 2.5.8.1 of the ROD required a site-specific health and safety plan to address potential risks to workers and nearby receptors. *Myers*, 652 F.3d at 962. The Defendant hired IT/OHM to do the remediation work. This Court notes that any party to the FFA could stop work at any time if it believed that the health and safety of persons or the environment was being threatened.

### *Thallium Not the Major Contaminant of Concern*

The phase 1 and phase 2 investigations of all the sites showed that thallium

1  was not a major threat.  That its levels, where it was found, were unacceptable is
2  true, but so were the levels of many other heavy metals, including lead.  This Court
3  previously found, although the Ninth Circuit disagreed,[10] that lead was the major
4  concern.  No witness ever testified that thallium was the contaminant of greatest
5  concern.  Every witness involved in the investigation and remediation testified that
6  lead was the contaminant of greatest concern.

7     In disagreeing with this Court, the Ninth Circuit focused on two sentences
8  from the ROD.  The first sentence referenced the primary contaminants of site 1A –
9  one of the four sites to be remediated.  That sentence read as follows: "[t]he primary
10  contributors to the HI [Hazard Index] are arsenic, copper, and thallium."  Exhibit
11  BD, ROD at p. 2-20.  However, lead was analyzed separately for some reason.
12  Thus, although the language quoted from the ROD was accurate, if one turns the
13  page, one can see that the ROD actually states with regard to 1A, as follows: "[f]inal
14  human health COC's [contaminants of concern] for soils are arsenic, copper,
15  thallium, *and lead*."  *Id.* at 2-21 (emphasis added).  The second sentence references
16  site 2A and says that lead was not mentioned in the list of primary hazard
17  contributors.  Site 2A was divided into two areas: the burn pit and the grease pit.  In
18  regard to the burn pit, it was an area not larger than two football fields.  With regard
19  to that area, the ROD states again that lead was separately analyzed.

### Contaminants of Concern at the Sites

21     Attached to this Decision, marked as an exhibit, are copies of the relevant
22  pages of the ROD that address the various sites and the contaminants.  Also
23  attached to this Decision is a table from the ROD, showing not just the
24  contaminants, but the maximum concentrations found at the various sites.  This is
25  important to the Court's later analysis of the dust monitoring records and records
26  documenting the origin of the dirt being moved each day.

27     These pages show the following.  For site 1A, as described in the body of the

28

[10]*See Myers*, 652 F.3d at 1025.

ROD, lead was found in a maximum concentration that was "at least one order of magnitude greater than the EPA residential soil Provisional Remediation Goal (PRG) of 400 mg/kg, and the Cal/EPA residential soil PRG of 130 mg/kg." The maximum lead concentration was, in fact, 8,800 mg/kg. By comparison, the background concentration for Camp Pendleton was 10.2 mg/kg. That means that there was 863 times more lead than the PRG. By comparison, thallium exceeded the PRG by approximately five times.

For site 1E, the ROD found that "the site-related primary contributors and/or hazard[s] to risk are antimony, arsenic, and chromium. In addition, the maximum lead concentration of 1,610 mg/kg exceeds background." For site 1F, the ROD states, "the maximum lead concentration (1,216 mg/kg) exceeds the EPA residential soil screening value of 400 mg/kg and the Cal/EPA residential soil PRG of 130 mg/kg." "Lead and antimony are the other main contributors to hazard." *Neither site 1E nor site 1F was ever found to contain any thallium whatsoever.* The soil from site 1E and site 1F made up approximately 47% of all the soil that was transported to site 7 in connection with the clean-up. Another 40% came from site 1A, which contained a small amount of thallium. Thirteen percent came from 2A and only one third of that came from the area where the highest concentration of thallium was found. As mentioned later in this decision, this drilling down through the data is important, because, among other things, the data discloses that on days when soil was being transported from sites 1E or 1F, any fugitive dust escaping the perimeter would not present a thallium hazard.

With regard to site 2A, the ROD noted that there were nine metals detected at concentrations exceeding PRGs: antimony, arsenic, beryllium, cadmium, copper, lead, manganese, thallium, and zinc. "Antimony, cadmium, copper, lead, manganese, thallium, and zinc concentrations exceeded PRGs and background concentrations and samples from boring 2AB-05. In addition, the lead concentrations from a five-foot sample from boring 230-03 exceeded the PRG and

1  background."

2       The ROD then further describes the risks as follows: "The cumulative

3  residential risk is 5 x $10^{-5}$ and is attributable primarily to arsenic . . . . The primary

4  hazard contributors are manganese, thallium, and zinc. Manganese and zinc

5  concentrations exceed background concentrations by more than three orders of

6  magnitude." The previous discussion, taken out of the ROD, was relevant to what

7  was labeled as the burn pit area, again a small area within a much larger area.

8       It was uncontroverted that boring 2AB-05 contained a lot of metal. In fact, it

9  was reported that shards of metal, not just dirt, were detected. The regulatory

10  agencies agreed that the 2AB-05 boring should be qualified with the initials BJ,

11  meaning it was a questionable test result. A duplicate field sample was tested, and

12  it showed results at 3.5 mg/kg.

13            ***Elevated Thallium Amounts at Sites 1A & 2A?***

14       As the sites were being excavated, the soil was being tested. This Court has

15  reviewed 151 sample results taken from site 1A. Twenty-three of those samples

16  exceeded background levels for thallium. Only two were above PRG. The mode

17  for the remaining samples was .35 mg/kg. The Court reviewed 90 samples from site

18  2A. Of those samples, 23 tested above background. Only one was above PRG.

19  The mode was 0.365 mg/kg. Therefore, it is clear to this Court that, just as the EPA

20  and the DTSC found in their professional judgment, the thallium concentrations for

21  sites 1A and 2A were very low. The evidence supports the conclusion.

22       Other contaminants such as lead, arsenic, and manganese were driving the

23  clean-up. Soil being brought in from site 1E and site 1F was not contaminated by

24  any amount of thallium. Furthermore, as previously pointed out, the soil that was

25  being brought in from site 1E and site 1F made up 47% of all the soil that was being

26  brought to site 7. In addition, prior to the remediation project beginning, huge

27  quantities of uncontaminated dirt had been brought from other sites and stockpiled

28  at site 7. Daily, the uncontaminated dirt was then being used, as soils from 1A, 1E,

1F and 2A were brought in to site 7, in order to cover up the contaminated dirt.

*Watermarks*

In the analysis that follows, there are a number of "watermarks" found on every page that run through the entire body of evidence. There is the decision to hide, for years, the fact that L's sister also has alopecia. There is the decision to buy with trust money a new car for L before she was old enough to drive, and then later exclaim at trial that she is incapable of driving. There is the odd picture of landfill dust beginning with many contaminants but depositing only thallium in Plaintiff's backyard. There is the insistence that L has psychological injuries, but an unwillingness by the parents to pay for therapy because it is not covered by insurance. There is the single, deeply flawed, urine lab test result that is communicated to every medical provider at the outset of every course of treatment that tinges every medical opinion. It is the obvious manipulation by counsel of the medical opinions of Drs. Renfroe, Eichenfield, and Brown. There is Plaintiff's expert, Dr. Gustin, explaining away every inconvenient medical fact about L as being due to the "protean" (unpredictable) nature of thallium toxicity. And it is the many unreliable histories offered by L's parents and their viewing of every circumstance through thallium-colored glasses.

**I.     THE NAVY'S BREACH OF ITS DUTY TO EXERCISE REASONABLE CARE TO ENSURE THAT ITS CONTRACTOR TOOK REASONABLE CARE TO FOLLOW REQUIRED SAFETY PRECAUTIONS WAS NOT THE PROXIMATE CAUSE OF L's ALLEGED INJURIES**

The Court of Appeals held that the Navy had a duty to exercise reasonable care to ensure that its contractor took reasonable care to follow required safety precautions in the Box Canyon landfill remediation project. Specifically, the Court of Appeals found that the Navy owed the Plaintiff's daughter, L, a duty and that the duty was breached in two respects. *First*, the Navy failed to have the site health and safety plan (HASP) reviewed by a competent person employed by the Navy. *Second*, the Court of Appeals further found that the Navy had breached its duty by

1  failing to have its quality assurance officer review the perimeter air monitoring data

2  generated as required by the HASP.  Neither of these breaches of duty by the Navy

3  proximately or actually caused L's asserted injuries.

4        Before digging into and testing the evidence on the question of causation, the

5  Court must address the burden of proof.  The general rule, of course, is that the

6  plaintiff bears the burden of proof.  *Avila v. Willits Envtl. Remediation Trust*, 633

7  F.3d 828, 836 (9th Cir. 2011).  Plaintiff argues that *this* is a special case where the

8  exception to the general rule of California law applies.  This is so, according to

9  Plaintiff, because the negligence of the Defendant has prevented precise evidence of

10  exposure because it negligently failed to measure for "total dust" or speciate the

11  dust during the Box Canyon operation.  Under such circumstances, California law,

12  according to Plaintiff, requires the shifting of the burden on causation from Plaintiff

13  to Defendant, so that the Defendant does not profit from its own negligence, citing

14  *Haft v. Lone Palm Hotel,* 3 Cal. 3d 756 (1970) and *Summers v. Tice*, 33 Cal. 2d 80

15  (1948).  With this approach, the trial ought to have gone backward, with Defendant

16  going first, in an effort to prove its breach of duty did not cause thallium to leave

17  the landfill, that thallium did not migrate to L's environment, that thallium from the

18  landfill was not ingested by L, and that L suffered no injuries, at least not from

19  landfill dirt.  If Defendant failed to introduce enough evidence, Plaintiff's burden

20  would be satisfied, with this exceptional burden shift.  The problem with Plaintiff's

21  argument is that the exception to the general rule is extremely narrow in California

22  law, and this case does not fit the exception.  Moreover, though Defendant does not

23  have the burden of proof, even if it did, it would still be entitled to a favorable

24  judgement, because Defendant has proven each of these points (as will be seen

25  below).

26        This Case does not fit within the narrow exception created by *Haft* and

27  *Summers* and their limited progeny.  *Thomas v. Lusk*, 27 Cal. App. 4th 1709, 1717

28  (1994) (narrow exception to the usual allocation of proof).  L's alleged injuries are

1   not certain, and if they really are injuries rather than normal functioning, it cannot

2   be said that they are certainly caused by Box Canyon thallium dust.  With

3   uncertainty of injury and uncertainty of its instrumentality, burden shifting is

4   improper.  *See, e.g., Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 406

5   (1985) ("Under these circumstances the presumption of causation would be

6   tantamount to a presumption of the instrumentality which caused the injury. . . .

7   There is a limit to the number of presumptions in which the court will indulge solely

8   for the purpose of assisting plaintiff in proving a case, especially when there is no

9   evidentiary starting point from which those presumptions can flow.")

10        This Court holds that, under California law, Plaintiff cannot shift the

11   causation burden of proof to Defendant under *Haft* and *Summers*, because it is not at

12   all certain that any defendant caused L injury.  *Sanderson v. Int'l Flavors and*

13   *Fragrances, Inc.*, 950 F. Supp. 981, 989-90 (C.D. Cal. 1996) ("[P]laintiff is not

14   merely unable to prove how much damage each defendant did; she can't prove that

15   any defendant did any damage.  And it is most emphatically not certain that between

16   all of the defendants, they caused all of plaintiff's injuries.").  With the burden of

17   proof resting on Plaintiff, as is the normal case, let us look at the evidence.

18        **A.    HASP Review by a Navy CIH**

19        The Navy's contractor, IT/OHM, proposed a site-specific Health and Safety

20   Plan (HASP).  Exhibit 107B.  Had a Navy CIH or a competent person by equivalent

21   training or experience reviewed the HASP before work began, he or she would

22   likely have approved the HASP.  It would have been approved  because the

23   perimeter air monitoring plan, in particular, was well-designed to protect human

24   health.

25        IT/OHM CIH, Mr. Frederick Mlakar, helped design the HASP and selected

26   the air monitoring action levels.  The Court of Appeals decided that a *Navy* CIH or a

27   competent person by equivalent training or experience was required to approve the

28   HASP.  *Myers*, 652 F.3d at 1036.  The Court of Appeals also found that the only

- 22 -

reasonable inference from the evidence is that the HASP was never reviewed by a *Navy* CIH. *Id.* As a result, the Court of Appeals concluded that, by violating that mandatory duty to have a *Navy* CIH or equivalent person approve the HASP, the Defendant breached its "duty to exercise reasonable care to ensure that the contractor took reasonable care to follow required safety precautions." *Id.* at 1036-37.

The Court of Appeals concluded that the following language from the Navy's policy manual required that a Navy CIH review the HASP:

> b. <u>Scheduling</u>. Each NAVFACENGCOM activity shall ensure that plans are reviewed and accepted prior to issuing the Notice to Proceed.
>
> c. <u>Reviews</u>. All HASPs shall be reviewed prior to initiating site work by a competent person. Competent person shall mean a certified industrial hygienist or equivalent by training and/or experience.

Trial Exh. 107B, NAVFACENGCOM Safety and Health Program Manual, NAVFACINST 5100.11J (dated Jan. 19, 2000) at ¶ 0407. In its opinion, the Court of Appeals mandated that this Court determine whether the Navy's breach of this duty was the proximate and actual cause of injuries to Plaintiff's daughter. After carefully reviewing the evidence the Court finds that it was not the proximate and actual cause.

### 1.    HASP on Perimeter Air Monitoring

Plaintiff's counsel argued that the HASP should have been reviewed by one of two Navy CIHs that worked for NAVFACENGCOM, Janet Corbett or Andrew Bryson. He further argued that, "[a]ny competent CIH would have looked at it and would have said, 'Your perimeter air monitoring is all screwed up for several reasons.'" (Oral argument of Steven Cox, Esq., before the Ninth Circuit Court of Appeals, June 10, 2010.) In light of Plaintiff's claims, the Court set out to evaluate the testimony and evidence that would support Plaintiff's claims. Since Plaintiff claimed that Janet Corbett or Andrew Bryson should have reviewed the HASP, but

1    did not, it begs the question: what would Janet Corbett or Andrew Bryson have

2    done if presented with the HASP in question?  Would they have said the HASP is

3    defective?  The answer is clear.

4    ##    2.    **Navy CIH Janet Corbett**

5          Janet Corbett testified at trial.  Although Corbett did not specifically recall

6    reviewing the HASP for this remediation, she never said that she would have

7    rejected, or amended, the HASP.  On the contrary, she would probably have

8    approved the HASP.  She testified that she followed a checklist in reviewing

9    HASPs.  The checklist (Exh Y) was a list of HASP components.  Corbett testified

10   that it was not part of her job when reviewing HASPs to select air monitoring

11   equipment or select action levels.  Janet Corbett is a CIH with many years of

12   experience.  Did she say that she would have rejected the HASP?  No.  Did she say

13   that she found anything wrong with the HASP?  No.  Rather, she testified that she

14   would *not* have second-guessed the contractor CIH's choice of action level, nor

15   would she have questioned the choice of perimeter air monitoring.  Corbett testified,

16   Q.    So as the Navy Certified Industrial Hygienist, do you have any
         responsibility for approving the type of instrument used in air

17        monitoring?

18   A.    No.

19   Q.    Do you have any role in setting action levels?

20   A.    No.

21   Q.    Do you review the action level listed by the contractor?

22   A.    Yes, I would like [sic] at the action level.

23   Q.    Are you looking to see that it's included in the plan?

24   A.    I'm looking to see that it's included in the plan, yes.

25   Q.    Do you do any kind of a mathematical calculation to see if you
         agree with the action level?

26   A.    No.

27   Trial Phase 1, Dkt.#439, at 104:25-105:12.  Corbett suggested in only one instance

28   she might have questioned the contractor's decision about the necessary action

02cv1349-BEN

level. Only if the HASP set an action level of "total dust," while measuring for PM10,[11] would she have talked to the contractor about the plan. *Id.* at 106 ("Well, there certainly would be an inconsistency there, and I would probably talk to the contractor about it."). But, that is a far cry from evidence that she would have rejected the plan.

### 3.   Navy CIH Andrew Bryson

At the time of the remediation, the other Camp Pendleton Navy CIH was Andrew Bryson. Andrew Bryson was the Health and Safety Manager at Southwest Division. He holds a master's degree in Occupational Environmental Toxicology. He testified through deposition testimony that he and Ms. Corbett reviewed 1,200 to 2,000 HASPs a year. (Corbett had reviewed only approximately 60 per year). Bryson testified that he would not change the air monitoring equipment specified in a HASP. And Bryson would not change the action level set in a HASP. His only observation about the HASP in this remediation project is that he "would have asked questions" about using PM10 measurements rather than "total dust" measurements for an action level. His questioning of PM10, if there was confusion, is far from saying that he would have rejected the HASP.

Mr. Bryson's testimony was particularly credible because of his exhaustive experience. Furthermore, at the time he was deposed he was no longer working for the Navy. He had no motive or bias. He could have just as easily thrown the Navy under the proverbial bus. Did Andrew Bryson say that he would have rejected the HASP had it been given to him for review? No. Did he find anything wrong with the HASP? No. Like Janet Corbett, he testified that it was not their job to second guess the contractor's CIH. In fact, he testified, "I'm reviewing a submittal from a contractor, whoever it is, who we've hired because he's an expert in that field. That's why we have them. You don't tell a doctor how to make a decision." *See*

---

[11]The term, PM10, is shorthand for an industry standard for measuring concentrations of airborne particulates that are less than 10 micrometers in size.

Deposition of Andrew Landon Bryson, dated Nov. 6, 2003, at 79:5-8.  Bryson found no fault with the action level.  He found no fault with the choice of air monitoring equipment.  Given Frederick Mlakar's testimony at trial,[12] this Court has no doubt that any question would have been answered to Mr. Bryson's satisfaction.  It has, to this Court's satisfaction.

The evidence at trial does not convince this Court that a Navy CIH would have rejected the HASP upon review.  The answer to the question becomes even more apparent when one considers that two other industrial hygienists from the Navy did look at the HASP.  Neither one said the HASP was deficient.

### 4.   Navy NEHC Industrial Hygienists Did Review the HASP

The NAVFACENGCOM policy manual that Plaintiff and the Court of Appeals relied on says, "[A]ll HASPs shall be reviewed prior to initiating site work by a competent person.  Competent person shall mean a certified industrial hygienist or equivalent by training and/or experience."  Trial Exh. 107A, NAVFACENGCOM Safety and Health Program Manual, NAVFACINST 5100.11J (dated Jan. 19, 2000) at ¶ 0407(c).

The very next paragraph provides that the "NEHC is funded to assist Navy activities in reviewing the worker health related aspects of HASPs and environmental risk assessments for the Navy environmental program."  *Id.* at ¶ 0407(d).  It is the mission of the Navy Environmental Health Center (or NEHC) to provide support and assistance to the Navy with regard to environmental and health matters.

> 2. Mission.  To coordinate and provide centralized support and services to medical activities, afloat and ashore, in areas of occupational health, environmental health, preventative medicine, health promotion (HP), population health, deployment medical surveillance, including chemical, biological, radiological, and environmental defense (CBRE-D), and drug screening, and perform such other functions and tasks as directed by higher authority.

---

[12]Frederick John Mlakar was employed by IT/OHM as a CIH.  Mr. Mlakar was the final author of the aspect of the HASP that addressed fugitive dust and perimeter air monitoring.  Trial Phase 1, Dkt.#444 at 10:10, *et seq.*

1

2  Exh BUMEDINST 5450.157A, dated Oct. 1, 2001, *Mission and Functions of the*

3  *Navy Environmental Health Center, Norfolk, VA.*

4      In July of 1999, a copy of the HASP was sent by the contractor to the NEHC

5  for review.  On August 5th, two industrial hygienists from NEHC traveled to Camp

6  Pendleton, after reviewing the HASP, to audit the work and compliance with the

7  HASP.  One of them was Mary Ann Simmons.

8          **5.    Navy NEHC Industrial Hygienist Mary Ann Simmons**

9      Ms. Simmons is an industrial hygienist with the Navy.  Although she is not

10  certified, there is no question but that she is "a competent person," *i.e.*, someone

11  with "equivalent [ ] training and/or experience."  She has been with the Navy for 22

12  years.  She has reviewed several hundred HASPs.  At the beginning of her career

13  she worked for OSHA as a compliance officer.[13]  She has a bachelor's of science

14  degree in Environmental Health Science and has completed course work towards a

15  master's degree in the same subject.  When she reviewed the HASP, did she say it

16  was defective?  No.  In fact, she spent several hours at the Box Canyon landfill on

17  August 5, 1999.  When she returned to Norfolk, Virginia, her duty station, she wrote

18  an email to the contractor's CIH, Mr. Mlakar, complimenting him on how well the

19  HASP was being implemented.  She wrote, "Both Carl and I were impressed with

20  the site implementation of your health and safety plans.  It was obvious from

21  everyone we spoke with or watched that health and safety was not just a paper

22  program."  *See* Exh "CS" (email message dated Aug. 13, 1999).  It is true that she

23  did not actually look at the perimeter air monitoring equipment readings.  She did

24  not have to.

25          **6.    Navy CIH Cmdr. Dan Field**

26      Another CIH from the Navy also looked at the HASP: Commander Danny

27  Field.  After L's complaints surfaced, he looked at a number of issues and provided

28  _____

[13]There is no dispute that a HASP is an OSHA-required document.

1    a written critique based on what he called "best practices." Specifically, he could

2    not understand how there would not be dust level exceedences given the number of

3    trucks that would be running. He also criticized that PM10 was being used for an

4    action level rather than total dust. After listening to Cmdr. Field testify, it appears

5    that his critique did not mean that the HASP was defective, for a number of reasons.

6        First, Cmdr. Field's CIH experience is in the static environment, not a

7    dynamic environment such as the landfill.[14] Second, "best practices" are simply one

8    person's view of how something should be done. No one ever testified that it was

9    expected that there would never be exceedences, given the volume of dirt being

10    brought in to Box Canyon and the meteorological conditions at Camp Pendleton.

11    Furthermore, it would be unreasonable to require such perfection. While finding

12    fault with the HASP for not requiring a total dust action level, even Cmdr. Field

13    testified that one could calculate a total dust action level by extrapolation from the

14    PM10 action level. And extrapolation is precisely what Mr. Mlakar testified that he

15    did when he drafted the HASP. He explained,

16          A.  Those contaminants which were of most concern were
              metallic components, such as lead, and which were above

17               -- they're in part per million levels. They're not really
              high.  Part per million levels are quite low.  It takes

18               10,000 parts per million to equal one percent, and one part
              per million is -- a part per million is like 1 inch out of 15

19               miles.  It's kind of hard to relate to, but these are very

20               small levels.

21

22        [14]Dust monitoring in a static environment is different from monitoring in an
active environment. For example, Plaintiff argues that the perimeter air monitors

23    should have measured for "total dust" and speciated the dust. This is a static model
approach. It is backward-looking. Reactive. Because it takes days to do the laboratory

24    testing necessary to speciate the dust, it is useful for revealing what particles may have
left the work site in the past. It is too slow a process to bear on actions in the present.

25        The air monitoring used in the HASP is dynamic – changing with conditions.
It is preventative and proactive. Rather than identifying the types of dust that left the

26    work site, the HASP objective was to prevent dust from leaving the site in the first
place.

27        Approximately 240 truck loads of dirt were being hauled every day. In an 8 hour
day, that is 30 trucks an hour or one truck every 2 minutes. Had the other approach

28    been taken (measuring for total dust and speciating dust), by the time fugitive dust
would have been collected, laboratory tested, and speciated, and work stopped based
on the results, a large quantity of hazardous dust could have left the work site.

. . . .

I use that information in deriving what we call action levels for worker protection. I need to know what the potential hazards of this stuff is so that I can use that information in determining what kind of protective equipment our workers are going to use? Do they need respirators? Do they need full suits? What is it going to take to do that? And then also to prescribe what we call action levels because we use direct reading instrumentation on these job sites, and I would calculate a dust level in the air based on these concentrations in the soil that a safe level of dust which would -- we can monitor these in direct reading instruments and then use that to alter or change our protective levels, depending on if dust levels fluctuate.

. . . .

Q. So what were you trying to determine by reason of doing these calculations? What was your purpose of doing them?

A. Okay. The purpose of me doing these was to determine, and this is unique to our industry, what we call an action level of total dust in the air, given all these considerations of the amount of the concentrations of contaminants, the relatively permissible exposure limits, building in various safety factors, because I just took the highest levels of lead from each of these areas. I didn't average them all, made conservative assumptions, take the highest lead levels from each of these five areas. I averaged those and calculated what level of total dust needs to be in the air in order to meet the permissible exposure for lead, and by picking lead in the highest levels of lead in all that were found in these areas, that puts a large safety factor in the calculation to begin with.

THE COURT: So, in other words, you don't do those calculations for each and every metal that is found in the area, you use one.

A. I picked one, but I'm making -- yes, I did, but a lot of it's a simple calculation, to look at many of these and say, okay, that one I can ignore because it's too low? The levels are low, and the permissible exposure limit is high. I can pick lead and find it has a low permissible exposure level and higher levels, that's the one I key on. I could run

- 29 -

the calculation very simply and demonstrate that lead is the most conservative. And then that level what we came up with -- what I came up with, my calculation shows about 16.9. You need to get 16.9 milligrams of total dust in the air per cubic meter of air and sustain that for an 8-hour time-weighted average, on an 8-hour day, in order to exceed the lead permissible exposure limit which Cal-OSHA would write me a citation for overexposure of my workers. Well, 16.9 cubic meters of dust in the air is so thick you would not be able to see across this courtroom room. To sustain that for an 8-hour day on our job site is not possible. So I know right away, okay, this waste is relatively safe. It's not going to take a whole lot of effort for us to control this dust and make it safe for our workers. So in order to make -- I'm not going to tell these guys, "Look, you can have 17 milligrams of dust in the air." I reduced that by a factor of 10 -- or actually 11, made it 1.5 milligrams per cubic liter (sic) of air. That was our action level for worker protection. Using our air monitoring dust monitors, if they achieve those levels they need to increase their dust control and that -- or upgrade the protective equipment by putting respirators on. I laid a factor of 10 on so that -- again, a huge margin of safety on the original calculations, which were based on conservative assumptions to begin with.

Trial Phase 1, Dkt.#444 27:10-16; 28:9-21; 31:4-33:4. In other words, Mr. Mlakar had calculated a total dust action level. He then converted that action level to a PM10 action level that could be measured by the perimeter air monitoring devices.

Plaintiff's expert, Mr. Roman Worobel, in his report (submitted to this Court in opposition to Defendant's motion for summary judgment and referred to at trial), had no trouble calculating a PM10 action level and then extrapolating back to a total dust action level. Again, Field's concerns about the HASP did not amount to a rejection, and based on Mr. Mlakar's explanation, his questions likely would have been satisfactorily addressed. This Court found Cmdr. Field's testimony to be credible. He had retired from the Navy and had no reason to shade his testimony.

### 7.    **DTSC CIH Frank Parr**

Like the EPA, the DTSC is charged with protecting the health of California residents. The DTSC sent a copy of the HASP to one of its CIHs, Mr. Frank Parr,

- 30 -

for review.  Mr. Parr reviewed the HASP and wrote a memorandum to Manny
Alonzo expressing several concerns about the HASP and asking for further
information.  Mr. Parr had only one question regarding the perimeter air monitoring
or the action level: "Please provide additional detail describing how the particulate
air monitoring action levels were derived.  Are the action levels based upon mass-
loading calculations incorporating soil-bound contaminant concentrations?"
Exhibit 147, Memorandum from Frank S. Parr, CIH, Department of Toxic
Substances Control to Manny Alonzo, Office of Military Facilities, dated Jul. 7,
1999, at p. 4.  Mr. Parr's memorandum was peer-reviewed by a second DTSC CIH.

As previously mentioned, Mr. Mlakar arrived at his action level using a mass-
loading calculation.  He determined the contaminant concentration and calculated
how much dirt would have to be in the air before the Permissible Exposure Limit
(PEL) was reached.  The second amendment to the HASP took Mlakar's original
calculations and then made the new action level 20 times more stringent than the
original.  The DTSC management team, the EPA, the contractor, and the Navy, were
in constant communication.  Even after Mr. Parr's questions were aired, no one
asked for work to be stopped.  The only reasonable inference that this Court can
reach is that the DTSC's question was answered to its satisfaction.

Although Mr. Worobel, Plaintiff's CIH, testified that in his opinion the HASP
was defective, the Court did not find his testimony persuasive and gave his
opinions little weight.  He seemed to be unable to answer simple questions posed to
him, so much so that twice, in quick succession, the Court had to admonish him.
His credentials were also less than impressive.  His experience was very limited.
And many of his opinions were inconsistent or simply not well supported, including
that one cannot calculate a total dust action level by using PM10, although he did it.
He also had complaints about Mr. Mlakar's calculations.  The big difference was as
follows: (1) he used an EPA rather than OSHA health based level; and (2) he used a
2002 EPA standard.  Of course, the HASP was drafted in 1999.  He also assumed

that all dirt brought to Box Canyon would contain 144 mg/kg of thallium. That makes little sense. He also did not seem to know that Mr. Mlakar had used lead as his surrogate contaminant, since at the time lead had the most stringent PEL and was found in greater quantities and concentrations in the sites being remediated. These criticisms of Mr. Worobel are discussed in greater depth a little later.

**8.   DTSC Was Unconcerned With Perimeter Air Monitoring**

The Navy's breach of duty in failing to have a Navy CIH review the HASP before work began, did not lead to a work site that was toxicologically hazardous – to either on-site workers or off-site human "receptors." This conclusion is buttressed by the fact that DTSC had authority to stop the project at any time. Manny Alonzo was the project manager for DTSC. At trial, Alonzo's demeanor was hostile toward the Navy.[15] Nevertheless, he testified that the concern of DTSC (and the EPA) on the Box Canyon landfill project was not fugitive dust. The concern was lead in the soil and ash leaching into the groundwater.

**9.   HASP Erred on Side of Protecting Human Health**

Therefore, the Court finds that the fact that a Navy CIH or equivalent person did not review the HASP before work commenced was not the proximate cause of Plaintiff's injuries.

**a.     *Why the Contractor Selected This HASP Air Monitoring Plan***

For addressing dust control at the landfill and beyond, the HASP used this language describing the monitoring equipment and the "action level."

7.1.3 *Miniram Aerosol Monitor*

A Miniram Aerosol PDM-3 or equivalent will be used to measure airborne particulates between 0.1 to 10 micrometers in size. The Miniram PDM-3 will be used as an indicator of breathable dust in the work area and will serve to monitor when additional dust control is required.

---

[15]The DTSC management had overruled him regarding the lead concentrations at site 1D leaching into the groundwater.

1   Using the levels listed below, worst case scenarios can be assessed for
    the purpose of establishing a total dust action level:

2       - Instrument -- Miniram Aerosol Monitor Model PDM-3

3           - Action Level -- 1.5 mg/m$^3$ for general site
4           areas; 1.0 mg/m$^3$ for perimeter (level chosen
            to minimize overall permissible dust release
5           from site)

6           - Action -- Don level C, Implement dust
            control procedures.

7   Exh 3, *Draft Final Site Health and Safety Plan, Remedial Action, Operable Unit-3,*

8   *Sites 1A, 2A, 1D, 1E, and 1F, Marine Corps Base, Camp Pendleton, California*

9   (dated May 17, 1999).

10      Mr. Mlakar was a credible witness and his testimony is given considerable

11  weight.  He explained the plan reasoning in detail.  As previously noted, the plan

12  was very cautious and based on conservative estimates of the toxicological elements

13  that might present a hazard to humans.  He testified that in determining an action

14  level for dust, he began with the contaminant of greatest concern: lead.  He found

15  the OSHA lead permissible exposure level ("PEL") for a time-weighted average

16  eight hour airborne exposure to be .05 milligrams per cubic meter ("mg/m$^3$").  He

17  selected lead based upon its high incidence of occurrence above naturally occurring

18  soil levels at the sites to be remediated, as well as upon the OSHA PEL level which

19  was the most stringent for any of the contaminants of concern (and twice as

20  stringent as thallium).

21      The HASP is consistent with Mlakar's testimony.  First, the HASP defines the

22  equipment to be used.  Section 7.1.3 clearly provides that it will measure airborne

23  particles between 0.1 to 10 micrometers in size.  This served to monitor when

24  additional dust control was required.  It says nothing about measuring total dust and,

25  in fact, by definition excludes any particulates above 10 micrometers in size.

26      Next, it states, "[u]sing the levels listed below, worst case scenarios can be

27  assessed for the purpose of establishing a total dust action level."  All that a reader

28  needs to do is substitute the synonyms for "assessed" (*i.e.*, gauge, estimate,

determine), and the sentence meaning becomes crystal clear.  It goes on to say,
"[a]ction level – 1.5 mg/m$^3$ for general site areas; 1.0 mg/m$^3$ for perimeter (level
chosen to minimize overall permissible dust release from site)."  To paraphrase,
using the levels below we can estimate a dust action level.  Or, using the levels
below, we can gauge a total dust action level.  This Court will not purposefully
attempt to create an ambiguity where there is none.  That its meaning is crystal clear
is supported by the fact that Plaintiff's "competent CIH," Mr. Worobel, was
perfectly able to understand what it says.  He calculated a PM10 action level
although much lower than Mr. Mlakar, but then he did what Mlakar did and
extrapolated to a total dust action level.

### b.   *Thallium vs. Lead Permissible Exposure Levels*

Mr. Mlakar did the calculations and concluded that in order to exceed the lead
permissible exposure limit, there would have to be present more than 16.9 mg/m$^3$ of
total dust, for an eight hour time weighted average, over an eight hour day.  Trial
Phase 1, Dkt.#444 at 1091.  Mlakar then said that if there were 16.9 mg/m$^3$ of dust
in the air, the air would be so thick that, "you would not be able to see across the
courtroom."  *Id.*  Although the PEL already has a safety margin built in, Mlakar then
reduced the 16.9 limit eleven times with a  resulting action level of 1.5 mg/m$^3$.  At
that level, he knew his workers would be safe, and by extension, humans outside the
site would be safe at 1.0 mg/m$^3$.  Given the PEL for thallium, the amount of soil that
would have to be in the air to exceed the action level "would be about 20 times that
of lead because the PEL is twice as high."  Trial Phase 1, Dkt.#444 at 1096.

Described differently, if 1.0 mg/m$^3$ of PM10 size dust were to reach the
perimeter fence, then more than an additional 15 mg/m$^3$ of dust in particles larger
than PM10 would also have to reach the fence in order to expose humans outside
the fence to impermissible levels of lead dust.  Of course, that would be extremely
unlikely because, as Plaintiff's fate and transport expert, Dr. Chorover, conceded, it
is the smaller particles of dust that tend to travel farther on the wind.  (Dr. Shields

02cv1349-BEN

opined that PM10 makes up roughly one-third of dirt in the air.)· In the end, Mlakar reduced the action level even further, to make it even more stringent, specifying the new action level to be .050 mg/m$^3$ (or 50 *micro*grams per cubic meter). That is twenty times more stringent.

### c.      *The Action Level Was Very Protective of Human Health*

In Southern California, ambient air quality is often above .050 mg/m$^3$.[16] And just how clean is air with particles in concentrations of .050 mg/m$^3$? Perhaps most telling, was a demonstration during the first phase of the trial. The witness, Kevin Hubbard, was demonstrating the type of air monitor used for the Box Canyon remediation work. *During the presentation, the monitor detected .050 mg/m$^3$ of dust particulates inside the courtroom. Over the course of the ensuing testimony, the level rose to .078 mg/m$^3$.* In the courtroom, there are no windows or vents to the outside, no one was vacuuming, no one was dusting, and there was no visible dust in the air.

The action level was not simply selected for the sake of the contractor's convenience or to give only lip service to human safety. It was based upon solid reasoning by a CIH with vast experience using, not his own, but OSHA's PELs for the greatest contaminants of concern, arriving at a permissible safety level and then reducing that by a factor of eleven for workers and sixteen at the perimeter fence, erring on the side of human safety.

### d.      *The Action Level Was Adjusted Downward to be More Cautious and to be an Alert; It Was Not Meant to Immediately Stop Work*

It bears noting that the "action level" for perimeter air monitoring was adjusted from the first HASP to the second amendment of the HASP.[17] The second amendment to the HASP set the action level as .050 mg/m$^3$ where ambient air or

---

[16] 0.050 mg/m$^3$ = 50 mcg/m$^3$ = 50 *ug*/m$^3$.

[17] The first amendment to the HASP was dated June 21, 1999. The second and final amendment referred to here was adopted on July 8, 1999.

"background" readings were .000 mg/m$^3$. It also took into account the many times when ambient air quality showed PM10 above .000 mg/m$^3$. The second amendment to the HASP states, *inter alia*,

> Instrument Placement:
>
> Two Miniram dust monitors will be placed between the work area and the adjacent residential area. Two Miniram dust monitors will be placed between the work area and the adjacent school. Two Miniram dust monitors will be placed between the work area and the ocean, which is normally upwind and, therefore, representative of background particulate concentrations. . . .
>
> Data Interpretation:
>
> If the readings of the monitors near the school or housing exceeds the background readings or the ambient air quality standard of 0.05 mg/m3, whichever is higher, [the] source of the airborne particles will be determined, and dust control efforts will be increased. If the increased dust control efforts are ineffective, the soil moving activities will be stopped. Work will also be stopped whenever visible dust emissions reach the perimeter fence. If a work stoppage occurs, the project manager and health and safety manager will be notified. Dave Song, Camp Pendleton's Assistant Chief of Staff, Environmental Security will also be notified at (760) 725-9741.

See Exh 5. The significant point for this aspect of the causation issue is that the HASP, as designed by Mlakar, and spelled out in the second amendment, did not require work to be stopped when the action level was hit.

Mr. Mlakar was asked at trial about what was intended to be done by the contractor if the action level was exceeded. He explained that an exceedence did not mean that work must be stopped. Instead, it meant that the contractor had to sit up and take notice of what was occurring in the air and determine the source of the high particulate reading. If the source was work site dust, dust suppression measures were to be taken. If the source was fog, or a motor vehicle idling by a monitor, then no action needed to be taken. It was only if work site dust could not be controlled that work was to be stopped. Mlakar testified,

> No, not at all. It was an action level which meant the site safety officer and the team there would have to take notice of what was going on, try to determine the source, and

control it. If the source could not be controlled, such as on a highly windy day, then the action was to shut the job down. But just because the action level was exceeded, that doesn't automatically trigger a shutdown of the work.

Trial Phase 1, Dkt.#444 at 1117-1118.

### e.    Plaintiff's Expert Witness Roman Worobel

The only criticism suggesting the HASP was defective came from Plaintiff's expert, Roman Worobel. Worobel criticized the HASP action level. He opined that the action level should have been 0.000294 mg/m$^3$ for PM10. Trial Phase 1, Dkt.#439 at 542:5-544:13. He based this extremely low action level on an unrealistic worst case scenario. Worobel started with the highest pre-remediation soil sample reading for thallium found at any of the several sites to be remediated: 144 mg/m$^3$. He then assumed that all of the soil from all of the sites had similar amounts of thallium. He then derived his safe exposure level calculation assuming that all the soil at Box Canyon would have the same 144 mg/m$^3$ concentration.

One problem with Worobel's suggested action level is that there is no evidence to support the idea that all the soil would have a thallium content of 144 mg/m$^3$. The soil samples taken both before and after the Box Canyon project detected much lower levels of thallium. The 144 mg/m$^3$ reading was questioned by all. It could have been a false reading due to the large amount of manganese close by. A second sample at that site detected a much lower thallium level of 3.5. Other than the questionable soil sample at the single point, there was no evidence that thallium concentrations at either site 1A or 2A was anywhere near 144 mg/m$^3$. Consequently, it would be unreasonable to employ a soil dust action level based on the assumption that all of the soil being brought to the Box Canyon landfill had concentrations of thallium of 144 mg/m$^3$, when sampling at sites from which soil was brought had much lower thallium concentrations or only background amounts. And some of the soil spread at Box Canyon was known clean soil used for capping and layering over the levels of remediated soil.

Plaintiff also criticized the action level selected because it was based upon

- 37 -

02cv1349-BEN

PM10, rather than total dust.  In essence, Plaintiff argues that by not measuring for total dust, larger particles of hazardous substances in general, and thallium in particular, were permitted to escape the work site and pass over the perimeter fencing to the Wire Mountain housing complex.[18]  One problem with this criticism is that thallium is a metal.  And metals like thallium, lead, and antimony, in particle sizes over 10 micrometers were not likely to be blown off site on the wind because of their weight.  The other problem is that the action level for PM10 selected by Mlakar took into account the total dust hazard.  And it does not require a CIH to recognize a total dust problem level, as larger particulates are easily seen with the naked eye.  As one witness put it, you have a total dust problem when you see a cloud of dust.

Even Cmdr. Field testified that Mlakar could calculate a total dust action level from a PM10 action level through extrapolation.  Plaintiff's expert, Mr. Worobel, himself was able to work the calculation back, starting at his proposed PM10 action level of .000294 mg/m$^3$, and arriving at a total dust action level of 2.0 mg/m$^3$.  The Court finds that Mlakar's PM10 action level, the method used in the HASP, to be more reasonable than Worobel's proposed action level.  Not because Mlakar and Worobel use irreconcilable methods, but because of Worobel's assumption that all the soil dust at the Box Canyon site would have concentrations of thallium in amounts of 144 mg/m$^3$.  Worobel's criticism of the HASP is unconvincing.

### 10.    Conclusion

The Navy's contractor selected reasonable safety precautions and took reasonable care to follow those required precautions by policing itself and

---

[18]But speculation regarding the effect of additional safety precautions or supervision is not sufficient to meet a plaintiff's burden on causation.  *See, e.g.*, *Rinehart v. Boys & Girls Club of Chula Vista*, 133 Cal. App. 4th 419, 435 (2005) (stating "it is entirely conjecture that such added personnel and repairs if needed would prevent all assaults or negligent acts which can occur despite the highest level of supervision").

1  successfully using techniques to minimize the creation and transportation of wind-

2  borne dust.  For this reason, had the contractor's HASP been reviewed by a Navy

3  CIH before work began, the evidence convinces this Court that the HASP would

4  have been approved without modification.  Therefore, the Navy's breach of duty

5  was not the proximate or actual cause of L's alleged injuries.

6  **B.    Navy Quality Assurance Officer (QAO) Nars Ancog and Review of the Perimeter Air Monitoring Data**

7  Next, the Court turns its attention to whether the fact that Navy Quality

8  Assurance Officer (QAO), Mr. Nars Ancog, did not review the perimeter air

9  monitoring data was the proximate cause of Lacie injuries.  Put differently, did the

10  Navy's breach of its duty to exercise reasonable care to ensure that its contractor

11  took reasonable care to follow required safety procedures, by failing to have Nars

12  Ancog review the air monitoring data, proximately or actually cause L's alleged

13  injuries?  The Court concludes that the Navy's breach of duty in this regard was not

14  the proximate or actual cause of L's alleged injuries, because if Nars Ancog had

15  reviewed all of the perimeter air monitoring data, he would have seen few

16  exceedences.  No work would have been stopped.

17  Preliminarily, the Court is somewhat troubled by the Ninth Circuit's

18  conclusion that Mr. Ancog did not review the perimeter air monitoring data.  It is

19  troubled because the only evidence on the subject came from Mr. Dunaway, the

20  project manager.  Mr. Ancog was higher on the chain of command than Mr.

21  Dunaway, according to the project organizational chart of the Remedial Work

22  Action Plan.  Mr. Dunaway was only at the Camp Pendleton site one day a week or

23  one day every other week.  He would attend project manager meetings.  Mr. Ancog

24  was not at those meetings.  Mr. Dunaway did not control the perimeter air

25  monitoring data.  The only testimony on this issue was as follows:

26  Q.    Do you know whether Nars Ancog ever looked at the perimeter air monitoring data?

27

28  A.    *I don't know.  I don't recall him ever looking at the data when I was on the project.  He may have afterwards, but I wouldn't know the answer to that.*

. . .

Q.   The QAO's job was to ensure that the contractor was doing all the testing that he was supposed to do, correct?

A.   Correct.

Q.   And his job was to ensure that the testing that was being done was being done in accordance with the work plan?

A.   Correct. I know it's not exactly clarified in this text here, but, generally, Nars would focus more on the sampling data at the sites that were being cleaned up or that were being contained, such as Box Canyon landfill, but more so soil and water sampling data versus air data.

Q.   Sure. You had all sorts of sampling going out there. You were doing confirmation sampling, and you were doing this sampling that indicated you need to step out, but some of the sampling test data that was involved was the perimeter air monitoring data, and it was collected by the contractor, right?

A.   Correct.

Q.   And as far as you know, the QAO never looked at that.

A.   He did not look at the data results.

Trial Phase 1, Dkt.#439 70:9-13 and 71:5-23 (emphasis added).

There is no way Mr. Dunaway established the preliminary facts to show that he had the opportunity to know whether or not Mr. Ancog looked at the perimeter air monitoring data. *See* FRE 104. Nor does it appear that he was testifying from his own personal observations. *See* FRE 602. Given that his initial response was, "I don't know," leads this Court to believe that he was speculating. Perhaps Mr. Ancog did look at the data. Perhaps he did not. Be that as it may, at this point, this Court is bound by and will follow the Ninth Circuit's holding.

## 1.   Contamination Levels Were Low and the HASP Action Level Appropriate

As previously noted, all of the professionals involved in this remediation project including the EPA and DTSC were satisfied that the contamination levels

from site 1A, 1E, 1F, and 2A were very low.  Furthermore, the action level was very conservative.  What about the dirt from site 1E and 1F?  What about the clean dirt that was also being moved around the site?  The Court finds that Mr. Mlakar's action level was appropriately set in the first HASP and made 20 times more stringent with the second amendment to the HASP.  But even accepting Mr. Worobel's calculations as accurate, what would the Navy QAO have found?

### 2. There Were Few, If Any, Action Level Exceedences for Ancog to See

Mr. Ancog would have seen a handful of exceedences over 0.050 mg/m$^3$ at the perimeter.  That would mean that only during a handful of times, out of the 3,379 times readings were taken, would Mr. Ancog have seen anything to put him on notice that dirt control efforts needed to be increased.

### 3. Even If Mr. Ancog Observed Exceedences, Work Would Have Continued

The language of the HASP does not say that, if there is an exceedence, then work will be stopped.  Nor does it say that if there is more than one exceedence, then work must be stopped.  That is what Plaintiff would like it to say, but it does not.  What it does say, is that if there is an exceedence, efforts will be made to locate the source of the measured particulates.  Then it says: "if the increased dust control efforts are ineffective, the soil moving activities will be stopped."  See Exh 5.

The obvious and inescapable basic premise underlying that sentence is that if the source of the particulates in the air is the soil-working activities, then and only then, if additional dust control efforts are not effective, soil moving activities will be stopped.  As several witnesses testified, if the exceedences were not the result of soil working activities, there was nothing to be done.

### 4. Any Action Level Exceedences That Occurred Were Insignificant; There Was No Further Action for Mr. Ancog to Take

With this in mind, the Court has evaluated the number of exceedences applying the stricter action level of the second amendment.  See Exh HE, Map, Dr.

Shields' Demonstratives, Figure 4, Locations of PM10 1999 Monitoring Stations.

Regrettably, the author of the Ninth Circuit Opinion noted that the trial court had

failed to note that there were over 200 exceedences. To be clear, this Court did not

fail to note it; it did not intend to note it. Why not? The Court will explain.

If one accepts the most cramped interpretation of the .050 mg/m$^3$ action level, the data would indicate 265 exceedences. This is the action level that was exceeded inside the windowless courtroom during this trial. With only 265 instances out of 3,379 readings, the exceedence rate would be only 7.8% over the 99 days of work. That, this Court concluded, was at least a careful, if not excellent, effort at complying with the action level.

### a.   False Exceedences From Non-Work Activities

The fact that activities other than soil-moving activities might cause the monitors to register high readings, was not lost on those working at the site. As Kevin Hubbard testified, he was told to look to see if there was visible dirt in the air. And if the readings were due to something other than the soil-moving activities, he understood that he could disregard the readings. This may not make sense to some, but it makes perfectly good sense to this Court. If no earth moving activity was going on, but the monitors were reflecting high readings, what were they supposed to do, stop *not* working?

### b.   The HASP Set the Action Level at .050 mg/m$^3$ Above Background

The Plaintiff's notion that an exceedence was simply any reading, at any monitor, over .050 mg/m$^3$, is simply wrong. Both experts, Mr. Worobel and Dr. Shields, interpreted the action level to mean either .050 mg/m$^3$ *above background*, or .050 mg/m$^3$, *whichever was higher*. That comes straight from the language of the second amendment to the HASP.  Only by counting every reading above .050 mg/m$^3$, regardless of background conditions, regardless of fog, regardless of monitor location can one say that there were over 200 exceedences. That is a clearly tortured application of the HASP action level language. The HASP directed

- 42 -

that two dust monitors be placed between the work area and the ocean to represent "background" particulate concentrations. Exh 5. It then said, *"[i]f the readings of the monitors near the school or housing exceeds the background readings or the ambient air quality standard of 0.05 mg/m³, whichever is higher,* [the] source of the airborne particles will be determined, and dust control efforts will be increased." Exh 5 (emphasis added).

When asked at trial, Mr. Worobel, Plaintiff's own expert, explained that the action level exceedence was a reading .050 mg/m³ *above background*, and background readings were those at the ocean monitors. He testified:

> Q.   Now, do you understand if the background was 50, and -- meaning one of the ocean monitors was 50, and one of the houses was 51, would that have been an exceedence of their action level?
>
> A.   No.
>       . . .
>
> Court:   I think Mr. Hubbard testified yesterday that he thought it was .066, I believe.
>
> Q.   066, and on that occasion would that have been a violation of their action level?
>
> A.   It's right at the margin, based on the 016 reading.
>
> Q.   What about the .059 reading at 9:50, say, compared to the ocean reading of .006?
>
> A.   Yeah, well, the difference is .053.
>
> Q.   And that would have been in excess of their action level, is that correct?
>
> A.   Yes.
>       . . .
>
> Q.   Let me show you exhibit 10b, which is the data sheet for July 13th, and at the top it shows a reading of 78, and is that in excess of the action level?
>
> A.   No, no, it's not.
>
> Q.   If the reading is higher than 78, how much higher would it have to be before it violated the action level?
>
> A.   83.

1  Trial Phase 1, Dkt.#440 113:3-21 and 116:20-117:1.

2            c.      **False Exceedences From the Marine Layer**

3       It was conceded that the monitors would register false positives if there was

4  moisture in the air.  In other words, all of the monitors would register moisture

5  particles the same as dirt particles.  The Court considered the fact that Box Canyon

6  landfill is adjacent to the Pacific Ocean.  The Court also considered that Southern

7  California coastal areas like Camp Pendleton experience a meteorological

8  phenomena in the summer and fall months known as the marine layer.  And what

9  does the marine layer carry with it?  Moisture.  In fact, when the Court looked at the

10  reported data, the highest number of readings above the worst case scenario of .050

11  $mg/m^3$ occurred on two days: August 3rd and November 3rd.  Those two days

12  accounted for 23% of the 7.8% of all readings above .050 $mg/m^3$.  What was

13  glaringly obvious was that those two days were noted to have either a heavy marine

14  layer or an onshore marine layer.  Additionally, many of the exceedences above .050

15  $mg/m^3$ were readings from the ocean-side monitors, 55 of the exceedences, to be

16  exact.  And these, by definition, could not be exceedences, according to the HASP.

17            d.      **Plaintiff's Own Expert: 87 Exceedences Over 99 Days**

18       Attached to Mr. Worobel's report, which had been submitted to the Court in

19  opposition to the defense's motion for summary judgement, was a schedule listing

20  the number of exceedences using what he understood to be the IT/OHM action

21  level.  The schedule showed a total of 87 exceedences, not 265.  If one considers

22  that the remediation project lasted 99 days, that is less than one exceedence per day.

23  That includes readings from four monitors at the start, and later as many as eight.  In

24  this Court's opinion, that shows beyond a shadow of a doubt excellent dust

25  mitigation results.

26            e.      **The Court Calculated Only 40 Genuine Exceedences;**
                     **at the Myers Residence...Only 8**

27       Looking at the actual data in what was last marked as Exhibit 189B, a copy of

28  which is attached and using what Mr. Worobel and Dr. Shields described the action

- 44 -

level to be, the Court found only 40 genuine exceedences. Those were distributed as follows: 28 for the housing monitors and 12 for the school monitors. Of the 28 exceedences at the housing monitors, *only eight were at the monitor closest to the Myers residence.* One exceedence occurred on July 2, 1999 when 1,200 cubic yards of dirt were brought in from site 1F. (Site 1F had no thallium.) No dirt was brought in from sites 1A or 2A (where thallium had been detected). On July 12, 1999, there were four exceedences; 2,520 cubic yards from site 1F and 390 cubic yards from site 2A were brought to the landfill on that day. The dirt from 2A made up only 13% of the dirt brought to Box Canyon on that day. On August 3, 1999, there was one exceedence and only dirt from site 1F was brought to the landfill. (Again, no thallium at site 1F.) On November 15, 1999, there were two exceedences. All of the dirt came from site 1E (where no thallium had been detected).

Close inspection of the air monitoring results reveal a careful and successful effort by the contractor to minimize fugitive dust, confirmed by a very small percentage of exceedences at perimeter air monitors with an action level already set to be extremely conservative and protective of human health.

### f.   *And Perimeter Air Monitoring Was Not Actually Necessary*

The EPA had determined that perimeter air monitoring was not even necessary to protect human health at Box Canyon. According to the EPA remedial project manager, Sheryl Lauth, the EPA did not believe that there was a risk to the residents near Box Canyon primarily because the concentrations of the metals were relatively low and metals are non-volatile compounds not readily transported through the air. This Court notes that there were no complaints in 1999 from residents of the adjacent housing complex or the elementary school about blowing dust from Box Canyon.

Of the various health and safety officials that routinely visited the site, none observed conditions causing concerns. There were complaints of noise. Those complaints were addressed by setting up noise monitors to control noise.

A teacher at the elementary school testified that her classroom faced the landfill. Daily, the teacher was in a position to notice whether dust was being created and whether dust was spreading towards either the school grounds or farther to the school buildings. The school teacher, Ms. Erin Hughes, was credible. Ms. Hughes testified that, over the life of the Box Canyon project, she observed dust coming over the fence onto the school grounds on only two or three occasions, and that each time the dust came over the perimeter fence, it did not approach the school. Moreover, the two or three occasions she saw dust migrating, it was from equipment creating a berm out of clean cover soil ("the capping soil"). She further testified that she did not keep her classroom door closed because of a concern about landfill dust. Instead, she kept it closed to keep out noise. Trial Phase 1, Dkt.#440 at 93:2 to 106:4 (Testimony of Erin Hughes). In contrast, L's father, Sgt. Myers testified that when soil was being dumped in the landfill near their housing unit, dust migrated towards the housing and settled in and around his house and over the neighborhood. Sgt. Myers testified that he had to keep the doors and windows closed because of the amount of dust coming into the living areas. Trial Phase 1, Dkt.#443 at Tr. 104:4-17; 106:6-13 (Testimony of Sgt. David J. Myers). As will be seen, Sgt. Myers is not a reliable historian.

The evidence showed that, Defendant's contractor took steps to prevent airborne dust at Box Canyon. Soil to be excavated was first sprayed with water. Tarpaulins covered truck beds used to transport soil. Dumped soil was moved little and then compacted. Water was again sprayed, sometimes with a mixed-in polymer bonding agent. The contaminated soil was covered at least once each day with six inches of clean soil. Any visible dust was likely from uncontaminated soil. The air monitors employed by IT/OHM were appropriate for the task. While there were occasions where the action level for airborne dust might have been exceeded, the action level set by IT/OHM was so low that there were exceedances where there was no visible dust.

### 5.   Conclusion

Consequently, even if Navy QAO, Nars Ancog, had reviewed every one of the 3,379 perimeter air monitor readings during each of the 99 days of the Box Canyon project, he would not have had occasion to stop the remediation work because of a HASP action level exceedence.  Therefore, the Plaintiff has not proven and the Court cannot say that the Navy's breach of duty in failing to ensure its QAO reviewed the perimeter air monitoring data was the proximate or actual cause of L's alleged injuries.

## II.   ALTERNATIVELY, THE NAVY'S BREACH OF DUTY DID NOT PERMIT THALLIUM TO ESCAPE BEYOND THE PERIMETER FENCE IN HAZARDOUS AMOUNTS

Even if the contractor's HASP should have been rejected and the work stopped by the Navy's QAO, there is a lack of evidence that hazardous thallium escaped the landfill work site and fell beyond the perimeter fencing into Plaintiff's daughter's environment.

### A.   Environmental Soil, Swipe, and Bulk Sample Testing

Testing in the year 2000 at Box Canyon landfill, the Wire Mountain housing area, and the elementary school adjacent to the landfill, showed no elevated levels of thallium.  Only one sample at the school showed any detection of thallium and that was at a level below the naturally-occurring background level of 1.4 mg/kg.  None of the soil samples taken from Plaintiff's residence indicated the presence of thallium.  Likewise, none of the "swipe" samples taken from inside Plaintiff's residence reported detections of thallium.  In fact, one of the "really good" samples came from the window sill of L's bedroom, and there was no thallium evident from testing the built-up dust.  Dr. Shields testified,

> Let me just add one comment on the Navy Environmental Lab wipe sample.  There was one sample there that Commander Field pointed out to me. . . . that was the one that I was really focusing on because Commander Field said that that would be the worst case situation.  It was in the little girl's bedroom window facing the landfill, and

1
2
3
4
5
6
7
8

> they had collected about a teaspoon of soil or dust from
> the window sill on their wipe. And so if anything was
> going to show a hint of thallium or these other indicators,
> manganese or zinc, it would be that sample, and there was
> sufficient material in there to really give you confidence
> that they had -- they didn't have to dilute it. It was not like
> two dust particles. There was a teaspoonful, like 2 or 3
> grams of soil. That sample was -- I think it was 1.3
> micrograms per wipe below their detection limit of 2, so
> that gave me confidence that even under the worst case
> situations they weren't able to detect any thallium or any
> other metals at an elevated level.

9   Trial Phase 1, Dkt.#446 109:14-110:7 (Testimony of Dr. Shields). The testing was

10  based upon sound scientific practices and by experienced chemists. There is simply

11  no evidence that any thallium migrated from Box Canyon to Plaintiff's residence or

12  elementary school.

13      As previously explained, prior to the 1999 earth movement activity, the

14  primary concern was lead, because lead was found in greater quantities than any

15  other hazardous substance in the soil to be moved. There was no concern raised

16  regarding danger to residents of the nearby housing complex or elementary school

17  from exposure to lead or thallium contaminants in airborne dust. As one witness

18  testified,

19
20
21
22

> [T]he idea of dust having contaminants that would pose a threat to
> humans at the school or at the housing area was just so negligible,
> intuitively, we had low concentrations of stuff at the sites themselves
> . . . we were transporting that to a site and disposing of it in a very
> small area of the site, in which probably 95 percent of the site was
> clean soil that was the source of potential dust at the site.

23  Trial Phase 1, Dkt.#439 at 33:7-15 (Testimony of Jerry Dunaway).

24      After L's complaints surfaced, the Navy made efforts to determine if dirt

25  contaminated with thallium had migrated to L's environment. In March of 2000,

26  four months after remediation activity ceased, and later again in September,

27  environmental samples were taken from around L's house, nearby residences, and

28  the Santa Margarita Elementary School. As Cmdr. Field testified, he planned to

1    take samples with a view towards biasing them high.  Samples were taken from
2    areas such as around and under the dog house at the Myers' residence, in the attic
3    space, inside a closet, under the eaves, and other areas that would not be affected by
4    weather or other environmental factors.  Plaintiff's own expert, Dr. Chorover,
5    agreed that if thallium had escaped the landfill in wind-blown dust, one would
6    expect to find it in these places at the Myers' housing unit.  He testified,

7             I think that they are significant in that they are locations
              that one would expect bulk samples to have been protected
8             from the weather in an exterior environment that would
              otherwise be subject to rain and other climatic effects.  So
9             these are -- these are places that are exterior to the house,
10            which would have been impacted by the fugitive thallium
              dust, but on the other hand, protected from [the] sort of
11            weather incidents that would remove that dust over the
12            course of time, in the interim period between the landfill
              operations and sampling.
13

14   Trial Phase 2, Dkt.#544 at 84:18-85:2.

15         These samples were sent to two different labs for testing.  Both labs returned
16   results that showed that thallium was not detected.  "Not detected" does not mean
17   that there was no thallium present.  What it does mean, is that if thallium was
18   present, it was in such low concentrations that it was not detected at all, or that it is
19   below the quantitation limit of the testing instrument used.

20         One lab retained its "raw data."  The other, apparently, did not.  The results,
21   however, were consistent with each other.  These samples were tested using a
22   technology know as ICP-AES, or Inductively-Coupled Plasma Atomic Emission
23   Spectrometry.  Like all laboratory testing techniques (GFAAS, ICP/MS, and XRF or
24   X-Ray Fluorescence), it is subject to false positives resulting from inter-element or
25   matrix interference.  The raw data showed that these samples had a very high
26   background interference from iron.

27         The chemist who ran the samples for the Navy Consolidated Industrial
28   Hygiene Laboratory, Richard Lee Norman, PhD, was cogent and reliable.  He

testified that, in his opinion, it was proper to report the samples as non-detect for thallium, because just as in the testing of L's urine (described *infra*.) the background signal was so high when compared to any signal for thallium that the result yielded a negative number. He testified that he did not run "background correction," but did run scans that in his opinion verified that if thallium was present, it was present in very, very low levels. Trial Phase 2, Dkt.#552 at 113:4-144-19.

Again, the presence of thallium would be expected. To simply say that thallium was present in L's urine, or in these environmental samples, is inconsequential since thallium is normally present in the environment. The results from the Navy Consolidated Industrial Hygiene Laboratory and the Navy Environmental Lab were corroborated by test results also run by IT/OHM and the Santa Margarita School District. Split samples of some of these were also sent to DTSC for testing. No different results were reported.

### 1.    No Thallium Hazard Found in Samples At the Myers' Residence

Since the perimeter air monitoring action level was set so low, and since the contractor took so many affirmative steps to control fugitive dust, one would not expect to find much thallium in the environment at the Myers residence. As expected, only naturally-occurring amounts of thallium were found.

As mentioned above, toxicological sampling took place in March and September 2000. The Navy did a great deal of sampling in and around the Plaintiff's residence. There were 30 swipe samples of surfaces. There were 10 bulk samples. There were 100 soil samples. The sampling was not random. The approach was designed to collect dirt and dust from areas protected from the weather and methodically carried out to achieve comprehensive coverage. Soil samples were taken at each point of a large grid from the grassy area between Plaintiff's unit and the work site perimeter fence. Samples were even taken from a storm water drainage washout area where water from winter rains would have naturally collected and deposited any trace metals. As Dr. Shields and Dr. Chorover

1   commented, if high concentrations of thallium were to be found, this certainly
2   would have been the place.  No thallium was detected above the background level
3   of 1.4 mg/kg – which is the amount found naturally occurring in native soil.  Thus,
4   any inference that rain may have washed the thallium away does not hold water.

5               **2.     Pre-Remediation Testing Disclosed Little Toxicological Risk**

6        That high levels of thallium were not found at the Myers residence was no
7   surprise, given that high levels of thallium were not found in the soil to be moved to
8   Box Canyon.  The FFA agencies had done tests to determine the extent of toxic
9   metals in the soils before the project began.  Sampling data revealed few
10  concentrations of thallium at very low levels.  Specifically, thallium was of no
11  concern at three of the five sites.  At the other two sites, extensive sampling was
12  done.

13       As touched on earlier, at site 1A, 151 soil samples were taken, including 40
14  samples taken from soil that ultimately was transported to Box Canyon.  Of the 151
15  samples, only one sample exceeded the safe standard for thallium – and not by
16  much.  At site 2A, 90 soil samples were taken, including 16 samples from the soil
17  ultimately transported to Box Canyon.  Of the samples, only two samples exceeded
18  the safe standard for thallium.  One sample was only a little high.  The other sample
19  was high, but appeared to be an unreliable test result (the sample marked "BJ").

20       The Defendant's contractor used the Inductively Coupled Plasma Atomic
21  Emission Spectrometry (ICP-AES) method to identify thallium in the soil samples.
22  That method often produces false positives where there are other metals in the
23  sample.  In the soil at site 2A, there were high concentrations of other metals such
24  as zinc and manganese, which likely caused the false positive test for thallium.

25       Plaintiff used unreliable data to try to convince this court that the
26  contamination was much greater than evidenced.  The pre-remediation soil testing
27  was accomplished by a form of testing known as X-Ray Fluorescence (XRF).
28  According to Plaintiff's "soil fate and transport expert," this XRF testing showed

thallium in the soil at levels that were higher than background (*i.e.*, above what is typically found naturally occurring in undisturbed soil). The evidence clearly discredits this opinion.

XRF is a screening device. An XRF testing device was not a device that was relied upon by any regulatory agency for accurate results (at least at the time of this 1990s clean-up). The XRF testing device is a portable device and is relatively inexpensive, quick, and allows for testing of a sample without its destruction. However, the Army Corps of Engineers in an unrelated paper has concluded that it generally registers high-biased results. *See* Exh JG; Trial Phase 2, Dkt.#544 at 149:8-150:24 (Testimony of Jon Chorover). Other literature about XRF confirms the EPA's conclusion. Dr. Shields is a highly qualified expert on remediation, soil treatment, transport, and testing methodology. He ran comparisons between XRF results and results by ICP/MS, and arrived at a similar conclusion. The reason is simple. As with so many other testing methodologies, including Graphite Furnace Atomic Absorption Spectrometry (GFAAS), they are all subject to interference from other substances. In the case of XRF screening tests, the interference comes from other metals in the soil matrix such as iron.

### 3. The 5.4 mg/kg Reference Dose is 3000 Times Less Than the NOAEL

In analyzing the soil testing, the EPA and the DTSC used a preliminary remedial goal (PRG) for thallium of 5.4 mg/kg. The PRG was designed to be 3,000 times *less* than the "no observable adverse effect level" (also known as NOAEL) derived from animal studies.

In other words, through scientific studies on the effect of thallium on animals, an amount of thallium was determined to have no observable adverse effect on animals. That amount of thallium was then reduced 3,000 times to arrive at the reference dose of 5.4 mg/kg for human protection. Amounts of thallium below the reference dose were considered to be of no consequence. Even by this extremely protective standard, the contaminants in soil placed in Box Canyon were so low that

1  it was deemed safe for landfill workers to forego wearing respiratory protection.

2       **4.**   **Plaintiff's Claim of Thallium in the Samples**

3       But Plaintiff adamantly argues that thallium was detected in the samples.

4  Once again, that is not significant by itself because thallium is found to occur

5  naturally in soil.  What is significant is the low amount of thallium in the samples.

6  The low amounts were not likely to cause elevated levels of thallium in an urine

7  sample.

8               *a.*   *Plaintiff's Expert Ron Briggs*

9       Plaintiff's expert analytical chemist, Dr. Ron Briggs, testified during the first

10  phase of the trial.  While credible in the limited area of his knowledge, his opinions

11  are sophomoric and not entitled to much weight.  He had little experience.  He had

12  never done any type of work involving collecting and analyzing samples from the

13  field.  He had never done any analysis of either soil or dust for heavy metals and he

14  had not analyzed biological materials.  He had earned his PhD only two years before

15  and his official position title was "Senior Lecturer" at Arizona State University.  He

16  had never testified before in court.  His opinion was formed only for this specific

17  case.  In other words, prior to this case, he had not analyzed laboratory raw data

18  from the testing of biological samples, soil samples, or dust samples.  Yet, he

19  offered opinions on the results of urine testing and environmental testing.

20               *b.*   *Defendant's Expert Richard Norman*

21       On the other hand, Defendant's expert analytical chemist, Dr. Richard

22  Norman, was very experienced and knowledgeable.  Dr. Norman earned his PhD in

23  1976 and worked as the lead chemist in the Navy's Consolidated Industrial Hygiene

24  Lab, analyzing metals from 1986 to 2010.  His opinions are relevant and reliable.

25               *c.*   *Other Lab Results*

26       Three other laboratories analyzed the environmental samples.  The Navy

27  Environmental Laboratory ran the samples with background correction and arrived

28  at similar low level readings.  IT/OHM also ran samples that reported non-detect.

Even the Santa Margarita school did environmental sampling and analysis.  One sample measured 1.0 mg/kg of thallium.

### d.      Missing Raw Data is Not a Problem

Plaintiff discounts these results because the raw data for these test results are "missing."[19]  There is the implication of a conspiracy to hide the raw data.  But the lab used by the Santa Margarita school did not have a contract with the Navy.  And the lab used by IT/OHM did not have a contract with the Navy.  There was no obvious reason to conspire.  Without valid scientific evidence, Plaintiff questions the actual lab results that show nothing beyond the ordinary amounts of thallium expected in native soils.

It is perhaps ironic that Plaintiff argues so heavily the absence of raw data when all of Plaintiff's  medical experts form their opinions (regarding L's thallium poisoning) without having seen the actual urine lab reports, much less the raw data.  Be that as it may, this fact remains.  Several laboratories tested the various samples.  All were licensed.  Some samples were even split and sent to California's DTSC with similar results.  No thallium above background was ever detected.  The 2005 ATSDR (Agency for Toxic Substances and Disease Registry) report made similar findings.  Exhibit JH.

### e.      Plaintiff's Expert Dr. Chorover

Plaintiff's expert, Jon David Chorover PhD, was also unpersuasive.  Dr. Chorover is a professor and department head of the University of Arizona Department of Soil, Water, and Environmental Science.  Unlike an expert that works carefully and deliberately to arrive at an opinion, he arrived at his far ranging and detailed opinions within hours of being hired and in spite of other time commitments.  See Exh NS (communication between Chorover and Plaintiff's counsel, dated Feb. 14, 2012) ("I received last night your Fedex package containing

---

[19]Plaintiff had the opportunity to subpoena the raw data from IT/OHM but did not.  Additionally, at one point Plaintiff moved to compel production of the raw data.  For reasons not apparent from the record, Plaintiff later withdrew her motion.

02cv1349-BEN

1    documents pertaining to the Myers v. U.S.A. case and, with a full day of meetings
2    and teaching today, I have had only a brief opportunity to review the materials.").
3    Curiously, his opinions were similar to counsel's arguments.

4            Moreover, Dr. Chorover's opinions regarding dilution of the thallium in soil
5    sampling and expected ratios of iron to thallium were not persuasive.
6    Consequently, his opinion that four of the ten bulk samples were incorrectly
7    reported as "non-detect" was not persuasive.  His opinions are accorded little
8    weight.  *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944) (even if
9    expert testimony is admitted, it is for the trier of fact to decide the weight to which
10   it is entitled).

11           Dr. Shields, on the other hand, was persuasive regarding his opinion that a
12   preferable normalization would be to manganese, given the high level of manganese
13   detected at 2AB-05.  "It is very clear in the literature that iron is an interferent for
14   thallium, and the laboratories absolutely must correct for inter-element correction,
15   as well as background, in order to have reliable quantitative runs, reliable
16   quantitative data.  It is very, very fundamental."  Trial Phase 2, Dkt.#553 at 65:21-
17   25 (Testimony of Walter Shields).

18           **B.    No Thallium Detected in Family Members and Pets**
19           Blood samples were taken from L and both of L's parents, and the two family
20   dogs.  No results of elevated thallium levels were reported.  Trial Phase 2, Dkt.#553
21   at 66:6-69:8 (Testimony of Walter Shields); Trial Phase 2, Dkt.#548 at 51:6-25
22   (Testimony of Cmdr. Dan Field).  No results showed the presence of other heavy
23   metals either, such as lead, manganese, antimony, etc., in the biological sampling
24   from the Myers family and their two dogs.  And there was no detection of other
25   heavy metals in the soil sampling.  *Id.* at  Dkt.#553 at 71:18-23.

26           **C.    No Complaints or Observations of Visible Dust**
27           In 1999, there were no complaints by anyone of visible dust leaving Box
28   Canyon.  No witness during the first phase of trial (except Sgt. Myers) testified that

dust was seen blowing over the perimeter fence toward the Wire Mountain housing complex. Sgt. Myers took the opportunity in March and April 2000 to canvass his neighbors in the Wire Mountain housing complex. Apparently, he found no one else who would support their testimony. There was a public hearing in April 2000, held by the Navy on base for the residents of the Wire Mountain housing complex, to talk about the Box Canyon project. No complaints of dust were recorded. Mary Simmons from NEHC testified that she never saw dust leaving the work site or approaching the perimeter fence during her visit. Jerry Dunaway testified he never saw dust blowing off of the landfill. Even Manny Alonzo, testified that he never saw dust leaving the site.

The most convincing testimony, however, came from previously-mentioned school teacher, Erin Hughes, who kept her classroom door closed due to Box Canyon noise – not because of dust.[20] The Court found Ms. Hughes a credible witness with no apparent bias or motive to testify in any particular fashion. Similarly, the school principal, Mr. Frank Gomez, complained about *noise* to the Navy. Exh 78, Meeting Minutes.

Only Sgt. Myers, joined in the second trial phase by Mrs. Myers, testified that dust was a constant problem blowing from the work site into their yard and housing area. The Court found their testimony on this point to not be credible. Although Plaintiff's attorney often phrased witness questions by including a phrase about residents in the nearby Wire Mountain housing complex seeing clouds of dust blowing from the landfill, the only residents who actually testified that they saw such clouds were Sgt. Myers and Christine Myers. No unbiased witness ever corroborated their testimony.

**D.** **Because No Thallium Left the Landfill, the Navy's Breach of Duty Was Not the Cause of L's Exposure**

If it is assumed that L's harm was caused by an exposure to thallium, it is still

---

[20]Ms. Hughes did see on two or three occasions dust passing over the perimeter fence in the direction of the school to the south. Wire Mountain is east of the landfill.

not clear where or how the exposure occurred.  Viewing the evidence in retrospect, it can be reasonably suggested that thallium from the adjacent landfill somehow migrated to the Myers' yard or their neighbors' yards.  However, the results from soil testing around the yards showed that thallium was absent.  In the same vein, swipe testing was performed inside the Myers' residence.  Areas of the home where dust was likely to build up were specifically included in the testing.  The swipe test results proved an absence of thallium.  Even Plaintiff's expert CIH, Mr. Worobel, conceded that there was no detection of thallium above the PRG of 5.4 mg/kg in the soil around the housing area or the elementary school.  Trial Phase 1, Dkt.#440 at 197:13-199:8.  At these amounts, defense toxicologist, Wayne Snodgrass, M.D. calculated that L would have had to ingest 60 pounds of dirt in order to have a toxic dose above 100 mcg/L in her urine.  Even if thallium was present at a higher concentration of 144 mg/kg in the soil, it would still require L to ingest 20 pounds of dirt to consume a toxic dose.

If thallium was present in L's home environment, one would also expect that her parents would show elevated levels of thallium in their bodies.  Biological testing showed the opposite.  If thallium was present, one would certainly have expected that the family dogs would have tested positive.  They did not.  If thallium had migrated off the landfill, it would be reasonable to expect that high levels of other metals would have been detected.  Metals such as copper, manganese, and lead.  They were not.  And neither L, nor her parents, nor her dogs ever showed abnormal concentrations of these metals when they were tested.

Perhaps the laws of physics, to steal a line from *My Cousin Vinny*, ceased to exist at the landfill perimeter fence?  What about the lead, the manganese, the iron, the zinc, and the other metals that were *not* found above background levels around the Myers' residence in post-project biological and environmental testing?[21]  The

---

[21] *My Cousin Vinny* (Twentieth Century Fox Film Corporation 1992), (Q.  "Are we to believe that boiling water soaks into a grit faster in your kitchen than in any place on the face of the earth? A.  I don't know.  Q.  Perhaps the laws of physics cease to exist on you stove?").

point is, even in retrospect, Plaintiff has not demonstrated, by a preponderance of the evidence, that the thallium which harmed L, if thallium harmed L, came from the Defendant's Box Canyon operations.  The evidence does not convince the Court that Defendant was negligent in its task of ensuring IT/OHM performed the Box Canyon work with adequate safety measures in place.

## III.   ALTERNATIVELY, EVEN IF THALLIUM LEFT THE LANDFILL IN HAZARDOUS QUANTITIES AND L WAS EXPOSED, L WAS NOT INTOXICATED

If it were the case that thallium had escaped in wind-borne dust during the remediation project, and if the fugitive thallium had accumulated in hazardous quantities in L's environment, there is no reliable evidence that L ever had more than a normal amount of thallium in her body.  The normal amount of thallium in children age 6 to 11 is approximately .2 mcg/L.  And, if L had only the typical amount of thallium in her body, then Plaintiff has failed to put forth evidence of exposure to thallium as a result of the Navy's remediation project at the Box Canyon landfill.

### A.   L's Urine Samples Indicated Normal Thallium Levels, Except for Three Unreliable Readings

It is not too much of an overstatement to say that this case is built entirely on one piece of evidence: a laboratory test report indicating a thallium concentration of 6.91 mcg/L[22] in L's urine.  It is central.  As Plaintiff's counsel said, "[a]nd 6.91 just stands like a beacon."  Trial Phase 2, Dkt.#553 at 140:1-2 (Plaintiff's Closing Argument).  It is one of three lab results from the same lab that suggest a thallium concentration in L's urine above what is typically found in the human population.

The main problem is that these three test results are worthless.  Even the lab must have recognized that the first and third results were unreliable because the lab did not "report out" those test results.  The second one, the one test result that was

---

[22]Thallium in urine is often measured in micrograms per liter, which may be abbreviated as mcg/L or *ug*/L.  Particulates in dust are often measured in milligrams or micrograms per cubic meter of air, which may be abbreviated as mg/m³ or mcg/m³ or *ug*/m³.

reported out, is an example of junk science. Other than this one curiosity, performed by an inaccurate method, in violation of lab protocols, and without confirmation testing, all of the rest of L's lab results were normal. *See* Exh OH (Chart of Urine Analyses).

"Reported out" is a term of art for laboratories that means the lab is confident in the accuracy of the result. A result may not be reported out for a number of reasons. One reason may be that the lab technician has not run calibration tests on the testing instrument. Another reason could be that the technician suspects that the sample tested (the analyte) contains impurities. Artifacts from prior tests of other analytes could also interfere with reading an accurate test result. When an instrument provides a result that is smaller than the instrument can accurately detect (also known as the limit of quantification), the chemist may report the result as a non-detect. *E.g.*, Trial Phase 2, Dkt.#544 at 15:4-16-22 (Testimony of Jon Chorover) ("The limit of quantification is the amount of contaminant or analyte that can be measured reliably and precisely sort of in a quantitative sense above the noise of the instrument.").

## B.    Three Test Results From the Same Lab Are Unreliable

Three lab test results were higher than all of the others. All three came from the same laboratory. The first two tests were run on a urine sample collected on March 13, 2000 and analyzed by National Medical Services laboratory (NMS) on March 15, 2000. The *first* result was 15.43 mcg/L but this result was not reported out. The *second* test result was 3.46 mcg/L, which was reported out as 6.91 mcg/L. A third test was also performed by NMS later on April 12, 2000. It is unclear which urine sample was tested. The *third* result was 9.52 mcg/L but was not reported out.

For a number of reasons, this Court is not confident that any of these three "high" results are accurate. And the Court is not alone. Even William Dunn, a forensic toxicologist and the only person to testify who actually worked at the NMS lab, concluded that after looking at all four of its test results, "If thallium is present,

1   it is not in excess of 5 micrograms per liter." *See* § D(3) *infra*.

2          Some of the other reasons include the unreliability of using Graphite Furnace

3   Atomic Absorption Spectrometry (GFAAS) testing of thallium in urine, the sample

4   (or accession number) confusion, the odd manipulation of the analyte and machine

5   readings for the 6.91 result, the lack of confirmation tests such as the "spike-

6   recovery" approach, and the fact that three other laboratories analyzing plaintiff's

7   urine samples arrived at much lower (*i.e*, normal) concentrations of thallium.

8          **1.      The First High Test Result – Not Reported Out**

9          The chemist at NMS that actually ran the tests at NMS did not testify,

10  although she may have been available to testify.  She was available at the time

11  William Dunn was deposed in 2003.  Apparently, Plaintiff did not depose her.

12  William Dunn, was a forensic toxicologist[23] at the NMS lab.  He did testify by way

13  of deposition.  He testified about his lab practices and his observations of the way

14  samples are analyzed at NMS.  Dunn described the various quality control tests and

15  procedures employed prior to testing an analyte.  He said the GFAAS machine

16  equipment appeared to have been set up properly prior to testing plaintiff's first

17  sample.  The first result was 15.43 mcg/L (the first high result).  The lab

18  technician/chemist who ran the test, however, did not report this result.  One can

19  only conclude from this, that the chemist was of the opinion that the result was

20  inaccurate or unreliable.  It is not accepted as evidence of elevated thallium in L's

21  urine.

22          It was surmised that the analyte contained too much background interference.

23  Witnesses testified that a test result can be skewed by the presence of salts,

24  _____

25          [23]Plaintiff's counsel incorrectly referred to Mr. Dunn as the "Lab Director" at
     NMS throughout both phases of the trial.  Ten times during the first phase and seven
26   times during the second phase.  But Mr. Dunn said his job title is simply, "forensic
     toxicologist."  *See* Deposition Excerpts filed March 19, 2013, Dkt.#538, at 26:11.  He
27   described his duties as supervising and certifying reports as they leave the lab.  He was
     apparently one of several toxicologists, as he described the "tox of the day" as a "duty
28   that all the toxicologists in National Medical Services will take on rotation."  *Id.* at
     158:12-19.  Defense counsel also referred to Dunn once in closing argument as the lab
     director.

something which urine is known to have.  A result can also be skewed by artifacts on the testing equipment.  A result can also be skewed by too much "background" contaminants.  Even Plaintiff's expert witness and analytical chemist, Dr. Briggs, acknowledged, after looking at the raw data for the test, that the thallium signal was so weak that it was less than 1% of the background in the sample.  Trial Phase 1, Dkt.#441 at 142:15-18 (Testimony of Dr. Briggs).

Defendant's expert Daniel Joseph McCoy, M.D., is a toxicologist with expertise in analytical chemistry.  McCoy has many years of experience testing heavy metals and setting up test equipment and running investigative laboratories. See Exh EE (Curriculum Vitae).  Dr. McCoy's opinions in both phases of the trial are relevant and reliable.  Dr. McCoy explained that, "the laboratory documentation indicated that there was an excessive amount of interference or background signal that would indicate that this was, quote, a specimen that was not optimal for analysis, and the results could not be relied upon."  Trial Phase 2, Dkt.#549 at 167:21-25.  This opinion makes sense.

### 2.   The Second High Test Result – Unreliable

The problems with the second high result are developed more fully below, but summarized here.

For the second high lab report, the lab technician/chemist diluted the urine and re-ran the test.  This time the detected amount was much lower, 3.46 mcg/L according to the raw data.  That amount is *smaller* than the test equipment was set up to accurately measure.  The technician/chemist then multiplied the measured amount by two and reported out a test result of 6.91 mcg/L.  And as with the first sample, even after dilution, the thallium signal was still less than 1% of the large background signal.  Trial Phase 1, Dkt.#441 at 142:15-18 (Testimony of Dr. Briggs).

The striking problem with the 3.46 mcg/L result is that the test equipment was not calibrated to detect amounts below 5.0 mcg/L.  Doubling the 3.46 mcg/L

- 61 -

still results in an inaccurate and unreliable result. The technician failed to confirm the result by running a new lower calibration curve for the test equipment or doing a "spike recovery" where a known additional amount of thallium is added to the analyte and retested.[24]

As evident from guidance Dr. Briggs received from the instrument manufacturer, when background is high and the thallium signal is low, spike recoveries and pretreatment studies are recommended.

> Q.   Now, you made an inquiry about this issue of a large background signal versus a small thallium signal with the scientists at Perkin-Elmer, the company that manufactures this instrument?
>
> A.   Yes, I did.
>
> Q.   And you called Perkin-Elmer and asked for a field technician or somebody with a lot of experience with this instrument?
>
> A.   Correct.

Trial Phase 1, Dkt.#441 at 143:17-25 (Testimony of Ronald Briggs). Dr. Briggs' August 31, 2004 email from Randy Hergenreder at Perkin-Elmer was raised at trial:

> Q.   ". . . .If background is high, then somehow also look at possible matrix interferences in your samples;" is that right?
>
> A.   Yes.
>
> Q.   And if you look at the last two sentences in that paragraph [Hergenreder] states, "when you have samples with high background, check for interferences by doing spike recoveries and pretreatment studies to check for losses. Also, it is good to run reference materials to confirm your methodology," do you see that?
>
> A.   Yes, I do.

Trial Phase 1, Dkt.#441 at 145:17-146:2 (Testimony of Ronald Briggs). After hemming and hawing, Dr. Briggs eventually conceded that no spike recoveries or

---

[24] A spike recovery works like this: to determine if a 3.45 mcg/L result with a large background was accurate, one might add 5.0 mcg/L of thallium to the specimen, and re-test. A result of 8.45 mcg/L would then offer confidence that the earlier 3.45 result was accurate.

1   pretreatment studies were done on L's samples.  Trial Phase 1, Dkt.#441 at 157:2-9.

2   High salts in the samples were not considered and chemical modifiers were not

3   used.  Instead of performing these confirmation tests, the lab technician/chemist

4   simply doubled the unreliable 3.46 mcg/L result (presumably to account for the 1 to

5   1 water dilution) and reported out the conspicuously high 6.91 mcg/L result.

6                    **3.      The Third High Test Result – Not Reported Out**

7        The third abnormal result came from the same laboratory, using the same type

8   of testing, approximately two weeks later.  The test result was 9.52 mcg/L, but the

9   lab did not report out the result.  This was also a curious result.  And it was a

10  significant element in Dr. Gustin's flawed toxicological opinion.[25]

11       One problem with the result is that the specimen had been labeled with the

12  same accession number as the sample tested on March 28, 2000, yet the creatinine

13  concentration was vastly different (the concentration levels should be the same for

14  the same samples).  The specimen tested March 28, 2000 had a recorded creatinine

15  concentration of 0.912 g/L.  The specimen tested on April 12, 2000 had a recorded

16  creatinine concentration of 0.143 g/L.  Creatinine concentrations are like

17  identification tags for urine specimens in that they allow chemists to be sure that

18  smaller aliquots split from larger specimens come from the same specimen and the

19  same patient.  This Court concludes that something was amiss.  Either the two

20  samples were from the same specimen, yet testing produced different results, or they

21  were two different specimens from different days, yet with the same accession

22  number.  The Court concludes that none of the three test results are reliable.

23                    **4.      Unreliability of GFAAS Testing vs. ICP/MS Testing**

24       The GFAAS laboratory test results of L's urine samples performed by NMS

25

26  ────────────────────
        [25]"So I'm relying on that as that being *a valid 9.52*.  So that is a very important
27  piece of information.  Because not only does L[ ] have the classical findings of chronic
    thallium intoxication, but she has a laboratory test to prove it."  Trial Phase 2, Dkt.#547
28  at 47:18-21 (emphasis added) (Testimony of Gustin, M.D.).  The problem is that the
    9.52 result was not valid.  The lab did not report it out.  She did not have a valid test
    to prove it.

1   are unreliable. Reasons include the confusion of the specimens, the non-reporting
2   of two results, and the oddly-arrived-at 6.91 result. Analytical chemist, Dr. McCoy,
3   testified that the GFAAS method is less reliable than a test known as ICP/MS or
4   inductively-coupled plasma mass spectrometry. Even William Dunn, the forensic
5   toxicologist working at NMS at the time, agreed that where there are lower levels to
6   be measured, ICP/MS is a better method than GFAAS because the accuracy will be
7   better and there are less problems with interfering compounds. *See* Deposition
8   Designations filed March 28, 2013, Dkt.#539 at 195:9-23.

9      After NMS arrived at the non-reported GFAAS result of 9.52 on April 12,
10  2000, the specimen accession number was changed. The analyte was then tested
11  using the more reliable ICP/MS test equipment. The result showed a very low
12  amount of thallium in L's urine. Specifically, thallium isotope 203 was detected to
13  have a concentration of only 0.124317 mcg/L. This was cross-checked against
14  thallium isotope 205. The result was similar to the isotope 203 test with a result of
15  0.148017 mcg/L. Those results, in turn, tend to confirm similar results arrived at by
16  another laboratory for two specimens from the same time frame.

17     **C.     Other Lab Test Results Showed Normal Thallium Levels**
18     Pacific Toxicology (PACTOX) used ICP/MS to test a urine sample from L
19  collected on March 31, 2000 and received on April 1, 2000. The specimen was
20  tested and thallium was detected in the typical concentration of 0.2 mcg/L. The
21  result was reported out on April 4, 2000. A second specimen with a different
22  creatinine concentration was received by PACTOX on April 7, 2000, tested using
23  ICP/MS and reported out on April 10, 2000 a similar result of 0.2 mcg/L. *See* Exh
24  109B.

25     Convinced by the testimony of the experts in this field who testified, this
26  Court is persuaded that these results of approximately 0.2 mcg/L reliably and
27  accurately described the thallium level in L's urine by the end of March 2000. To
28  sum up, the ICP/MS test results from both NMS and PACTOX were similar and

they detected only typical levels of thallium in the urine. Each of the other three tests done by GFAAS by NMS were suspect for the various reasons discussed above and below. The one elevated 6.91 result that is the centerpiece of this case might be precise, but it is likely precisely wrong.

### D.    Analysis of the Evidence

Does the laboratory evidence substantiate L's alleged exposure to thallium? First, as previously explained, everyone is exposed to thallium in food and other products like costume jewelry, glassware, and electronics. We all have thallium in our bodies. *See Reference Manual on Scientific Evidence*, 3d, n.77 (citing National Center for Environmental Health, Centers for Disease Control and Prevention, Fourth National Report on Human Exposure to Environmental Chemicals (Updated Tables August 2014), at 204) (mean level of urinary thallium in age group 6-11 years during survey years 99-00, = .201 *ug*/L).

It is equally false to say that there is no safe level of thallium to which humans can be exposed. It logically does not follow. Since we are exposed to thallium on a daily basis, there must be a level that does not cause adverse health effects. With regards to children, both Dr. Frederick Oehme, Plaintiff's prior toxicologist, and defense toxicologist, Dr. Snodgrass, have opined that children are *less sensitive* to thallium. Laboratories generally do not report as abnormal, any urine level of less than 5.0 mcg/L. A worker is not considered as having been industrially exposed to thallium, according to OSHA, unless his or her thallium urine levels are 50 mcg/L, or more.

### 1.    World Health Organization Exposure Levels

As previously mentioned, the World Health Organization has concluded that thallium urine levels of less then 5 mcg/L are not associated with any adverse health effects. Levels between 5 mcg/L and 500 mcg/L liter are uncertain as to any adverse health effects. Only levels greater than 500 mcg/L are generally considered toxic. OSHA has a permissible exposure limit for thallium (or what has been

previously referred to as a PEL in Mr. Mlakar's testimony) of .1 milliliters per cubic
meter of air, for 40 hours per week, over a lifetime.  Dr. Snodgrass testified that the
literature equates that to a urine level of 100 mcg/L.

### 2. EPA Exposure Levels

Plaintiff has argued, apparently convincingly, that in 2009 the EPA found that
there was no NOAEL (no observable adverse effect level) for thallium.  That is a
gross distortion of what the EPA concluded.  What it concluded was as follows:

> As discussed in section 4.6.1 most information on thallium toxicity in
> humans comes from poisoning, suicide attempt, or accidental
> exposures.  Epidemiologic studies of either the general population for
> occupationally exposed groups are limited by design or insufficient
> exposure characterization.  Thus available human studies do not
> provide data useful for dose-response analysis.

The lack of reliable studies was again addressed by the EPA in 2012 in its
Provisional Peer-Reviewed Toxicity Values.[26]  The PPRTV summarizes the 2009
EPA IRIS (Integrated Risk Information System) report as follows: "No toxicity
values were posted on the IRIS database (U.S. EPA 2009) for thallium because of
limitations in the database of toxicological information."  The PPRTV then goes on:
"However, the toxicological review presents information which could be used for
development of an RFD."  The PPRTV includes an appendix listing toxicity values,
including one for thallium.

From the above data one can conclude that there is some level of thallium that

---

[26] Dr. Gustin explains the EPA hierarchy of standards,

IRIS is that entity the EPA charged with determining what toxic
thresholds and toxic values are for any substances. The EPA maintains
a tier system for evaluating the toxicity of substances and products in the
environment, and the tier system is – IRIS is the first tier. The second tier
is PPRTV, which is the provisional peer-reviewed toxic value group. And
the third tier is a smattering of other groups, including the ATSDR from
the -- which is the Agency of Toxic Substances and Disease Registry.
And so IRIS is charged -- if IRIS comes up with a conclusion regarding
[a] substance, it is gospel. Nothing else happens after that unless there is
a special need. If IRIS can't come up with something, then it goes to tier
2 or tier 3.

Trial Phase 2, Dkt.#547 at 61:4-15 (Testimony of Dr. Gustin).

is not related to adverse health effects.  In fact, both children and adults who have had much greater thallium concentrations in their urine – sometimes in thousands of mcg/L – have recovered fully.  And no case has ever reported a child or adult with 7.0 mcg/L as suffering adverse health effects, much less of the magnitude claimed by Plaintiff.

### 3.    The Unreliable Urine Lab Result of 6.91 mcg/L

The "elevated" lab result of 6.91 which Plaintiff repeatedly and forcefully has argued was "ten times that of an unexposed adult," is completely unreliable.

In March 2000, as the parents and the doctors were trying to find out what was causing L's alopecia, a urine sample was taken.  Previously, a blood sample had been taken which was negative for thallium and lead.  However, blood serum is not as reliable a test for determining thallium exposure.  The urine sample was sent to Quest Labs for analysis.  Quest then sent it to NMS.  NMS then tested the sample using GFAAS.   As mentioned above, GFAAS testing is far from foolproof.  Possible errors can be caused by sample preparation, lack of dilution, and high background interference, among many other reasons.  Even though the technician who analyzed the sample apparently had set up the equipment properly, according to both Plaintiff's analytical chemist, Dr. Ron Briggs, and William Dunn, forensic toxicologist at NMS, when she ran the first test the equipment generated a result of 15.43.   See Exhibit OH.

It is undisputed that the technician found this result to be questionable, although the precise reason is not known.  The Court would have liked to have heard from the technician/chemist as to why she questioned the result.  Everyone agreed that she might have found the sample to be "dirty."  We do know that she then diluted the sample one to one with de-ionized water.  Again she ran the sample through the GFAAS process.  This time the result dropped considerably – not by 50% but by a factor of almost five.  She then multiplied the resulting 3.46, even though it was below the machine's quantitation limit of 5.0, and arrived at a final

result of 6.91.  This result was reported out.

This is the result that Plaintiff claims shows L had "ten times the amount of an unexposed adult."  This is the result Plaintiff's counsel communicated to Dr. Eichenfield (after he had stopped treating L) which led him to conclude that L had "alopecia areata-acquired."  This is also a result conveyed to Dr. Gustin, Plaintiff's "toxicologist," and on which he relied.  This is the result which has in one way or another been communicated to almost every one of L's health care providers through the years.  Given the significance of this result, it becomes critical that its accuracy and reliability be scrutinized.

a.      *Equipment Set Up Properly, But Something Was Wrong*

The Court begins by looking at the obvious.  Everyone has concluded that the GFAAS equipment had been properly set up before the first sample was run.  But the evidence shows that something was wrong – the technician refused to accept the first result.  Next, the Court notes that by diluting the sample 1 to 1, the subsequent result dropped considerably.  That drop may be explainable.  But how that happened was never satisfactorily explained.

Not only is the sample preparation important, so is something known as calibration.  Like a speedometer on a car, it may register a certain reading, but that reading will be repeatedly in error if it has not been properly calibrated.  To calibrate a GFAAS instrument, known quantities of the specific substance to be analyzed, known as "a standard," are run through the instrument.  This sets up a calibration curve.  Even Dr. Briggs acknowledged that the instrument calibration can "drift" in just 20 minutes.  The GFAAS instrument used to test L's urine had not been calibrated *below* five micrograms per liter.  Dr. Briggs said about the NMS testing: "[t]his lab lists a reporting limit of 5 micrograms per liter, and the reason they do that is it's the lowest actual standard they ran through their machine . . . . [T]his lab has chosen not to report anything below that lowest standard because that's their reporting limit."  Trial Phase 1, Dkt.#441 at 81:21-82:2.  But the

reporting limit was ignored.

Dr. McCoy explained why the result of 3.46 was unreliable. There is no point in going through all of the quality control analysis if in the end, one is simply given to say, "whatever." Such disregard for established practice and lab protocol makes any result not scientifically or technologically reliable. He testified,

> A.   It should not have been reported according to the guidelines that National Medical used for reporting out information that they had for test values.
>
> Q.   Can you explain to the court why that is?
>
> A.   National Medical, in their calibration curve and data, used the lowest standard of a five. So that was the lowest reportable level. When they actually did this analysis, the level that was determined was below 0.5 -- pardon me, below 5. What they did to get the 6.9 level was multiply that level by 2. *But by doing that, they have violated their own standard protocol, as indicated in their own literature and in their own guidelines and in their own process.* Their lowest reporting level was 5. So anything lower than 5 is not a reportable concentration. By using the value that was determined that was below 5, they violated that particular policy. They've also violated, if you will, the standard way of looking at a reportable level, and that is to not report a level that is lower than your lowest standard. The lowest standard they ran was a 5, and this level was below a 5.

Trial Phase 2, Dkt.#549 at 169:6-25 (emphasis added). Dr. McCoy's opinion is given considerable weight.

One cannot just say, "well, the result was below our calibration curve, but if we multiply by two we have an acceptable result." Such guesswork cannot pass the reliability standard required by *Daubert*, 509 U.S. 579. *See Reference Manual on Scientific Evidence*, 3d, at 28 (unintended inaccurate results from malfunctioning laboratories are subject to *Daubert* challenges); *see also Expert Evidence*, at n.8 ("For scientists, the 'validity' of a test instrument means the extent to which it 'measures what it is supposed to measure rather than something else.' Thus a bathroom scale that misweighs people by ten pounds every time they use it would

be reliable but not valid.").

The lack of reliability becomes even more pronounced when one considers other factors. GFAAS results can be adversely affected by something known as background interference. Background interference can be caused by other elements or substances, such as salts, salts such as sodium chloride or potassium chloride, both commonly found in urine.

### b.    *Dr. Briggs Needed Assistance*

Dr. Briggs had never analyzed urine samples. He had never used GFAAS to analyze for thallium. But he was hired by plaintiff to testify about the GFAAS urine test results. Given his lack of expertise, he reached out to more knowledgeable sources on urine testing by GFAAS.

One of those sources was a Mr. Hergenreder at Perkins-Elmer. Perkins-Elmer was the manufacturer of the GFAAS equipment used at NMS. Mr. Hergenreder confirmed that "high salts" can cause interference. He was told, "if background is high, then somehow also look at possible matrix interferences in your sample." Dr. Briggs acknowledged that background was high, not just with regard to the 15.43 sample, but with both of the first two samples. He agreed,

> Q.    Having read this, and having looked at the results yourself, you were aware for the 15.43 result that the thallium signal was less than 1 percent for the background of that sample?
>
> A.    Yes.
>
> Q.    And you're aware for the other result, the 6.91, that the thallium signal was less than 1 percent of the background for that analysis as well, right?
>
> A.    Yes.

Trial Phase 1, Dkt.#441 at 142:10-18. Briggs was also advised that in cases where the signal is very low compared to background, spike recoveries, pre-treatment studies, and modifiers should be used. For example, Dr. Briggs was told by Mr. Hergenreder at Perkins-Elmer that the 6.91 result would be more reliable if a spike recovery had been performed:

1
2
3

Q.    Let's look at the next question that you asked him . .
      . .  It says, "which of the two statements would you
      agree with?"  The first one is, "to a reasonable
      degree of scientific uncertainty, the reported
      concentration of 6.91 micrograms per liter, ppb, is
      not a false positive."  Is that right?

4

A.    Correct.

5
6

Q.    His statement is, "this would be true if spike
      recoveries determine that there are no matrix
      interferences, as I've discussed above."  Right?

7

A.    That is his reply, correct.

8

Trial Phase 1, Dkt.#441 at 150:3-13.

9

    A spike recovery is not a vague term.  It is well established in the scientific

10

community and, as Dr. McCoy testified, a common validating technique.  It simply

11

refers to adding a known quantity of the analyte to the sample and then re-testing

12

the sample.  If the result is equal to the sum of the known quantity and the previous

13

result, the previous result is reliable.  If not, the reliability of the previous result is in

14

doubt.  That was never done.

15

    Salts were also a potential problem.  Dr. Briggs was instructed and

16

understood that urine samples that contain high levels of salts can cause

17

interferences with the results.

18
19
20

Q.    "While Zeeman background correction will correct
      for background to relatively high levels, the high
      salts in the samples can cause other interferences"
      Is that right?

21

A.    Yes, that can be a problem.

22

*Id.* at 145:8-12.

23

    In other words, Dr. Briggs needed help explaining the NMS results run by

24

GFAAS.  He turned to the manufacturer of the GFAAS machine.  The

25

manufacturer's experts told him the test results would be reliable if spike recoveries

26

were done, if pretreatment studies were done, watch out for high salts in the samples

27

and used modifiers.  Now, he had answers.  But not the answers he would have

28

liked.

### c.   *Dr. Briggs Squirms*

NMS had not run spike recoveries.  It had not done pretreatment studies.  It had not used modifiers.  And it had not analyzed the samples for high salt content In an attempt to justify the unjustifiable, Dr. Briggs attempted to confuse calibration standards with spike recoveries and pretreatment studies:

> Q.   In the data that you reviewed from NMS, you didn't see any data reporting spike recoveries or pretreatment studies, did you?
>
> A.   What those included, with that data packet, was kind of a combination of spike recoveries and reference materials, the bio-rad solutions.
>
> Q.   Are you saying now that you did see spike recoveries in pretreatment studies?
>
> A.   I think what I said initially is there was nothing specifically called a spike or a pretreatment study, but, as we outlined today, there are reference materials known amounts that go through the graphite furnace.
>
> Q.   But I'm asking you about spike recoveries or pretreatment studies, no reference materials; is there any data showing spike recoveries or pretreatment studies?
>
> A.   Again, a spike is just another type of reference material, so I would have to say yes to that.  There's nothing specific we called a spike though.

Trial Phase 1, Dkt.#441 at 146:3-20.  Dr. Briggs continued to squirm,

> Q.   And you didn't see any data on spike recoveries for this urine sample, did you?
>
> A.   Again, just what we were calling standards or QA/QC data, but nothing specifically called a spike sample.

*Id.* at 157:2-5.  This was the same conflation offered by Dr. Briggs at his deposition: "I do not see in the data any reports on spike recoveries or pretreatment studies, but I did see calibration data which looks very good, as a matter of fact, as well as the spectrum for each one of those things." *Id.* at 147:14-17.

He also waffled on pretreatment studies but conceded that they also had not been done for L's GFAAS testing at NMS. He answered,

> Q.   You didn't see any data on pretreatment studies for this urine sample, did you?
>
> A.   Once again, just the way the solutions were made up, but nothing called -- specifically called a pretreatment.

*Id.* at 157:6-9. And again,

> Q.   You didn't see any pretreatment studies for this urine sample, did you?
>
> A.   The only pretreatment studies, if I would even call them that, is the pages that precede the raw data that show the way the solutions were prepared.

*Id.* at 150:21-25. And he conceded that he could not say what level of salts were in L's urine sample:

> Q.   And then if you look about halfway down the paragraph it states, "in almost all of these situations, zeeman correction was error-free. However, there was interference for thallium in the presence of .1 percent milligrams per liter of nacl or ccl, both with Zeeman and continuum correction," do you see that?
>
> A.   Yes.
>
> Q.   And nacl is sodium chloride?
>
> A.   Yes.
>
> Q.   And crl is potassium chloride, is that right?
>
> A.   Right, but no molybdenum though.
>
> Q.   And from the data you were provided, you couldn't tell how much salt, either sodium chloride or potassium chloride, was in L[ ] Myers' urine?
>
> A.   No, I didn't know how much.

*Id.* at 152:4-18. Another way that the 3.46 result might have been analyzed to gain a higher degree of confidence would have been to add what are known as "chemical modifiers." Dr. Briggs acknowledged that there was no indication that chemical modifiers were used.

1    Q.    And you're also aware, aren't you, that this article
2          discusses the use of chemical modifying to
           eliminate chemical interferences for the detection of
           thallium by the graphite furnace method?

3    A.    Yes.

4    Q.    You've heard of chemical modifiers before, haven't
5          you?

6    A.    Of course.

7    Q.    And from your review of the NMS data, you didn't
           see any data regarding use of a modifier, did you?

8    A.    In the NMS data that I reviewed earlier, no, I didn't
9          see any indication whether one was or was not used.

10   *Id.* at 154:1-11.

11       Dr. Briggs eventually acknowledged all of these points under cross-
12   examination:

13   Q.    And you didn't see any data on spike recoveries for
           this urine sample, did you?

14   A.    Again, just what we were calling standards or
15         QA/QC data, but nothing specifically called a spike
           sample.

16   Q.    You didn't see any data on pretreatment studies for
17         this urine sample, did you?

18   A.    Once again, just the way the solutions were made
19         up, but nothing called -- specifically called a
           pretreatment.

20   Q.    And you didn't see any data on the amount of salt in
           this urine sample.

21   A.    No, I did not.

22   Q.    Or any documentation whether a modifier was used.

23   A.    I could not tell one way or the other whether a
24         modifier was used.

25   *Id.* at 157:2-15.

26       The Court finds that the 3.46 result is not reliable and that the 6.91 "result"
27   lacks scientific validation.  Plaintiff's own analytical chemist knew little about
28   testing urine samples by GFAAS.  He got advice from the manufacturer of the

- 74 -

02cv1349-BEN

1  GFAAS testing equipment. The manufacturer told him that for a reliable result,
2  spike recoveries and pretreatment studies should be performed, high salts content
3  considered and chemical modifiers used. Dr. Briggs conceded that none of that was
4  done in the case of L's urine sample tests. Any opinion by Dr. Briggs, that these
5  results were reliable, is given no weight. And the 6.91 test result, itself, is
6  disregarded.

<em>d.      Another Indicia of Unreliability</em>

8         But the evidence establishing the lack of reliability does not end there. A
9  third sample was tested. As noted above, there is some confusion as to whether or
10 not it is the same sample as the 3.46 or 15.43 sample. It was given the same
11 laboratory number as the two previous samples. It too was tested by GFAAS. This
12 time the result was 9.52. It has the same high background as the prior samples. No
13 spike recoveries were conducted for this sample either and the result was never
14 reported by the lab.

15        Plaintiff argues, and is possibly right, that this was a different sample. That
16 does nothing to make the lab practices followed any more reliable. And whether it
17 was the same sample or the previous sample, lab notes show that everyone was
18 anxious to get the results, but the lab apparently misplaced the sample.

19        Why the 9.52 lab result was not reported out may never be known. Dr.
20 McCoy said that the same problems existed with both the 6.91 test and the 9.52
21 unreported test. Trial Phase 2, Dkt.#549 at 182:20-23. Plaintiff would like the
22 Court to think that the Navy, specifically a Commander Betts MD, ordered the
23 results not to be reported out. The Court does not accept that speculation. There is
24 no question that everyone was trying to get the results back. That does not equate to
25 Commander Betts ordering that the results not be reported out. And this Court will
26 not adopt an unfounded accusation.

<em>e.      Normal ICP/MS Results Cast Doubt</em>

28        There is at least one other, and probably more reasonable, explanation for

- 75 -

why the GFAAS 9.52 result was not reported out.  The testing by ICP/MS.  When NMS tested the urine sample by ICP/MS, the result was 0.27.

Dr. McCoy said that, theoretically, if the same sample is analyzed by both GFAAS and ICP/MS, the results should be similar.  But the NMS results were inexplicably different.  He testified,

> Q.   Now theoretically, if the same sample is analyzed by two different methods, should the results be the same or similar?
>
> A.   They should be similar.
>
> Q.   Are these results similar by graphite furnace and by ICP-MS?
>
> A.   No, they're not.
>
> Q.   And how do you explain the fact they're not similar?
>
> A.   *That is a question that really can't be explained very well.*  If appropriate analysis or appropriate preparation of the specimen for graphite furnace would have been performed, and the background would have been corrected, you would get a better idea what the values were for thallium.  They just don't compare, even to one another.  The values that were actually determined by graphite furnace were different all three of the times it was performed.  So they don't agree with one another; whereas, with the ICP data, they seem to be consistent.

Trial Phase 2, Dkt.#549 at 187:1-17 (emphasis added).

Quest, the lab where the samples had been originally sent, analyzed the sample by ICP-MS.  It returned a result of <.5 *ug*/L, which is well within normal limits.  That result was reported out.  Two other test results were obtained from a different lab, PACTOX.  They tested a sample, not once but twice and obtained a result of .2 *ug*/L.  *See* Exh 109B.

Plaintiff has argued that the ICP/MS result cannot be relied on because it only tested for two thallium isotopes, 203 and 205.  But those are the only naturally - occurring, stable isotopes.  Most other isotopes have half-lives of days or less.  Isotope 204 has a half-life of 3.78 years.  But there would be no reason to think that these other forms of thallium would be present at the landfill.  The sites being

- 76 -

remediated, Sites 1A, 1E, 1F and 2A, had not been in use for twenty years or more. There is a paucity of evidence to support the idea. This Court will not engage in such rank speculation.

### f.    The Sword of Raw Data

Plaintiff also argues that the "raw data" is missing and therefore the results of the ICP/MS testing cannot be verified. That sword cuts two ways. Plaintiff would like the Court to accept the questionable GFAAS result despite the raw data; at the same time, Plaintiff would like the Court to reject the ICP/MS results by assuming the raw data would cause questions. But missing raw data does not make the ICP/MS results inadmissable. After all, experts like Dr. Eichenfield rely in their professional practice on test results without looking at the raw data. And as between accepting as valid, a test result that was not consistent with the lab calibration curve obtained by less-than-disciplined practices, versus consistent lab results generated by two (if not three) separate licensed labs, each using their own equipment, their own technicians and their own protocols, the Court chooses to accept the latter and disregard the former.

### g.    Even Dunn Says All GFAAS Results Are Below 5.0 ug/L

Finally, and perhaps most compelling is that even Mr. Dunn testified that the four results run by NMS showed L's thallium levels to be below 5.0 *ug*/L – thereby undermining the validity of the 15.43, 3.46 (6.91), and 9.52 "results." Mr. Dunn said that he had overseen 100,000 GFAAS tests per year, and 50,000 ICP/MS tests per year, mostly of urine samples. Mr. Dunn testified,

Q.    Being we talked about many different methods and different analyses on L[ ]'s urine, is it you opinion that thallium was contained in L[ ]'s urine?

A.    Possibly, but not in excessive (sic) 5 micrograms per mill, or , excuse me, micrograms per liter.

. . .

Q.    We are talking about all four analyses, the three graphite furnace analyses which were positive and the fourth being the ICP/MS.

A.    Correct. If thallium is present, it is not in excess of 5 micrograms per

liter.

Q.   So could you – can you conclusively state in your opinion whether thallium was contained in the sample tested by NMS?

A.   Not in – not in excess of 5 micrograms per liter.  It could potentially be there at very low levels.

*Id.* at 196:1-8 & 197:6-20 (Deposition Testimony of William Dunn).  And although he admitted that it looked like thallium might be present as previously noted, that is a *non sequitur*.  It is not the presence of thallium, it is the dose that matters.

### E.   Conclusion

Therefore this Court finds that the evidence is insufficient to prove by a preponderance of the evidence that L had abnormally high levels of thallium in her urine.  Dr. McCoy concluded that there was a normal level of thallium in the urine samples, after looking at all of the urine test results.  "My ultimate conclusion is that the information that I reviewed, the test results, the analytical data supporting them, indicates that there is a normal background level of thallium in the urine."  Trial Phase 2, Dkt.#549 at 201:16-20.  Dr. McCoy's opinion is given substantial weight and this Court agrees.  The Court finds that L's urine thallium levels were within normal limits.  That fact that some thallium was detected in the urine samples is insignificant.  "The presence of a chemical in the body is not evidence that it is causing harm.  And in some cases – those that involve chemicals, such as the metals . . . that occur naturally – the [National Health and Nutrition Examination Survey] findings may simply reflect natural background levels."  *See Reference Manual on Scientific Evidence*, 3d, at 537.  Consequently, Plaintiff has not proven that L was exposed to fugitive thallium dust from the Box Canyon remediation operations.  Even if she was, it has not been proven that she was exposed to a hazardous amount of thallium because her blood and urine tests were within normal limits.

### IV.   ALTERNATIVELY, EVEN IF THALLIUM WAS INGESTED IN ABOVE-NORMAL AMOUNTS, THE EXPOSURE DID NOT CAUSE L'S INJURIES

Assuming for the sake of argument that due to the Navy's breach of duty, L was exposed to thallium, as evidenced by the reported out 6.91 *ug*/L urine test

result, the amount of thallium was small – it stands more like a dim porch light than "a beacon." Even if elevated, the thallium level was very low. The low level is consistent with the medical testimony that her physical condition and alleged injuries are either overstated, or unrelated to thallium toxicity.

### A.    L Has Alopecia Areata; Not Alopecia From Thallium Toxicity

L has Alopecia Areata, or more specifically, Alopecia Areata Universalis. Alopecia Areata is *not* associated with exposure to thallium. In December of 1999, L's parents noticed that L's hair was falling out. L was taken to see Dr. Thomas Robinson. *See* Exh NR, Office Visit Notes, dated Jan. 25, 2000, at MED0006. The initial diagnosis was Alopecia Totalis. *Id.* She then was referred to Dr. William Lennard. His initial diagnosis was "extensive Alopecia Areata / Universalis R/O [rule out] Anagen effluvium." *See* Exh NR, Office Visit Notes, dated Feb. 20, 2000, at MED00218. She was referred to, and eventually seen by, Dr. Lawrence Eichenfield at Children's Hospital of San Diego. See Exh NR, Referral Form, dated Mar 8, 2000, at MED00178; Exh NR, Report Letter From Dr. Eichenfield to Dr. Le[n]nard For Date of Service Mar. 20, 2000, at MED00014-00015.

"Alopecia" is a generic term for hair loss. It is generally divided into subgroups. It is labeled according to its etiology and/or stage of hair growth at the time the hair loss occurs. By April 2000, Plaintiff's father had contacted a lawyer and had found a book which confirmed in his mind that L's alopecia was related to the landfill activities.

There is no question that alopecia is often evident in cases of thallium poisoning. The temporal and geographic proximity to L's alopecia certainly lends weight to such a conclusion. *E.g., Dominique v. Holland America line, N.V.*, 2013 WL 5437436 *4 (W.D. Wash. Sept. 27, 2013) (noting Ninth Circuit opinion finding significance in temporal and geographic proximity of toxin to oyster bed in toxic tort case).

However, a careful review of the evidence in this case convinces this Court

that L's alopecia is not the result of thallium exposure. As previously stated, this Court cannot comment on every exhibit in the record that it has reviewed in order to arrive at this conclusion. Nor will it attempt to comment on every nuanced bit of testimony. The Court, however, will review the evidence that leads to its conclusion.

### 1.     Alopecia Associated With Thallium Poisoning

Alopecia associated with thallium poisoning generally manifests itself within ten days to three weeks after exposure. The majority of dirt brought to the landfill showing the highest concentration of thallium was brought to the landfill between July 16th and July 26th.

Alopecia associated with thallium poisoning generally results in rapid hair loss, usually within a month. L's hair loss, on the other hand, progressed over four and one-half months, starting approximately six months later. Alopecia associated with thallium poisoning generally reverses itself and there is complete re-growth within a month following hair loss. L's hair loss has ebbed and flowed with some periods of re-growth then followed by new hair loss. Alopecia associated with thallium poisoning generally affects the lateral portions of the eyebrows. L's alopecia involves all of her eyebrows. Alopecia associated with thallium poisoning involves depilation of scalp hair and portions of the eyebrows. L's alopecia involves her scalp, eyebrows, and all axillary hair as well. Alopecia associated with thallium poisoning is oftentimes accompanied by Mees lines which are semi-lunar lines that run laterally across the nails. L did not have Mees lines.

Alopecia Areata, on the other hand, is often accompanied by pitting of the nails. The lack of pitting does not detract from a diagnosis of Alopecia Areata. Pitting, however, tends to confirm Alopecia Areata. L had nail pitting. Alopecia Areata is often associated with hypothyroidism. L has been diagnosed as being

1  hypothyroid.[27]

2         **2.     Alopecia Areata Runs In Families**

3         Finally, and perhaps most compelling, is that Alopecia Areata runs in

4  families.  Alopecia Areata is a polygenetic autoimmune disorder that causes the

5  immune system to attack the hair follicles.  Because it is genetic, there is a high

6  incidence of first and second generation relatives who also experienced Alopecia

7  Areata.

8         Alopecia Areata, is subdivided into three subtypes, depending on the severity

9  of the manifestation.  The more common Alopecia Areata generally manifests itself

10  by focal, localized, patchy hair loss.  A more severe variant, Alopecia Totalis,

11  involves all of the scalp.  The most severe form is known as Alopecia Universalis.

12  It manifests itself by loss of all hair.  L has the most severe form, Alopecia

13  Universalis.

14         Dr. David Norris, an extremely well qualified expert on Alopecia Areata,

15  testified at trial.  His qualifications were impressive.  He is a board certified

16  dermatologist and he is board certified in a sub-specialty dermatologic immunology

17

18         [27]Plaintiff has argued that L's hypothyroidism was also caused by thallium
19  poisoning.  Plaintiff relies on two factors: (A) elevated LDH; and (B) lack of thyroid
    antibodies.  Even Dr. Gustin, Plaintiff's toxicologist, was scarcely aware of medical
20  literature finding a connection between elevated LDH and thallium toxicity.  He
    testified,

21         Q.    Dr. Gustin, I just want to make clear, the document I'm referring to
22               is the 2009 EPA document on thallium toxicity.  You did not see
               any indication in that document that elevated LDH was associated
23               with thallium toxicity?

24         A.    I don't recall seeing that.  I'd have to look again.  I don't remember.

25         Q.    And with respect to all the other literature, looking at thallium
               toxicity that you reviewed, you did not see any reference in that
26               literature to elevated LDH being an indication or one of the things
               that follows from thallium toxicity, did you?

27         A.    That is correct.  Except for the Sprague rats study, which doesn't
28               specifically mention it.  It just shows the elevation.

    Trial Phase 2, Dkt. #550 95:21 - 96:8.

02cv1349-BEN

and diagnostic immunology. He has been on the faculty of the University of Colorado since 1977 and is currently the chairman of the Department of Dermatology at the University of Colorado School of Medicine. Dr. Norris sees patients with Alopecia Areata five half-days a week in a hair speciality practice that has been focusing on Alopecia Areata for the past 20 years. He has also authored over 100 primary publications in high quality medical journals. He is also a co-principal in the National Alopecia Areata Registry which is funded by the National Institute of Health. The registry collects information about Alopecia Areata patients and tracks their progress. Dr. Norris' credentials are exceptional and his testimony was cogent and disciplined. His opinions are relevant and reliable. Even in the face of thorough and sometimes heated cross-examination, Dr. Norris was able to explain his thought process and defend his opinion. Dr. Norris testified that he examined L, looked at her medical records, took her history, and concluded that L has Alopecia Universalis.

### 3. L's Sister, D, Also Has Alopecia Areata – But the Myers Deny It

The familial incidence of Alopecia Areata is so well established that even Dr. Gustin, Plaintiff's "toxicologist," wrote in what came to be known as his "cheat sheet" as follows: "1/3 of patients who have it [Alopecia Areata] have a family history of it." *See* Exh OF at ¶11. That is accurate.

Unfortunately, Dr. Gustin's comments about there being no Myers family history of alopecia was just plain wrong. Although he wrote in the cheat sheet, "In 1st/2nd degree relatives of L[ ] there is no autoimmune disorders, no alopecia. . . ," *L's little sister, D, was diagnosed with Alopecia Areata in 2001. See* Exh JN, Office Notes of Christi M. Zohlen, MD, dated Oct. 12, 2001. Although her Alopecia Areata is of the less severe variant, it has been a recurring problem for her, "every other school year." Trial Phase 2, Dkt.#543 at 23:1-7 (Testimony of D Myers).

Both Sgt. Myers and Plaintiff testified that when D began losing her hair they

became very concerned.  In Plaintiff's words, she began "freaking out."  Exh NR, Office Notes dated Nov. 8, 2001 at MED02761.  Dr. Pesqueira, a physician who examined D, had also examined L and noted on D's visit, "sister has alopecia universalis."

D's struggle with Alopecia Areata, is such a determinative factor, that when Plaintiff and her husband were deposed in 2004 they failed to disclose D's alopecia. When confronted with the fact (that D suffers from Alopecia Areata also and that they had failed to disclose it), both Plaintiff and her husband claimed that they did not understand the question posed.  The question was not difficult.  Christine Myers was asked,

> Q.   Mrs. Myers, that is on the screen in front of you.
> Do you see where I ask at that deposition:  question: and other than your daughter L[ ], has anybody in your family had any episodes of hair loss?  And you gave the following answer:  huh-uh, no?

Trial Phase 2, Dkt.#543 at 98:9-13 (Testimony of Christine Myers).  And Sgt. Myers was asked,

> Q.   I'm showing you a section from your 2004 deposition.  And I'm referring to page 31, 9 through 12.  Do you see where I asked:  okay, other than your daughter L[ ], has anybody in your family, being your blood relatives, suffered any hair loss? Answer: no.

Trial Phase 2, Dkt.#543 at 209:15-20 (Testimony of Master Sergeant David Myers). Their depositions were never corrected.  Plaintiff, in particular, became quite defensive at trial when impeached.  Given the fact that hair loss has been such a significant part of their family's life, the Court does not accept their explanation. The concealment of D's Alopecia Areata is extremely troubling.  The Court notes that Plaintiff negotiated a settlement with the co-defendant, the contractor, IT/OHM for 1.5 million dollars before this critical fact was revealed.

### 4.   Analysis of Plaintiff's Evidence of Alopecia Resulting From Thallium

The Court will now address Plaintiff's evidence.  Although other

dermatologists have treated L over the years since 2000, including Dr. Michelle

Dern, Plaintiff only called two physicians to discuss the cause of L's alopecia: Dr.

Eichenfield (a dermatologist) and Dr. Gustin (an emergency room physician).  First,

the Court will address Dr. Gustin.

### a.   Dr. Gustin

Barry Gustin, M.D., was offered as a "toxicologist."  He is not.  He is not

board certified and has no relevant experience in the field.  He is not a

dermatologist.  He is not a neurologist.  He is an emergency room physician.  As

pointed out at the outset, a physician without particular expertise in toxicology is

unlikely to be able to evaluate the strengths and weaknesses of toxicological

research.  "Most practicing physicians have little knowledge of environmental and

occupational medicine."  See *Reference Manual on Scientific Evidence* 3d,

Reference Guide on Toxicology, ¶ V. Expert Qualifications, at 676.  His demeanor

at trial was less than confidence inspiring.  As previously mentioned, he had to

constantly refer to what became known as the "cheat sheet."  *See* Exh OF, Tying it

All Together.  The cheat sheet contained information about thallium literature and

included such basic information as: what is a differential diagnosis?

As previously pointed out, he began noting that there was no alopecia in L's

family.  When confronted with D's Alopecia Areata, he incredibly opined that even

D's Alopecia Areata might have been triggered by thallium.  He testified,

> Q.   You told me at deposition that you were not able to render an
> opinion regarding the most likely cause of D[ ]'s alopecia even
> though you acknowledged to me that that would be an important
> factor in determining the cause of L[ ]'s alopecia, right?
>
> A.   I think last Wednesday we went over that.  I believe it is more
> likely than not alopecia areata.  But I said I cannot eliminate the
> possibility of thallium-induced delayed alopecia for the reasons I
> mentioned a few days ago.  It is still an open question.  I'm sorry,
> go ahead.

Trial Phase 2, Dkt.#550 at 15:4-13.  Dr. Gustin was out on a limb, as the following

question and answer demonstrated,

The Court:       Dr. Gustin, do you know of any physician, or

| | | |
|---|---|---|
| 1 | | anyone who has diagnosed D[ ]'s alopecia to be thallium poisoning related? |
| 2 | The witness: | Your Honor, no. When I looked through all of |
| 3 | | D[ ]'s records, I actually never saw the word thallium even mentioned in any of those records, |
| 4 | | which was kind of concerning to me. |
| 5 | The Court: | So the answer to the question is no? |
| 6 | The witness: | No. |

7  Trial Phase 2, Dkt.#550 at 21:16 - 22:1. Of course, emergency room physicians,

8  perhaps even more than any other physicians, are used to going out on a limb to

9  form an opinion on causality without hard evidence. "[P]hysicians . . . are

10 accustomed to using *any* reliable data to assess causality, no matter what their

11 source because they must make [health] care decisions even in the face of

12 uncertainty. This is in contrast to the courts which require a higher standard than

13 clinicians . . . , and wherein causation cannot just be 'possible' but where 'a

14 preponderance of evidence' establishes that an injury was caused by an alleged

15 exposure." *See Reference Manual on Scientific Evidence*, 3d, at 714 (citation

16 omitted). Dr. Gustin's tree limb cannot bear the weight of his opinion in this case.

17        This Court has reviewed considerable medical literature, case studies, and

18 case surveys provided in the trial exhibits. It has found no evidence whatsoever for

19 the proposition that Alopecia Areata can be triggered by exposure to thallium. The

20 opinion is given no weight. *Sartor*, 321 U.S. at 627 (trier of fact left to decide the

21 weight of expert opinion); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th

22 Cir. 2001) ("A reliable expert opinion must be based on scientific, technical, or

23 other specialized knowledge and not on belief or speculation, and inferences must

24 be derived using scientific or other valid methods.") (citation omitted). The medical

25 study that Dr. Gustin relied upon to support that incredible speculation is found at

26 paragraph 29 of Exhibit "OF" and will be referred to as the Rodriguez Study.

27 Ironically, that study was performed in collaboration with the National Alopecia

28 Areata Registry.

Dr. Norris testified that Alopecia Areata is triggered by something that excites or stimulates the immune system such as stress or a viral or bacterial infection. Thallium, on the other hand, suppresses the immune system which is why one of the common associated symptoms of thallium poisoning is anorexia or cachexia. L was experiencing quite the opposite – an increase in appetite and gaining weight.

The Rodriguez study does not mention thallium, much less draw a link between thallium and Alopecia Areata. It does, however, clearly corroborate Dr. Norris' testimony that Alopecia Areata can be triggered by a viral infection. Specifically, in the Rodriguez study, they were looking at the concordance of twins diagnosed with Alopecia Areata and the Epstein-Barr virus. This Court also notes that it is claimed that L had experienced flu-like symptoms just prior to L's hair loss.

### b.    *Dr. Eichenfield*

Finally, the Court will address the testimony of physician Lawrence Eichenfield, M.D. Dr. Eichenfield is a well-respected dermatologist from the San Diego, California, area. He saw L in March and April 2000 to treat her alopecia. A Navy physician, Dr. Lennard, made the referral.

In his referral to Dr. Eichenfield, Dr. Lennard recommended that L undergo a biopsy and hair mount. *See* Exh KG. Both procedures are helpful in diagnosing conditions such as thallium poisoning and Alopecia Areata. Unfortunately, neither procedure was performed. Dr. Eichenfield did look at L's hair and did not notice a darkening of the root. That is significant because what appears as a darkening of the hair root is a very common objective sign of thallium poisoning. He also sent a hair sample to be examined for heavy metals. The result was negative for heavy metals.

His notes reflect that, although "Telogen Effluvium" (a category of alopecia) and exposure to thallium were both in the differential, the most likely diagnosis was

Alopecia Areata. His notes also reflect that lab tests of L's blood were normal. He noted that L's urine had been sent out for testing. He noted that he would await the lab results and that "the mother" was to bring the lab results the next time he saw L in four to six weeks.

Dr. Eichenfield noted no complaints other than Alopecia. He performed a review of systems. That exam was normal. There was no ataxia, no cranial nerve involvement, no gastrointestinal complaints, no complaints of L losing her appetite or her coordination. Dr. Eichenfield testified:

> Q.   Did the family or L[ ] report to you any history of neurologic symptoms at the time you saw her, L[ ], in March of 2000?
>
> A.   In March of 2000, I don't have any record of that at the time.
>
> Q.   Is there any report of temperature sensitivities?
>
> A.   No, there is not.
>
> Q.   Is there any report of numbness or clumsiness?
>
> A.   No, there is not.
>
> Q.   Is it correct that during your examination, you observed no neurologic symptoms?
>
> A.   That's correct . . . . we don't do neurologic evaluations in dermatology. And we didn't do it, and it is not reported that we did it. But a general assessment, we did not notice anything that was abnormal.

Trial 2, Dkt.#545, at 200:15 - 201:15.

The Court also notes that although Dr. Eichenfield may be a dermatologist, he is a physician first. At the time he first suspected possible thallium exposure, he could not have known what L's urine tests would later show. Thallium poisoning can be a fatal condition. It can quickly cascade into paralysis, respiratory distress and even cardiac failure. Notwithstanding the fact that they had no idea what L's thallium level might be, no one, neither Dr. Robinson, nor Dr. Lennard, nor Dr. Eichenfield, ever suggested that she be chelated, treated with Prussian Blue (the standard treatment for thallium poisoning), or hospitalized for observation. Even if he is just a dermatologist, surely Dr. Eichenfield would have taken note if L had any

other complaints that would cause him to seriously suspect thallium poisoning. Dr. Eichenfield never treated L for thallium poisoning. He did, however, treat her for Alopecia Areata.

The next (third) appointment with Dr. Eichenfield was scheduled for May 2000. Plaintiff and L did not make that appointment and years passed by. As it turned out, Plaintiff did not get the lab results to Dr. Eichenfield. But Plaintiff's counsel did, before Dr. Eichenfield was deposed in June of 2004.[28]

### c.    Dr. Dern

In another curious turn of events, although Plaintiff did not return to see Dr. Eichenfield in May 2000, she did meet with another physician for an appointment arranged by her lawyer. On July 9, 2000, three months after she last saw Dr. Eichenfield, Plaintiff brought L to be seen by Michelle Dern, M.D., a pediatrician at U.C.S.D. Dr. Dern's office notes reflect that the doctor met with L's parents and lawyers for an hour. The office notes also reflect that Dr. Dern had lab results. L did not return for treatment by Dr. Dern after that summer.

### d.    The 2011 Appointments

Eleven years after her last office visit, Plaintiff's counsel scheduled another appointment for Dr. Eichenfield to see L. At the time the appointment was made, Plaintiff and her family were living in Keller, Texas. They traveled to San Diego, California, for the expressed purpose of having Dr. Eichenfield refer them to a

---

[28]Dr. Eichenfield made oblique reference to this 2004 meeting during his trial testimony in 2013, when he said,

| The Court: | As a result of your learning of the lab results, did you take any other medical treatment of L[ ]? |
| --- | --- |
| Eichenfield: | We had − no. Because it was in between that time period, between her last visit in April [2000], and when we expected to see her again. *And we didn't see her again for four years.* |

Trial Phase 2, Dkt.#545 at 189:11-16 (emphasis added).

- 88 -

dermatologist in "the Fort Worth area."[29]  Apparently, U.S. Postal Service to San Diego had ceased, the phone lines cut, and email service discontinued.  Of course, Plaintiff never listed Dr. Eichenfield as an expert witness and did not provide an expert report.  But even during this 2011 visit, Dr. Eichenfield did nothing to treat L's suspected thallium-associated alopecia.  At trial, defense counsel understandably objected to Dr. Eichenfield's testimony about causation.  Nevertheless, Dr. Eichenfield's notes of his 2011 visit with L were admitted into evidence.

> ### e.    Dr. Eichenfield's Troubled Quasi-Expert Opinion on Causation

This Court finds the transparent attempt to circumvent Federal Rule of Civil Procedure 26 to be absurd.  The absurdity becomes clear when one considers that, in August of 2011, Plaintiff or L had visited the Keller Family Practice clinic.  What should be apparent to anyone is that the 2011 visit to Dr. Eichenfield was a transparent attempt to circumvent Rule 26.  Why?  Because in August, Plaintiff had been to the Keller clinic with both L and D.  Specifically, she requested a referral to: (1) an endocrinologist; (2) a neurologist; and (3) a dermatologist.  She was given a referral to Dr. Harla, a dermatologist in her local area around Fort Worth, Texas, and a Dr. Gonzales, a neurologist in the Fort Worth Area.

In any event, Dr. Eichenfield never testified as to how he went about ruling out Alopecia Areata.  He testified that he had one positive clue and one negative indicator,

| The Court: | And I think you testified that you -- you met with some folks, and you eventually formed the opinion that it was thallium toxicity? |
|---|---|
| The witness: | Yeah. We had one -- we had one positive and one negative |

---

[29] The trip is all the more curious for the following reasons.  In August, the Keller Family Practice clinic had referred Plaintiff to a neurologist in Irving, Texas, and a dermatologist in Keller, Texas.  Plaintiff had made an appointment with Dr. Harla, a dermatologist, for October 2011.  Keller, Texas, is a northern suburb of Fort Worth, Texas.  *See* Exh 468.  Instead of going to see these doctors, the family never showed up.  *See* Exh 937.

02cv1349-BEN

1    --

2    The Court:            That is what I was trying to get.

3    The witness:          The positive test -- if we had a history and we had -- we
                          had a history of potential exposure.

4    The Court:            Okay.

5    The witness:          Plus the physical finding of the diffused hair loss.  And
6                         then we had at least one or two urine tests that looked
                          consistent with an abnormality.  Because my
7                         understanding was that there were significantly elevated
                          levels of thallium, which you wouldn't have unless you
8                         had unusual thallium exposure.  The hair tests -- and this is
                          where you'll get other experts.  But my reading at that time
9                         was that hair tests were highly unreliable.

10   Trial Phase 2, Dkt.#545 at 210:24-211:15.  His opinion that L's alopecia is related

11   to thallium exposure is certainly not supported by what this Court would consider a

12   rigorous differential diagnosis.[30]

13        The notes reflect that his impression was Alopecia Areata "acutely-acquired."

14   If that was included to mean that her Alopecia Areata was the result of exposure to

15   thallium, for the reasons stated previously, this Court does not accept that

16   conclusion.  It is certainly not the result of a disciplined differential diagnosis and

17

18        [30]One court recently described "differential diagnosis" like this:

19        A reliable differential diagnosis . . . generally is accomplished by
20        determining the possible causes for the patient's symptoms and then
          eliminating each of these potential causes until reaching one that cannot
21        be ruled out or determining which of those that cannot be excluded is the
          most likely.  The first step is creating a comprehensive list of all possible
22        causes of the person's symptoms.  After the expert has ruled in all of the
          potential causes, the expert begins a process of elimination based on
23        continued review of the evidence.  Ninth Circuit law requires an expert to
          provide reasons for rejecting possible causes using scientific methods.
24        The elimination of those hypotheses must be founded on more than
          subjective beliefs or unsupported speculation.

25   *Dominique v. Holland Am. Line, N.V.*, No. C12-78RSL, 2013 WL 5437436, at *3
26   (W.D. Wash. Sept. 27, 2013) (quoting *Clausen v. M/V New Carissa*, 339 F.3d 1049
     n.4 (9th Cir. 2003) (internal quotations omitted);  *see also Reference Manual on*
27   *Scientific Evidence*, 3d, at 690 ("In the legal context, differential diagnosis refers to
     a technique 'in which [a] physician first rules in all scientifically plausible causes of
28   plaintiff's injury, then rules out the least plausible causes of injury until the most likely
     cause remains, thereby reaching [a] conclusion as to whether defendant's product
     caused injury. . . .'").

02cv1349-BEN

there is no scientific data to support it. "When an expert rules out a potential cause in the course of a differential diagnosis, the 'expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation.'" *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) (quoting *Clausen*, 339 F.3d at 1058).

Furthermore, his opinion on the etiology of L's alopecia was not formed during the course of treatment and could, but will not be, excluded. Nevertheless, his opinion clearly lacks objectivity and scientific support. Because of its lack of objectivity and reliability, and given the surreptitious way that it was obtained, the Court has elected to disregard Dr. Eichenfield's opinion, giving it no weight.

Other aspects of his testimony were also rather troubling. Dr. Eichenfield testified he was supposed to see L after April 10, 2000. He testified L did come to her next appointment and that he did not examine her again until 2011. Some time in the interim, he said he obtained the lab results of her urine. He never mentioned from whom he got the results. In a rather curious way, Dr. Eichenfield testified,

| The Court: | Look, let me try this: you said you found out about the urine test, right? |
|---|---|
| The witness: | Yes. |
| The Court: | That caused you to think that definitely thallium was a possibility? |
| The witness: | Yes, absolutely. |
| The Court: | Now did you make any notes to your records, to your medical records, of your conclusion in that regard? |
| The witness: | I don't know if they're physically written. Because *we* probably -- *we* processed the laboratory work when it came. But since at the time, *we* were on paper records -- now, with electronic medical records -- *we* were physically writing -- we're much more conscious of the trail of evidence, so to speak, in medicine. But in this case, *we* probably didn't write it down. It was something that was known. It was something that *we* discussed as a group. |

Trial Phase 2, Dkt.#545 at 188:12-189:4 (emphasis added).

The Court was troubled by that testimony.  Why did his records not include a copy of the lab results?  How did he conclude that whatever the thallium level reflected by the report, was such a high level so as to cause L's alopecia?  And who was the "we" that he referred to?  Was it an intern, a resident, a fellow, or some other doctor?  If so, why was there not a note?  He had his paper records from the March and April 2000 visits – yet nothing to reflect a significant aid in diagnosis such as a lab result or his consultation with others?  This Court did not buy it.  As it turns out, it would eventually come to light that it was Plaintiff's counsel who told him about the 6.91 and the 9.52 results just prior to his deposition in 2004.  Of course, there is no record of what other information or misinformation may have been conveyed in order to taint his opinion.

Nor is there any explanation in his notes or testimony of how he applied the information that D also had Alopecia Areata into his opinion.[31]  Did he ignore it?  Did he not think it was important?  And if not, why not?  Was he told of the normal ICP/MS test results from NMS, PACTOX, or ARUP?  How did he rule out Alopecia Areata in light of D's Alopecia Areata?  And why did he mention to Plaintiff: "Discussed novel research into alopecia areata gene and hope for promising gene therapies in the pipeline"?  *See* Exh 394, Physician Notes, dated Nov. 28, 2011, at p. 4.

These questions have not been answered to this Court's satisfaction.  Whatever opinion Dr. Eichenfield may have reached about L's alopecia, this Court elects to reject it in favor of the opinion of Dr. Norris.  *Sartor*, 321 U.S. at 627 (trier of fact left to decide the weight of expert opinion).  The Court adopts the opinion of

---

[31]In the "assessment/treatment plan" portion of Dr. Eichenfield's 2011 office visit notes, he wrote: *"Family history of alopecia in the patient's sister raises question of alopecia areata with precipitation with heavy metal* [blank space in original] *Exposure."*  *See* Exh 394, Physician Notes dated Nov. 28, 2011, at p. 4.

Dr. Norris and treating dermatologist, Dr. Pesqueira[32], and finds that L's alopecia is Alopecia Universalis and is not caused by thallium poisoning.

**B.     No Cognitive Deficits Result from Thallium Toxicity**

Next the Court will address L's alleged neuro-cognitive impairment.  Plaintiff alleges that L is impaired and that the impairment is the result of L's exposure to thallium.  To opine on this, Plaintiff called neuropsychologist Sandra Brown, PhD, neurologist James Renfroe, M.D., and rehabilitation counselor and life care planner Carol Hyland.  It is claimed that L will not be able to live alone, will not be able to drive, will not be able to go to college, and will not be able to hold down a job without supportive help.  Having heard and observed L, for this Court to accept such claims as anything other than gross exaggeration, would require the suspension of disbelief.

**1.     L's Courtroom Testimony**

L entered the courtroom appearing as an attractive, although somewhat overweight, young lady.  She walked with purpose and poise.  She approached the witness stand with confidence.  She answered questions articulately and without hesitation.  L made good eye contact, even with the Court.  Some witnesses do not.  When the Court asked her to name her favorite band, without hesitation she answered that she didn't have one.  When the Court asked her to name her favorite book, she answered "Glass."  The Court asked her what the book was about and again she answered appropriately.  In short, L appeared to function no less capably than hundreds of other witnesses that this Court has observed.  Other than her alopecia, which she disguises quite well, L seemed like the typical average teenage young lady.

This Court's impression was validated by the testimony of several witnesses.  First, Michael Westerveld, PhD.  Dr. Westerveld is a neuropsychologist.  He is

---

[32]"Although <u>Thallium</u> exposure can be assoc. [with] hair loss, Alopecia Areata/Universalis in this Pt <u>not</u> related."  (Emphasis in original.)  Exh NR, Office Notes dated Oct. 9, 2001, at MED000917, MED00277, and MED 00310.

employed at the Florida Hospital Medical Center and is the director of Pediatric Neuropsychology at the Walt Disney Pavilion at the Florida Hospital for Children. Before that, he had been an associate professor in the neurosurgery department at Yale University. He is board certified in clinical neuropsychology. He was the president of the American Board of Clinical Neuropsychology. He was at the time of the trial, the chairman of the Practice Advisory Committee of the Neuropsychology Division of the American Psychological Association. He has a sub-specialty, children with neuropsychological conditions. His opinions are relevant and reliable.

### 2. Standardized Testing

Dr. Westerveld reviewed L's medical history, and administered standardized tests of L's abilities in 2012. He concluded that L's full scale IQ was 84. Her verbal score was 89, and non-verbal was 83. Dr Westerveld testified that 50% of the population would generally fall within the 90 - 109 range. He testified that he also administered another exam called the Test of Memory Malingering to determine if L was giving her best effort. It is expected that by mere chance one should get 50%, or 25 questions, correct. The TOMM is a test also given to persons with Alzheimer or dementia. Persons with Alzheimer's or dementia obtain better scores the second time it is administered. Someone with severe memory impairment would be expected to get 75% correct.

L, on the other hand, took the test three times. The first time she took the test, she got only 28 correct. The second time she got 6 correct, and the third time, 2 correct. Although Dr. Westerveld was too kind to assert that L was malingering, he testified that the chances of that happening would be minuscule. In his words, "She was 98 percent accurate in selecting the wrong response."

The Court notes that L was also administered the standardized tests twice by Dr. Sandra Brown, Plaintiff's expert neuropsychologist. Dr. Brown had tested L in 2003. Dr. Brown tested L again in 2012. Dr. Brown testified that she had to repeat

the test because it did not seem that L was giving it her best effort.  Dr. Brown attributed the lack of effort to the fact that the test was really administered by one of her students, who, as Dr. Brown put it, "is very handsome and L[ ] is a teenage girl."

### 3.    L's Cognitive Performance is Similar to Her Mother's Performance

Dr. Westerveld compared L's scores to her mother's score when she was a young girl.  It was uncontroverted that parental intelligence contributes largely to a child's intelligence.  L's mother scored 87 on the verbal, 84 on the non-verbal and 68 on the quantitative test, which he described as below borderline.  He testified that L's mother's scores were substantially below grade average, with one exception – math.  She was at grade level in math.

Dr. Westerveld then reviewed an analysis of L's performance.  In that analysis, Dr. Westerveld concluded that L's score performance throughout the years was average to low average.  *See* Exh JX.  He also compared how L is described by Plaintiff and Plaintiff's experts to her performance in real life.  He concluded, "It is just not a plausible presentation of the reality of what her independence is."  Having reviewed L's school records and the testimony of her teachers, this Court could not agree more.

Perhaps the most meaningful exchange occurred when Plaintiff's counsel tried to impeach Dr. Westerveld.

Q.    You guys talked a lot about Christine's bad grades in high school.  How did that fit in, given the fact that she's performed excellently since that time?

A.    I think it fits in in a number of ways.  So one of the things that I really wanted to emphasize is, that you can't look at somebody's I.Q. and say this is going to place a ceiling on what you're going to be doing for the rest of your life.  And that example is exemplified with Christine.  She performed poorly on that test in eighth grade.  And if they had said, now you're not going to graduate, and made all of these negative proclamations about her, then maybe she wouldn't have been as successful.  But her motivation trumped what was at that time her I.Q.  And I guarantee you, if we gave her a test now, she would score much

> higher. I.Q. changes over time, based on your experiences. And
> I think that's what we really have to focus on, can L[ ] do more
> than you think she can because she got an I.Q. of 84 or 86?

Trial Phase 2, Dkt.#549 at 146:5-21 (Testimony of Michael Westerveld). This

Court could not agree more. L's mother has gone on to become a successful

emergency room nurse. Although L has been diagnosed many times as having ADD

or ADHD, this Court feels that she is much more capable than the Plaintiff is

leading us to believe.

### 4.   ADD/ADHD Is Not Associated With Thallium Toxicity

Perhaps it should be noted that there is absolutely no case study literature or

report that has ever associated ADD or ADHD to thallium exposure. It is for that

reason that Plaintiff's neurologist, Dr. Renfroe, refused to acknowledge that L has

ADD or ADHD, preferring to use a less specific term (*i.e.,* neuro-cognitive

impairment). When confronted with the fact that his records included several

mentions or diagnosis of ADD or ADHD, he offered numerous excuses, including

incredibly that such was the language selected by his computer. Dr. Yarbrough and

Dr. Westerveld have both opined that L has ADD or ADHD.

### 5.   Observations of L's School Teachers

But this Court's views of L's true cognitive condition is not limited to

witness-stand observations or opinions of doctors. L's teachers, who see her every

day, have also commented about how competent and capable she is. Again, no one

denies that she has ADD or ADHD and that she is easily distracted. But the

teachers interact with L daily. One of her teachers, Ms. Maxine Davis, testified (by

deposition) that L learns all of the same concepts as other students. She does not

need extra time to be instructed on what to do on an exam. She works

independently, but if she needs help she knows to ask for it. L can grasp exponents.

When she needs to do extra work she comes into class early and knows what to do.

She is social and gets along "really well" with others. She is driven to do well and

so she tends to be successful.  Ms. Davis believes, based on her observations and
her observations of others, that L will be able to hold down a job.  Although L has at
times been distracted by putting on her make-up in class, L never seems
overwhelmed.  "She smiles and she works."

Another of L's teachers was ebullient about how well L had done on a paper
examining *Romeo and Juliet*, Acts I & II.  Ms. Jamie Mayes testified (by deposition)
that this was a very difficult subject for most students, but L handled it
impressively.   The evidence also shows that L has done quite well in some of her
classes, including getting the second-highest grade in her class in Integrated Physics
and Chemistry.  In her English class, she did better than satisfactory.  The same was
true of Biology.  Remarkably, during trial Plaintiff attempted to understate L's
competence.  The following exchange is illustrative:

| | |
|---|---|
| The Court: | . . . So tell me, which classes is she mainstreamed in and which classes is she not mainstreamed in? |
| The witness: | She's mainstreamed in her -- it's like life sciences, where they learn to go fish. |
| The Court: | They learn to go fish? |
| The witness: | Yes. |
| The Court: | Okay.  So she learns to bait a hook? |
| The witness: | Right.  And then hiking, that's part of it.  And then the other classes that she's getting pulled out for, last semester -- she's getting pulled out for her main subjects, every one besides English.  And English is the one she failed. . . . |

Trial Phase 2, Dkt.#543 at 123:13-24 (Testimony of Christine Myers).

### 6.   Analysis of Plaintiff's Evidence on Cognitive Performance

The Court will now evaluate Plaintiff's evidence.  First, the Court will
address Dr. Sandra Brown.

#### a.   *Dr. Sandra Brown*

Dr. Brown is a well-qualified and respected professor at the University of
California, San Diego.  She is a professor in the Department of Psychiatry.  She is

board certified in neuropsychology. However, unlike Dr. Westerveld, she has no sub-specialty, or specialized experience with children. Dr. Brown testified that she was provided a considerable amount of information by Plaintiff's counsel, including a series of articles on thallium poisoning as well as medical records. In other words, after having "poisoned the well" sufficiently, Plaintiff's counsel asked her to administer tests and evaluate L. She tested L at 7 years, 3 months of age, and found that her verbal IQ was 83. According to Dr. Brown, the standard score would be 100, with a standard deviation of 12.5. Her performance score was 102. Her full scale IQ was 91.

Dr. Brown testified that L was inconsistent. Interestingly, Dr. Yarborough, who will be discussed later, referred to L not as inconsistent, but as "inconstant." Dr. Brown testified that L is "scattered."

She testified that family history was very important and that she inquired about it, and it was all reported to her as negative. However, in a report she wrote the following:

> I summarized Christine's [L's mother] grade school performance on two tests of achievement and proficiency and the Metropolitan Achievement tests. I started with the twelfth grade. Since her grades in high school are probably more stable (as she was closer to being an adult) and reflective of her current academic attainment..... As you can see, Christine's scores in the achievement tests, in several domains, varies widely from year to year. At times she scores poorly in math and at other times, her scores are more in the average range. Her scores also vary in language and spelling, however, scores are largely in the average to low average range overall.

To this Court, it sounds eerily like the description of L's cognitive performance. In another report, Dr. Brown criticized Dr. Westerveld's conclusions stating: "It is unclear what Dr. Westerveld means when he says 'the expectations of her development given the family history.'" What family history? It was established prior to Dr. Westerveld's review of this case that there is no family history of intellectual impoverishment nor is there a family history of learning "problems" or "learning disabilities."

To support her conclusion, Dr. Brown also wrote: "It is important to note that in contrast to L[ ], D[ ] does not have alopecia...." Apparently, Plaintiff's learning problems and the alopecia of L's sister, D, had *not* been communicated to Dr. Brown. Curious to say the least.

Finally, Dr. Brown acknowledged that there is nothing in the literature that associates thallium toxicity and attention deficit disorder. Trial Phase 2, Dkt.#546 at 108:9-11 (Testimony of Dr. Sandra Brown).

### b.    Mother's Dyslexia?

And like the troubling testimony about D's Alopecia Areata, a similar pivoting occurred with regards to Plaintiff's own learning issues. For years, Plaintiff had been telling others that she was dyslexic. In his medical records, Dr. Sharp noted in 2001 "mom is dyslexic." In 2004, Dr. Yarbrough testified that she told him that she was dyslexic. Exh NR at MED03722, 80:1-9 (Deposition of Ronald Yarbrough, Vol. I). She told Dr. Gustin that she was dyslexic. When she was deposed by Defendant she said she was dyslexic. Incredibly, at trial, she now testified that she was *not* dyslexic because her mother had recently told her that she had never been diagnosed as dyslexic.[33]   Trial Phase 2, Dkt.#543 at 110:5-112:11 (Testimony of Christine Myers).

Whether she is dyslexic or not, is not the question. The question is whether she also has exhibited some learning disabilities. It is confirmed by her admissions. It is confirmed reluctantly perhaps by Dr. Brown. And heredity matters, as both Dr. Brown and Dr. Westerveld have testified. In its review of the thousands of pages of

---

[33]This is another example of facts that suggest Plaintiff is an unreliable historian. During her testimony in 2013, she testifies that her mother informed her that she was never diagnosed with dyslexia. She says that took place recently: "It was a couple months ago." Trial Phase 2, Dkt.#543 at 112:16.
    However, nine years earlier, her mother, Flo Bernard, filed a declaration in this case that said, *inter alia*, "Christine has never been diagnosed or treated for dyslexia." *See* Declaration of Flo Bernard, at ¶2, Dkt.#100 (filed Feb. 12, 2004). Did Plaintiff remember this event nine years ago as if it were only months ago? Did she completely forget being informed by her mother in 2004? Could Plaintiff's mother have filed this declaration without telling Plaintiff about it?

02cv1349-BEN

evidence admitted in this case, in the bowels of Exhibit "NR" the Court found a typewritten note from Plaintiff to one of L's teachers.  The body of the note is 110 words.  It includes the following:

> It seems everyday she gets a bad commit (sic) in her folder.  As for her not doing her homework, every time she brings home her homework, she does it.  On the days for what ever (sic) reason she doesn't bring her homework home, is (sic) out of my control.  She does get grounded for not bringing it home.  Maybe the school can't met (sic) her needs, if this is so please let me know so we can sit (sic) up a conference.

Exh. NR at Med 03661.  One does not have to be an English professor or a neuropsychologist to see that Plaintiff, herself, struggles with language or attention to writing detail.  Nevertheless, notwithstanding whatever her own difficulties may be, she has gone on to become a successful woman and an ER nurse.

### c.   Dr. Yarbrough

Finally, the Court will briefly comment on Ronald C. Yarbrough, PhD.  In 2004, he had been practicing forensic psychology for forty years.  His testimony is credible, but it was based upon information sifted by Plaintiff's counsel.   Dr. Yarbrough tested L in 2002.  According to Dr. Yarbrough's testing, L's full scale IQ, in 2002, was 96.  L's verbal IQ was 93, and her performance IQ was 100.  Exh NR, at MED00352 (WISC-R Test Profile).  All three are within the average range. Trial Phase 2, Dkt.#546 at 120:2-9 (testimony of Dr. Sandra Brown commenting on Dr. Yarbrough's testing).  Dr. Yarborough concluded that L has attention deficit disorder.

> Q    Is it your opinion to a reasonable degree of psychological certainty that L[ ] suffers from ADHD or ADD?
>
> A:    Yes, sir.
>
> Q:    And what is that opinion?
>
> A:    That she does.

Exh NR at MED03716, 56:20-25 (Deposition of Ronald Yarbrough, Vol. I).  He

described her as "inconstant," or a case of "inconstantcy versus inconsistency." *Id.*
at MED03718, 61:7-13.   Dr. Yarbrough further testified that he saw no indicator
that L had been diagnosed with central nervous system impairment.

### d.   Plaintiff's Counsel "Poisons the Well" with Expert Witnesses

Dr. Yarbrough, like Dr. Eichenfield, and Dr. Renfroe, all pose a disturbing
evidentiary scenario for this Court.   All are held out to be "treating physicians."
And what is the importance of that?   Well, treating physicians are not hired
litigation experts.   Ordinarily, their opinions might be entitled to more deference,
since the opinions are arrived at solely for the purpose of treating a disease or
condition.   The problem, however, is that as to all of these doctors, Plaintiff's
attorneys injected themselves into the doctors' opinions, and in so doing,
compromised their independence.

This Court is fully aware that a plaintiff's lawyer may, in fact, should contact
a treating physician to ascertain the nature of the injury (as opposed to causation),
the treatment provided, and the prognosis.   But there is a difference.   This Court's
view is that Plaintiff's counsel overstepped acceptable limits by providing these
providers with information not germane to their treatment, and not providing other
records that are germane to forming an opinion.   Information about test results,
information from other providers, information and opinions obtained from litigation
experts and literature about thallium and thallium-related conditions were provided.
With the exception of Dr. Renfroe, who will be discussed later, none of these
providers used the information for purposes of providing treatment.   In other
instances, experts were only given selected records.   For example, Dr. Renfroe was
not provided with a complete set of L's medical or educational records, nor did he
have the reports of defense toxicologists.   Trial Phase 2, Dkt.#545 at 109:19-111:22.
He did not have the medical record of Dr. Sharp.   *Id.* at 126:7-13.   In another
example, Dr. Gustin did not know that biological samples had been taken from L's
parents and pet dogs.   Trial Phase 2, Dkt.#547 at 142:13-19.   Dr. Brown was given

1   no school records about L's father.  Trial Phase 2, Dkt.#546 at 118:17-24.  In the

2   practice of law, this is commonly known as "poisoning the well."

3        Plaintiff's counsel's attempts to bias Dr. Yarbrough were downright blatant.

4   The Court has read Dr. Yarbrough's deposition and finds that his assessment of L is

5   "spot on."  Exh NR, at MED03703-03747.  The Court, however, disregards any

6   opinions of causation for the reason previously stated and because as a treating

7   physician or psychologist he cannot express such an opinion.  *Goodman v. Staples*

8   *The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) ("Today we join

9   those circuits that have addressed the issue and hold that a treating physician is only

10  exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his

11  opinions were formed during the course of treatment.").

12       Dr. Yarbrough, in his notes of April 12, 2002, noted that L was "full of life

13  and bubbling with information.  It is obvious that she is very intelligent and

14  creative."  Exh NR, at MED03723, 82:13-24.  Fair enough.  But with regards to any

15  opinion on causation, this Court elects to disregard it.  Why?  Dr. Yarbrough

16  testified that before his deposition, Plaintiff's counsel met with him on May 25,

17  2002.  He did not ask Dr. Yarbrough any specific questions.  He did, however work

18  through with him how the thallium exposure occurred.  He testified that Plaintiff's

19  counsel took him through, "this notebook that had a variety of pictures and a history

20  starting with photographs, and actually, the notebook starts with a work plan about

21  re-mediation of the soil at Camp Pendleton and helped me understand where the

22  house was and why this might have been an issue, and then through the medical lab

23  proceedings and stuff like that."  *Id.* at MED03733, 121:1-16.

24       If defense counsel had tried this, this Court has no doubt that Plaintiff would

25  be screaming bloody murder, accusing them of witness tampering and seeking some

26  form of sanction.  Plaintiff's education of Dr. Yarbrough had nothing to do with

27  whatever testing Dr. Yarbrough did while he was seeing L in 2002.  This blatant

28  effort to taint Dr. Yarbrough's opinion and then his attempt to hold him out as a

disinterested treating physician, renders Dr. Yarbrough's causation opinion unreliable and unworthy of any weight.

Finally, in reviewing the literature on thallium poisoning and its effect on cognitive function, it is true that there are a few cases where cognitive impairment has been associated with thallium. However, a survey of the literature and case studies show that the thallium levels were quite high, again, sometimes in the thousands of micrograms per liter. In any event, this Court finds that L suffers from ADD or ADHD and that there is no basis in the literature or the evidence to associate that with thallium poisoning. Whatever L's cognitive limitations may be, it is due to heredity factors, not exposure to thallium.

### C.   No Gastrointestinal Complaints from Thallium Toxicity

The Court will now turn to claims that L had gastrointestinal (GI) symptoms in mid-December 1999, shortly before she began losing her hair. This is important for Plaintiff, because GI complaints are very common among patients that have consumed toxic quantities of thallium.

More specifically, reference has been made to L having "flu like symptoms." Of course, if L did have the flu, it would be consistent with Dr. Norris' testimony that a viral infection can trigger Alopecia Areata. Nonetheless, the Court will briefly address the GI complaints.

First, Plaintiff and her husband have both testified that L experienced GI issues. The problem is that their versions of the onset or duration of the symptoms vary greatly. Second, they claim that they took L to Dr. Lennard for treatment and that he saw L several times for the GI problems. The medical records however do not support such a claim. The medical records do show that sometime in December 1999 Plaintiff went to the clinic, requested over-the-counter Tylenol, refused to see the triage nurse, and left without being seen.

When Dr. Lennard was deposed several years later, his recollection was clouded. He could not recall seeing L for GI complaints, although he would not

close the door on whether or not he had seen her.  He could recall seeing L for Alopecia Areata.  He could also recall being told of possible exposure to thallium and recommending that the family be moved to other housing.  On March 3, 2000, Dr. Lennard wrote the Camp Pendleton Housing Office stating:

> "I have been evaluating his daughter, L[ ], for the past three months for *hair loss*.  To date the work up for her hair loss has been negative with no etiology identified.  From talking with the family, it sounds as if there may be some hazardous toxins in their environment....  Although this can not be definitively identified as the cause of this child's *hair loss*, it can not be ruled out as the cause either."

Exh 63 (emphasis added).  Nowhere in the note, written at a time when Dr. Lennard's memory would have been fresh, is there any mention of GI complaints.  Nor is there any mention of GI complaints on visits or treatments in any other note written by Dr. Lennard.  As several physicians testified, a patient's history of symptoms are important in arriving at a diagnosis.  So it begs the question: If Dr. Lennard suspected that L's hair loss was associated with toxic chemical exposure, and if he had seen L for GI complaints or been told that she had GI complaints, would he not have noted it?

Given that, as previously pointed out, Plaintiff and her husband are not the most reliable historians, the Court finds this evidence to be questionable, at best.  Furthermore, as relevant and reliable experts Dr. Snead (board certified neurologist) and Dr. Snodgrass (board certified toxicologist) pointed out, if GI symptoms are going to manifest themselves, they are painful, they manifest themselves early, and they cease when toxic exposure ceases.  As noted by Sgt. Myers, L's GI complaints continued long after the suspected exposure ceased and she was moved from the Wire Mountain residence.

The Court notes that no one has ever treated L for Thallotoxicosis.  Therefore, the Court finds that, if in fact, L did have GI symptoms, those symptoms are: (1) non-specific; (2) not supported by the medical records; and (3) in any event, could just as likely have been a case of the "flu" which triggered L's Alopecia Areata.

### D.   Neuropathy Complaints Not From Thallium Toxicity

Next, the Court will address the claim of neuropathy.  This claim covers a panoply of symptoms.  For example, it is alleged that L was tripping and falling at the time she began to lose her hair.  She could not catch a ball.  She could not ride a bike.  It is claimed that she would complain about bath water being too hot, while her little sister did not.  It is claimed that her deep tendon reflexes (DTRs) were diminished and at times even absent.  It is also claimed that she had epileptic seizures.  It has even been claimed that she had head tremors.

### 1.   Tingling in Hands and Feet?

Plaintiff testified that in 1999, L began to have tingling in her hands and feet and complaining when she took a bath.  As previously pointed out, Plaintiff is not a reliable historian.  There is no corroboration in the medical records of any such complaints until 2001.  Plaintiff also testified that L was tripping and falling when she was sick (presumably in November or December 1999.)  Plaintiff testified "she wouldn't ride her bike or anything, she was not feeling good, just feeling –you can tell when you have a sick child.  She had a problem walking upstairs, but she was also tired.  She would trip."  At trial, Sgt. Myers corroborated Plaintiff's testimony.  Unfortunately, he was deposed in 2004.  At that time, he was asked:

> Q:   ...When did you first notice that she was having a problem with balance and coordination?
>
> A:   The first time I really noticed it was probably a few years ago, I guess.
>
> Q:   So that would....
>
> A:   So shortly - - right about the time we got here, I'd have to say is when I really started noticing it.
>
> Q:   And I'm sorry, that would have been sometime in 2001?
>
> A:   Yeah
>
> Q:   Okay
>
> A:   We got here in July 2001.

There is no medical record that mentions tripping, falling, or head tremors.

As Dr. Snead cogently pointed out, Plaintiff and her husband thought their daughter was sick. They thought she might have been poisoned, yet they failed to mention these things that they noticed to any of the doctors: Thomas, Robinson, Lennard, Eichenfield, or Dern? It is just not credible.

The medical records all note that reviews of systems were normal, a normal gait, no ataxia, cranial nerves intact, nothing that would even hint that this child might have been poisoned. Nothing abnormal was noted except: (1) her alopecia; and (2) that she was gaining weight. No medical provider has ever reported numbness or tingling, with the exception of Dr. Renfroe. Dr. Renfroe will be discussed shortly.

### 2.   Temperature Sensitivity?

Next the Court will address the temperature sensitivity. During October 2001, almost two years after L began to lose her hair, it was reported to Dr. Sharp that L would complain about hot water. It was repeated by Plaintiff in a history given to Dr. Renfroe in April 2003. Exh NR at MED00979; Trial Phase 2, Dkt.#545 at 53:3-14.

First, that condition has never been confirmed by objective testing. In fact, those physicians that have tested L for temperature sensitivity have not been able to confirm it. Second, this Court has looked at a substantial amount of literature on thallium poisoning, both acute and chronic. It has not found any case study, article, or survey that reports any such symptom being associated with thallium exposure. The neuropathy that is generally reported is painful, like walking on coals, a sensation which depending on the severity of exposure can be incapacitating. There is also no literature that supports a delay of two years, after exposure ceases, before the neuropathy manifests itself.

### 3.   Epileptic Seizures?

Plaintiff contends L had epileptic seizures. L had an EEG in December of 2003. That EEG showed one abnormal spike. Its cause was not determined. L was

then administered a second EEG.  This time a much more thorough EEG, an
ambulatory 24 hour EEG.  That EEG allowed the parents to push a button and mark
the EEG if they thought L was having a seizure.  The parents pushed the button
three separate times.  The EEG was subsequently found to be normal, with no
spikes.  Nothing abnormal was noted.  A subsequent EEG in 2010 also was reported
as normal – although Plaintiff erroneously reported to at least one medical provider
that L's 2010 EEG was abnormal.

### 4.    Diminished Deep Tendon Reflexes?

With regard to L's DTRs, they have been reported from time to time to be 1+,
meaning that they are diminished.  But it had also been reported many times that
they were 2+, meaning normal.  In any event, even Dr. Renfroe, Plaintiff's
neurologist had to admit that it was a "soft sign."  Curiously, when L first saw Dr.
Renfroe or perhaps more accurately, his nurse practitioner, Gene Bougher, DTRs
were the only indication of any abnormality.  All other systems were normal.  Yet,
for whatever reason, even though L was seen many times, testing of DTRs was
thereafter "deferred."

### 5.    Medical Testimony

#### a.    Dr. Renfroe

The Court has considered Dr. Renfroe's testimony and concluded that it is not
worthy of being given any weight.  This Court does not come to this conclusion
lightly.  First, like Dr. Eichenfield and Dr. Yarbrough, Dr. Renfroe's opinions were
severely compromised by Plaintiff's counsel.  Within two months of L's first
presenting at his office, counsel had made sure to provide Dr. Renfroe information
about thallium.  We know that he was given articles and literature about L's
poisoning.  "Dear Dr. Renfroe: Enclosed please find journal articles re: Thallium
(provided by plaintiff's toxicologist) for your review regarding the above-
referenced matter.  After your review please call Scott Allen to discuss your
findings."  *See* Exh NV (Letter dated Aug. 20, 2003).

Of course, of what value that would be to a treating physician who is not treating for thallium poisoning, but is treating for neuropathy remains unknown. What other information may have been provided to him, like the case of Dr. Yarbrough, we do not know. The information provided to Dr. Renfroe was in his "legal box."[34] In any event, all that Dr. Renfroe could do three years after the alleged exposure was manage the symptoms. Once he learned from Plaintiff that L had allegedly been exposed to thallium, he would need to know nothing else in order to manage the symptoms.

This Court notes that no one, not even Dr. Renfroe, ever testified that his management of L's neuropathy would have been any different if it was caused by an auto-immune disease or by her hypothyroid condition. Furthermore, the literature reveals that in cases of thallium poisoning, peripheral reflexes are normally spared. L's sensory examination was normal. Of interest to this Court was that the following abnormalities were noted upon presentation to Dr. Renfroe: "very overweight, greater than 97th percentile. She has a dowager's hump . . . which we see with some endocrine abnormalities." Trial Phase 2, Dkt.#545 at 61:22-25. It was also noted that she had a very large head size. He admitted that he should have checked her birth records. He didn't. *Id.* at 59:9-14 (The Court: "Doctor, did you,

---

[34] Dr. Renfroe explained his legal box:

| The Court: | Just a second. What do you mean the legal records? |
|---|---|
| The witness: | Generally, when I'm doing a court case -- and I think in L[ ]'s, it has gone on so long, there is a box I put notes in or copies so it doesn't get mixed in with her medical records, his request for information, her request for information, etc. so that would include things like articles that I had searched and information I obtained. So it's not part of the medical records. If I want to Google thallium, and I think that is an interesting article, I'll throw it in a stack to read later. |
| The Court: | Isn't that part of your treating -- |
| The witness: | No, not in general. |

Trial Phase 2, Dkt.#545 at 110:13-25.

by any chance, look to see what her measurements were, her head measurements were after she was born?"  The Witness: "I did not.  I was thinking about that yesterday as I reviewed this.  I wonder what the neonatal reports showed.").
As it turned out, she had what is known as a pseudo tumor cerebri, a condition where there is too much fluid around the brain causing headaches and vision problems.

When questioned about why his nurse practitioner referred to L's "cognitive impairment" as ADHD, he replied, "one it is a habit, it ended up there.  She was diagnosed with ADHD and treated with Concerta before we saw her....and just habitually she is repeating that.  Now, two, it could be that insurance will not pay for Concerta or other stimulants unless she has a diagnosis of ADHD."  *Id.* at 73:10-15.

Eventually, L's "treatment" would stop being performed by Dr. Renfroe's "beyond competent" nurse practitioner.  He speculated that when the nurse practitioner learned that the case would be going to trial, she turned the patient over to himself.  *Id.* at 78:15-16 ("Knowing Ms. Bougher, she was starting to get scared this was going to be a legal issue, and she wanted it off her plate.").  Almost immediately, L's symptoms appear to have grown worse.  Now, L had "absent patella reflexes bilaterally, questionable biceps reflexes bilaterally."  She also began experiencing diadochokinesis but her sensory exam was "intact to light touch, appropriate perception and pin prick."

So, four years after the alleged exposure and after the exposure had ceased, her sensory exam was normal but a completely different symptom now surfaced.  Disdiadochokinesis and what had previously been "somewhat diminished DTR's" were suddenly completely absent and her biceps reflexes were also now affected.  Of course, Dr. Renfroe also testified that DTRs were nothing "he would hang his hat on."  In 2011 he again saw L.  This time she was complaining of numbness in her hands and legs, like having gloves on and pantyhose."  He added, however, that

"she feels this is worse when she is stressed."

This Court will now make a few observations. First, Dr. Renfroe has been offered as a "treating physician." He may have been at one time, but that ship sailed long ago. How many treating physicians review expert witness reports before testifying? When is an expert witness report relevant to the treatment, diagnosis or prognosis of a patient? But, as he admitted, Plaintiff's counsel provided Dr. Renfroe with a copy of Dr. Snead's expert report. When? In time to review the report on his plane trip to San Diego - "I reviewed it on the plane trip over." Trial Phase 2, Dkt.#545 at 110:2-11. Of course, like Dr. Eichenfield, Dr. Renfroe was not listed by Plaintiff as an expert witness and did not provide an expert report to Defendant.

And his visit with L is rather curious, much like L's 2011 visit to Dr. Eichenfield. The family was living in Keller, Texas, a town outside of Ft. Worth, Texas. In August of 2011, Plaintiff requested a referral for an endocrinologist, a dermatologist and a neurologist. She was referred to Dr. Harla, a dermatologist in the Fort Worth area and as previously noted, Dr. Gonzales, a neurologist in the Fort Worth area. But she did not see Dr. Harla, although she made an appointment to see him. She did see Dr. Gonzales, but not until after her appointment with Dr. Renfroe. For unexplained reasons, six years after she had last seen Dr. Renfroe, she flew half way across the country to Florida to see him. Then all of the way back across the country to San Diego to see Dr. Eichenfield. Since last seeing Dr. Renfroe, L had seen Dr. Mosotti in 2010. Dr. Mosotti had reported no neurologic symptoms. "DTRs 2+ and symmetrical, no pathological reflexes. Cerebellar exam, condition, and gait within normal limits. Finger to nose intact . . ."

Dr. Jreisat, a neurologist saw L on February 24, 2011. He noted that her cranial nerves were intact and there were no facial neurological deficits noted. Then in October 2011, L went to another doctor at Mayfield Family Health Care. Dr. Mayfield noted that L had "slightly decreased peripheral sensation." Like every

other doctor that L saw, he also was told that L had been poisoned by heavy metals as a toddler.  He diagnosed her as having neuropathy secondary to heavy metal exposure.  He diagnosed her as having ADD and prescribed Vyvanse.  He also diagnosed L as having Alopecia Universalis and prescribed Closetassol Propionate and Latisse.

When she finally arrived at Dr. Renfroe's office again, on November 18, 2011, L's DTRs were, "2/4 throughout."  "Cerebellum is completely normal."  "Her motor strength is 5/5 throughout with normal tone and bulk."  "Sensory is intact."  "She continues to experience subjective complaints associated with her neuropathy. She continues to experience paresthesias.  Her examination is normal at this point."

### b.    Dr. Renfroe's Impeachment

Dr. Renfroe denied that he had used as a basis for his opinion, a pre-existing opinion that the cause of L's symptoms was thallium toxicity.  He was subsequently impeached and admitted that he was under the impression that she had a pre-existing "diagnosis" of thallium exposure.  He was also impeached with his deposition testimony that he had not performed a differential diagnosis.  And like Dr. Eichenfield, when asked an important question, like:

> Q:    "Did you review the medical history before you knew that L[ ] had a pending case, legal case, regarding her alleged thallium exposure?"

An ever-present "we," as in Dr. Eichenfield's testimony, quickly surfaced.

> A:    "It would be *our* habit to search for information concerning thallium toxicity.  When *we* have a patient with purported thallium toxicity.  I don't have any direct recollection of what type of search *we* did."

Trial Phase 2, Dkt.#545 at 127:8-14 (emphasis added.)  He then was forced to admit that he had received a letter from Plaintiff's counsel including journal articles provided by "plaintiff's toxicologist," requesting that Dr. Renfroe call plaintiff's counsel "once he had reviewed the material."

In fact, Dr. Renfroe admitted, as this Court has previously noted, he would

have "no real need to know the effects of thallium toxicity." Dr. Renfroe admitted that L had not been on any medication to address her peripheral neuropathy. Dr. Renfroe also admitted that he had not seen any literature that diminished deep tendon reflexes are attributable to thallium toxicity. He was also not aware of any literature identifying temperature sensitivity as a symptom of thallium toxicity. He admitted that doctors can perform tests to test for temperature sensitivities, but that he did not do it. He reluctantly admitted that even though the referral to him had suggested a "complete work up," including an MRI, he did not order one until December, six months after the initial visit. The MRI was normal.

No weight is given to Dr. Renfroe's opinions on causation. *Sartor*, 321 U.S. at 627 (trier of fact left to decide the weight of expert opinion); *see also, e.g., Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1364 (M.D. Ga. 2007) ("But bearing even more on the Court's conclusion that Dr. Miller's causation opinions lack an independent basis is the fact that Plaintiff's counsel hand-selected Dr. Miller. When a plaintiff's counsel chooses the plaintiff's doctor for the plaintiff, it raises serious questions in the Court's mind about the independence of the doctor. This is especially true when, as here, the plaintiff's counsel sends his client 350 miles from home. . . .").

This Court concludes with the words of another court:

> "Dr. Renfroe's report is result oriented. The Special
> Master's unshakeable impression is that Dr. Renfroe starts
> from the conclusion, (vaccine caused illnesses) and works
> back from the conclusion in a multitude of ways, a number
> of which are contradictory."

This Court could not agree more. If Dr. Renfroe was ever a "treating physician," his opinions, besides being scientifically unreliable, were totally corrupted at an early stage of his "treatment." This Court elects to give little, if any weight to any of his opinions about L's condition or its cause.

### c.   *Dr. Gonzales*

Eventually, she did find her way to Dr. Gonzales. A review of his physician

notes reveals that, either he is a horrible note taker, or once again Plaintiff is not a reliable historian. For example, Dr. Gonzales writes: "The patient has been hypothyroid since 2009." That was not true. She was diagnosed in 2003. "[H]as peripheral neuropathy since 2000." This is not supported by any contemporaneous medical record. "She has had problems talking and expressing herself since age three." No one has ever reported any such disability. "She had an EEG done in 2010 in North Carolina and apparently was abnormal." Also not true - her EEG was normal. See Exhibit NR MED02193. "She has had ataxia and poor coordination and walks like a drunk at times in 2000." No one has ever confirmed L experienced ataxia. Dr. Gonzales was also told that L had "nerve conduction" studies. Amazingly, this is something that Dr. Renfroe testified was a test to confirm neuropathy, yet he would not do it or have it done. If, in fact, nerve conduction studies were done, they are nowhere to be found in the medical records. Dr. Gonzales noted that Plaintiff herself had been obese in the past (like L), and that she had undergone gastric bypass surgery. So, why would so many inaccuracies be found in a history given to a treating physician?

Dr. Gonzales concluded that L, "knows... that there are 12 quarters in $3, 20 quarters in $5, can spell "world" forwards and backwards, no right - left confusion, initially 2/3 subsequently 3/3 recall. Able to write, "Today is a nice day" in print. Sensory exam.: intact to position, pin prick, vibration, and touch. Cranial nerves are grossly intact. ...motor exam 5/5. Coordination is fair... DTR's 1+ for both upper and lower extremities. Toes are down going on plantar stimulation gait is not wide based. She can walk on heels, walks in tiptoes. And hop on one foot well." Dr. Gonzales also noted that she had ADD and prescribed medication for it. Dr. Gonzales did not prescribe any medication for neuropathy. This Court found it curious that Dr. Gonzales noted L's ability to tell how many quarters in $3, etc. This Court did not find credible Plaintiff's claim at trial that L could not make change.

#### d.   Dr. Snead

On the other hand, Defendants offered a qualified and un-impeached neurologist, Dr. Snead. Dr. Snead is a pediatric child neurologist. His practice is in the Hospital for Sick Children, in Toronto, Canada. He attended pharmacy school at West Virginia University. He completed medical school also at West Virginia. He did pediatrics at Duke and pediatric neurology at Yale. He obtained his MD degree in 1970. Dr. Snead is board certified in pediatrics and by the Board of Psychiatry and Neurology. He was a professor of neurology, pediatrics psychology and pharmacology at the University of Alabama. He was a professor and Vice-chairman of the Department of Neurology as well as a professor of pediatrics and pharmacology at the University of Southern California. He has a clinical practice a couple of times a week and trains students and others in the practice. He is also an attending physician in neurology where he sees children with neurological diseases. He has published 340 peer-reviewed articles and some 40 chapters in books. He has also been involved in research. His opinions are relevant and reliable.

Like all of the other medical experts offered by the defense, his qualifications are beyond criticism or question. But most importantly, his testimony was quite persuasive. Dr. Snead makes out a well thought out, logical and supported analysis and concludes that L does not fit the diagnosis of thallium intoxication. Trial Phase 2, Dkt.#551 at 143:9 - 200:13 (Testimony of Dr. Orlando Snead).

As this Court was listening to Dr. Gustin and Dr. Renfroe, it had formed several questions. Why was there no evidence of ataxia or other neurological problems until 2001? Why did no one treat her for thallium toxicity? Why were there no notes or complaints of loss of coordination, head tremors? And so how could her symptoms wax and wane and then suddenly in 2004 her symptoms unexplainedly worsen? Why wasn't she treated for the subjective neuropathy that surfaced in 2001? Does hypothyroidism also cause learning problems, weight problems and neuropathies? Why was she gaining weight? Dr. Snead addressed

these issues and more.  In particular with regards to L's claimed neuropathy, the following exchange is instructive:

> Q:  Now Dr. Snead, assuming the reports of paresthesias in 2003 by Dr. Renfroe are correct, is that symptomology consistent with thallium toxicity?
>
> A:  No.  It is not consistent for the reasons I have talked about in terms of it's basically too late to occur twenty one months after exposure to thallium to be asymptomatic.  Neurologically asymptomatic and then have onset of very subtle, subjective findings.  She only had – by the history taken by Dr. Sharp [in October of 2001] at that time, she really only had this weird sensation, numbness and tingling, when she put her hands in water.  So I don't think that that is consistent with a diagnosis of thallium toxicity.

Trial Phase 2, Dkt.#551 at 148:13-24.

Dr. Snead then went through a list of medical providers that had seen L between January 2000 and September 2001.  *See* Exh OL.  No health care provider was ever told of any temperature sensitivity, numbness or tingling until October of 2001.  As Dr. Snead pointed out, these parents were very concerned that their child had been poisoned and would have reported these symptoms.  Finally, Dr. Snead discussed L's weight.  He noted that from the earliest medical records, it was reported that L was gaining weight.  As Dr. Snead pointed out, anorexia is one of the "hallmarks" of chronic thallium intoxication.  She was reported to have good activity level, not lethargic, normal gait.  Finally, Dr. Snead pointed out that when Dr. Sharp, the first neurologist to see L, examined her, he was not able to elicit any abnormal response.  Dr. Sharp noted that she had normal sensory exam including light touch, pin prick, vibration and procieption .  This Court has looked at Dr. Sharp's records and it does not appear that he prescribed any medication for neuropathy.  Dr. Snead also tested L for temperature sensitivity and found nothing abnormal.  Dr. Snead's review of the medical providers, their finding and their relevance to L's claims was thorough and dispelled much of the confusion deliberately created by others.

02cv1349-BEN

### e.   *Medical Literature in Evidence*

The Court notes that no medication was prescribed and no other action taken by Dr. Dern with regards to L's behavior.  Remember, Dr. Michelle Dern was a University of California San Diego pediatrician to whom L was referred by Plaintiff's prior lawyers.  After meeting with L's parents and their lawyers (for an hour) in July of 2000 to discuss the case, Dr. Dern would be heard from no more. Exh NR at MED00233 & MED00916 ("7/19/00 I met with parents and their lawyers today for one hour to go over the case.").

The Court is unable to find whether or not L's reported neuropathy is real or whether it is simply a report by a four-year old child of natural temperature sensory differences between individuals.  What this Court can conclude is that this type of neuropathy, and its delay in manifesting itself, does not support a conclusion that it was caused by thallium.  It is not supported by the evidence or the medical literature.  The Court has reviewed the considerable medical literature regarding thallium poisoning in evidence or alluded to at trial.  Among the literature and case studies there are reports of children as young as 19 months and adults who have been exposed to thallium.  Children who have presented with much worse symptoms than L's, have recovered completely and most within a relatively short period of time.  Although some have had residual neurologic complaints, these children's urine thallium levels were in the hundreds and thousands of micrograms per liter of urine.  In contrast, this Court was not able to find a single case study where the subject presented with a level of only seven micrograms per liter, like L's urine level (assuming, of course, that the 6.91 mcg/L result was a valid result). Particularly with regards to IQ or neurocognitive deficits, the case studies show extremely high thallium urine levels in symptomatic patients.

### 6.   **Summing Up**

Therefore, in order to conclude L suffered thallium poisoning, this Court would have to accept that L is an exception in virtually every way. The evidence is

02cv1349-BEN

clearly insufficient for this.  Plaintiff has persistently argued that "every physician" who has treated L has found that her symptoms were caused by thallium.  That is false.  What is true, is that every physician or health care provider has been told (by her parents or by her lawyers) as a fact that L was poisoned by thallium.  No physician or provider has, after the thorough and rigorous process of a differential diagnosis, ever diagnosed L as having been poisoned by thallium.  And no physician or provider has ever treated L for thallium poisoning.

Whatever L's physical, psychological, and neurological conditions are, or have been over the years since 1999, they have not been caused by thallium toxicity.  Because L's condition is not the result of thallium toxicity, and thallium is the only hazardous substance Plaintiff claims left the Box Canyon landfill and entered L's living environment, Plaintiff has failed to prove that any breach of duty by the Defendant is the proximate or actual cause of L's alleged injuries.

## V.     CONCLUSION

"Under California's nondelegable duty doctrine, the United States is directly liable for its own negligence when it fails to ensure that an independent contractor takes adequate safety precautions and the work to be performed involves special dangers." *Myers*, 652 F.3d at 1034.  It is not, however, a strict liability standard. *Privette v. Superior Court*, 5 Cal. 4th 689, 696 (1993) ("Even when work performed by an independent contractor poses a special or peculiar risk of harm, however, the person who hired the contractor will not be liable for injury to others if the injury results from the contractor's 'collateral' or 'casual' negligence." ); Restatement (Second) of Torts §416, cmt. f ("In order that the employer be subject to liability, it is necessary that the contractor fail to exercise reasonable care to take adequate precautions.").  Causation and injury remains to be proven.  *Myers*, 652 F.3d at 1037; *Willits Envtl. Remediation Trust*, 633 F.3d at 836 .

Having now heard all of the testimony and reviewed all of the evidence, the Court concludes that the Defendant's breach of duty was not the cause of any

injuries, if there were injuries, that L may have suffered.  The leaps in proof the
Plaintiff offers are significant and unjustified by the evidence.  Plaintiff asks this
Court to find, *inter alia*:

(1) that L's alopecia was not Alopecia Areata, but caused by exposure to
thallium;

(2) that L's ADD or ADHD was proximately caused by exposure to thallium
even though there is no scientific basis for such a finding;

(3) that L's cognitive function is the result of thallium exposure rather than
heredity;

(4) if it was more than just subjective, that L's reported neuropathy, first
reported two years after exposure ceased, was caused by thallium even though there
is no scientific evidence to support such a finding;

(5) that the clearly unreliable urine test results from a single lab should be
credited and the reliable results from three other labs should be disregarded;

(6) that L's hair testing negative for thallium is inconsequential;

(7) that L's hair roots showing no darkening indicative of thallium poisoning
is insignificant;

(8) that L's negative blood testing for heavy metals (including thallium)
should be discounted;

(9) that  L's father, mother, and family dogs negative test for thallium and
other heavy metals should be disregarded;

(10) that the EPA and the DTSC were wrong in their evaluation of the toxic
risks associated with the dirt being moved to Box Canyon;

(11) that had Nars Ancog looked at the perimeter air monitoring data, he
would have taken action to stop remediation work and thereby prevented fugitive
thallium dust from accumulating in hazardous quantities in L's backyard and
residence;

(12) that there was a substantial quantity of dirt that migrated to L's yard, that

02cv1349-BEN

the Navy knew about it, and did nothing to stop;

(13) that only dirt carrying thallium migrated to L's residence;

(14) that the environmental samples from L's residential environment that did not show abnormal levels of all of the other heavy metals found at sites 1A, 1E, 1F, and 2A and transported to Box Canyon, while thallium was detected, has some rational – although still unidentified – explanation;

(15) that the environmental sampling results obtained by at least four different labs that are consistent with each other should be disregarded; or

(17) that had a Navy CIH looked at the HASP, the HASP would have been rejected.

The Court finds that the evidence would not support any of these findings in Plaintiff's favor.  Therefore, the Court finds that Plaintiff has not proven by a preponderance of the evidence that L was injured or that the injury was proximately or actually caused by the Defendant's failure to have a competent person review the HASP or by its failure to have the QAO, Nars Ancog, review the perimeter air monitoring data.

In this case, the evidence of causation is scant and unreliable.  The Court concludes that neither the breach of duty in failing to carry out a HASP review by a Navy CIH, nor its breach of duty in failing to have the Navy QAO reviewing air monitoring data, are the proximate or actual causes of L's alleged injuries. Therefore, judgment shall be entered against the Plaintiff and in favor of the Defendant.

Alternatively, notwithstanding the Navy's breach of duty, wind-borne thallium dust in hazardous quantities did not escape from the Box Canyon landfill operations and enter L's living environment, and therefore did not cause her alleged injuries.

Alternatively, notwithstanding the Navy's breach of duty, if wind-borne thallium dust in hazardous quantities did escape from the Box Canyon landfill

1   operations and did enter L's living environment, she was not poisoned by the

2   escaped thallium, and it did not cause her alleged injuries.

3       Alternatively, notwithstanding the Navy's breach of duty, if wind-borne

4   thallium dust in hazardous quantities did escape from the Box Canyon landfill

5   operations and did enter L's living environment, and she was poisoned by the

6   escaped thallium, it was not enough thallium to cause her alleged injuries and her

7   alleged injuries are not of the type and kind resulting from thallium toxicity

8   according to medical experts and published medical literature.

9       Judgment for the Defendant.

10      **SO ORDERED**.

11  DATED: 11/20/14

12

13

14                          Hon. Roger T. Benitez
                            United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28